No. 19-17397

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

DAVID ISABEL, individually
and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

*vs.*

MICHELE REAGAN, in her individual capacity; et al.,

*Defendant-Appellees.*

_____

## EXCERPTS OF RECORD
## (ER001–152)

_____

Appeal from the United States District Court
District of Arizona
CV18-03217-PHX-DWL

_____

Spencer G. Scharff
SCHARFF PLLC
502 W. Roosevelt Street
Phoenix, Arizona 85003
(602) 739-4417
spencer@scharffplc.com

Nathan Fidel
MILLER, PITT, FELDMAN & MCANALLY, P.C.
2800 N. Central Avenue, Suite 840
Phoenix, Arizona 85004
(602) 266-5557
nfidel@mpfmlaw.com

Scott Caplan
THE LAW OFFICE OF SCOTT CAPLAN, P.C.
34-18 Northern Blvd., Ste. B28
Long Island City, NY 11101

*Counsel for Plaintiff-Appellant David Isabel*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**No. 19-17397**

**INDEX OF EXCERPTS OF RECORD**

| DOCKET NO. | DATE | DESCRIPTION | PAGES |
|---|---|---|---|
| 82 | 11/26/19 | Notice of Appeal | ER001–ER003 |
|  |  | Trial Court Docket 18-cv-03217-PHX-DWL | ER004–ER012 |
| 79 | 11/01/19 | Order Dismissing FAC | ER013– ER028 |
| 71 | 09/30/19 | *Tentative* Order Dismissing FAC | ER029–ER040 |
| 54 | 06/07/19 | Order Dismissing Complaint | ER041–ER063 |
|  | 08/20/18 | Transcript of 6/5/19 Oral Arguments | ER064–ER110 |
|  | 06/05/19 | Transcript of 10/24/19 Oral Arguments | ER111–ER152 |

1   Spencer G. Scharff, No. 028946
2   SCHARFF PLLC
    502 W. Roosevelt Street
3   Phoenix, Arizona 85003
    (602) 739-4417
4   spencer@scharffplc.com

5
    Nathan Fidel, No. 025136
6   MILLER, PITT, FELDMAN & MCANALLY P.C.
    2800 N. Central Ave, Suite 840
7   Phoenix AZ 85004
    (602) 266-5557
8   nfidel@mpfmlaw.com

9   *Attorneys for Plaintiff*

10              IN THE UNITED STATES DISTRICT COURT

11                 FOR THE DISTRICT OF ARIZONA

12

13  David Isabel, individually and on behalf    No. 2:18-cv-03217
    of all others similarly situated,
14                                               **NOTICE OF APPEAL**
                        Plaintiff,
15  v.

16
    Michele   Reagan,   in   her   individual
17  capacity;   Maricopa   County;   Adrian
    Fontes,  in  his  official  capacity  as
18  Maricopa County Recorder,

19                        Defendants.

20

21          Pursuant to Rule 3(a), Federal Rules of Appellate Procedure, Plaintiff David Isabel

22  appeals to the United States Court of Appeals for the Ninth Circuit from this Court's

23  November 1, 2019 Judgment of Dismissal (Doc. 80), including the pre-judgment orders,

    entered in the above-captioned action.
24
            Plaintiff's Representative Statement, required by Ninth Circuit Rule 3-2(b), is
25
    attached to this Notice as Exhibit A.
26

27

28

                                                                          **ER001**

DATED this 26th day of November, 2019

          _s/ Spencer G. Scharff_
          Spencer G. Scharff
          SCHARFF PLLC

          &

          Nathan Fidel
          MILLER, PITT, FELDMAN & MCANALLY
          P.C.

          _Attorneys for Plaintiff David Isabel_

**ER002**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26, 2019, I electronically transmitted the above document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*s/ Spencer G. Scharff*

**ER003**

APPEAL,CLOSED,MIDP,STD

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:18-cv-03217-DWL

Isabel v. Reagan et al

Assigned to: Judge Dominic W Lanza

Interim Related Case: 2:16-cv-03618-SPL

Case in other court:  Ninth Circuit, 19-17397

Cause: 42:1983 Civil Rights Act

Date Filed: 10/09/2018

Date Terminated: 11/01/2019

Jury Demand: Plaintiff

Nature of Suit: 441 Civil Rights: Voting

Jurisdiction: Federal Question

## Plaintiff

**David Isabel**
*individually and on behalf of all others
similarly situated*

represented by   **Nathan Jean Fidel**
Miller Pitt Feldman & McAnally PC
2800 N Central Ave., Ste. 840
Phoenix, AZ 85012-1069
602-266-5557
Fax: 602-266-2223
Email: nfidel@mpfmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Spencer Garrett Scharff**
Scharff PLC
502 W Roosevelt St.
Phoenix, AZ 85003
602-739-4417
Email: spencer@scharffplc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Michele Reagan**
*in her individual capacity*

represented by   **Timothy Andrew LaSota**
Timothy A LaSota PLC
2198 E Camelback Rd., Ste. 305
Phoenix, AZ 85016
602-515-2649
Fax: 602-340-0888
Email: tim@timlasota.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

## Defendant

**Maricopa, County of**

represented by   **M Colleen Connor**
Maricopa County Attorneys Office
222 N Central Ave., Ste. 1100
Phoenix, AZ 85004
602-372-2275

**ER004**

Fax: 602-506-8567
Email: connorc@mcao.maricopa.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Talia Janelle Offord**
Maricopa County Attorneys Office -
Phoenix (Central Ave.)
222 N Central Ave., Ste 1100
Phoenix, AZ 85004-2206
602-506-8144
Email: offordt@mcao.maricopa.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Adrian Fontes**
*in his official capacity as Maricopa County
Recorder*

represented by **M Colleen Connor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Talia Janelle Offord**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/09/2018 | 1 | COMPLAINT. Filing fee received: $ 400.00, receipt number 0970-16050164 filed by David Isabel. (Fidel, Nathan) (Attachments: # 1 Civil Cover Sheet)(SIB) (Entered: 10/09/2018) |
| 10/09/2018 | 2 | SUMMONS Submitted by David Isabel. (Fidel, Nathan) (Attachments: # 1 Summons, # 2 Summons)(SIB) (Entered: 10/09/2018) |
| 10/09/2018 | 3 | Filing fee paid, receipt number 0970-16050164. This case has been assigned to the Honorable John Z Boyle. All future pleadings or documents should bear the correct case number: CV 18-3217-PHX-JZB. Magistrate Election form attached. (SIB) (Entered: 10/09/2018) |
| 10/09/2018 | 4 | NOTICE TO THE PARTIES - The Court is participating in the Mandatory Initial Discovery Pilot (MIDP) and this case is subject to that pilot. The key features and deadlines are set forth in the attached Notice which includes General Order 17-08. Also attached is a checklist for use by the parties. All parties must respond to the mandatory initial discovery requests set forth in the General Order before initiating any further discovery in this case. Please note: The discovery obligations in the General Order supersede the disclosures required by Rule 26(a)(1). Any party seeking affirmative relief must serve a copy of the attached documents (Notice to Parties, including General Order 17-08 and MIDP Checklist) on each new party when the Complaint, Counterclaim, Crossclaim, or Third-Party Complaint is served. (SIB) (Entered: 10/09/2018) |
| 10/09/2018 | 5 | Summons Issued as to All Defendants. (Attachments: # 1 Summons, # 2 Summons)(SIB). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 10/09/2018) |

| 10/22/2018 | 7 | Agreement to Magistrate Judge Jurisdiction. Party agrees to Magistrate Judge Jurisdiction. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 10/23/2018) |
|---|---|---|
| 11/02/2018 | 8 | * SERVICE EXECUTED filed by David Isabel: Affidavit of Service re: Complaint, Notice of Parties, Mandatory Initial Discovery, Consent Magistrate upon Maricopa County on 10/23/2018. (Fidel, Nathan) * Document filed in error, attorney noticed to re-file with the correct PDF document on 11/5/2018 (LAD). (Entered: 11/02/2018) |
| 11/02/2018 | 9 | SERVICE EXECUTED filed by David Isabel: Affidavit of Process re: Complaint, notice to parties mandatory initial discovery, magistrate consent upon Adrian Fontes on 10/23/18. (Fidel, Nathan) (Entered: 11/02/2018) |
| 11/02/2018 | 10 | SERVICE EXECUTED filed by David Isabel: Affidavit of Service re: Complaint, mandatory initial discovery notice, magistrate consent upon Michele Reagan on 10/24/2018. (Fidel, Nathan) (Entered: 11/02/2018) |
| 11/02/2018 | 11 | SERVICE EXECUTED filed by David Isabel: Affidavit of Process re: Complaint, Notice to Parties Mandatory Initial Discovery, Consent to Exercise Magistrate upon Maricopa County Board of Supervisors on 10/23/2018. (Fidel, Nathan) (Entered: 11/02/2018) |
| 11/02/2018 | 12 | NOTICE TO FILER OF DEFICIENCY re: 8 Service Executed filed by David Isabel. Incorrect PDF attached. *FOLLOW-UP ACTION REQUIRED:* Please refile with correct PDF document. The PDF attached to document number 8 appears to be a duplicate of document number 9 . Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (LAD) (Entered: 11/05/2018) |
| 11/05/2018 | 13 | * Notice of Appearance/Association of Counsel by Michele Reagan . (Elliott, Stephanie) * Modified to correct event; attorney noticed on 11/5/2018 (LAD). (Entered: 11/05/2018) |
| 11/05/2018 | 15 | Party Elects Assignment of Case to District Judge Jurisdiction. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 11/06/2018) |
| 11/06/2018 | 16 | MINUTE ORDER: Pursuant to Local Rule 3.7(b), a request has been received for a random reassignment of this case to a District Judge. FURTHER ORDERED Case reassigned by random draw to Judge Dominic W. Lanza. All further pleadings/papers should now list the following COMPLETE case number: CV-18-3217-PHX-DWL. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 11/06/2018) |
| 11/06/2018 | 17 | SERVICE EXECUTED filed by David Isabel: Certificate of Service re: Complaint and Summons upon Adrain Fontes on 10/23/2018. (Fidel, Nathan) (Entered: 11/06/2018) |
| 11/06/2018 | 18 | SERVICE EXECUTED filed by David Isabel: Affidavit of Service re: Complaint and Summons upon Maricopa County Board of Supervisor in care of Maricopa County on 10/23/2018. (Fidel, Nathan) (Entered: 11/06/2018) |
| 11/07/2018 | 19 | *Re-Docketed at (Doc. 20 ) for case management purposes* MOTION to Transfer Related Case by Michele Reagan. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Associated Cases: CV-16-03618-SPL) (Elliott, Stephanie) Modified on 11/8/2018 (EJA). (Entered: 11/07/2018) |
| 11/07/2018 | 20 | MOTION to Transfer Related Case by Michele Reagan. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Associated Cases: CV-18-03217-PHX-DWL, CV-16-03618-PHX-SPL) (EJA) (Entered: 11/08/2018) |
| 11/11/2018 | 21 | *RESPONSE to Motion re: 20 MOTION to Transfer Related Case filed by David Isabel. (Scharff, Spencer) *Modified on 11/16/2018 (REK). Please Note: Item re-docketed in |

**ER006**

| | | related matter (CV-16-03618-PHX-SPL) as document number 41 because that is the case in which the motion is pending. (Entered: 11/11/2018) |
|---|---|---|
| 11/13/2018 | 22 | STIPULATION FOR EXTENSION OF TIME TO ANSWER COMPLAINT by Adrian Fontes, Maricopa, County of. (Attachments: # 1 Exhibit Exhibit A-Proposed Order) (Offord, Talia) (Entered: 11/13/2018) |
| 11/14/2018 | 23 | STIPULATION FOR EXTENSION OF TIME TO ANSWER COMPLAINT re: 1 Complaint by Michele Reagan. (Attachments: # 1 Text of Proposed Order Proposed Order) (Elliott, Stephanie) (Entered: 11/14/2018) |
| 11/14/2018 | 24 | ORDER granting a one-time extension of time until November 27, 2018 for the Maricopa County Defendants to respond to the complaint and until November 30, 2018 for Michele Reagan to respond to the complaint. The parties' obligations to produce the information called for in the MIDP will be triggered by Defendants' answers to the complaint after the extension. No further extensions will be granted. Ordered by Judge Dominic W Lanza on 11/14/18. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 11/14/2018) |
| 11/15/2018 | 25 | REPLY to Response to Motion re: (41 in 2:16-cv-03618-SPL) MOTION to Transfer Related Case filed by Michele Reagan, Michele Reagan. (Associated Cases: 2:18-cv-03217-DWL, 2:16-cv-03618-SPL) (Elliott, Stephanie) (Entered: 11/15/2018) |
| 11/16/2018 | 26 | NOTICE of Appearance by Talia Janelle Offord on behalf of Adrian Fontes, Maricopa, County of. (Offord, Talia) (Entered: 11/16/2018) |
| 11/16/2018 | 27 | *Joinder in Defendant Michele Reagan's Motion to Transfer Case to Judge Steven P. Logan* by Defendants Adrian Fontes, Maricopa, County of. (Offord, Talia) (Entered: 11/16/2018) |
| 11/16/2018 | 28 | Joinder re: ( 41 in 2:16-cv-03618-SPL) MOTION to Transfer Related Case. filed by Adrian Fontes, Maricopa, County of. (Document administratively docketed in lower-numbered case to link to the pending motion.) (Associated Cases: 2:16-cv-03618-SPL, 2:18-cv-03217-DWL) (LAD) (Entered: 11/19/2018) |
| 11/21/2018 | 29 | PRELIMINARY ORDER: IT IS THEREFORE ORDERED: 1. That Plaintiff(s) must promptly serve a copy of this Order and its Attachments on Defendant(s) and file notice of service with the Clerk of Court; 2. That, unless the Court orders otherwise, on January 8, 2019, the Clerk of Court shall terminate without further notice any Defendant in this action that has not been served pursuant to Rule 4(m) of the Federal Rules of Civil Procedure; 3. That, unless the Court orders otherwise, the parties shall file with the Clerk of Court a notice of service of MIDP Responses, supplemental MIDP Responses, and production of ESI, rather than copies of the actual disclosures [see attached Order for details]. Signed by Judge Dominic W Lanza on 11/21/18. (MAW) (Entered: 11/21/2018) |
| 11/21/2018 | 30 | NOTICE re: Service of Preliminary Order by David Isabel re: 29 Order, Set Deadlines . (Scharff, Spencer) (Entered: 11/21/2018) |
| 11/26/2018 | 31 | Additional Attachments to Main Document re: 29 Order (Attachment: Notice - MIDP; Attachments: # 1 MIDP User Manual)(MAW) (Entered: 11/26/2018) |
| 11/27/2018 | 32 | *MOTION to Dismiss for Lack of Jurisdiction by Adrian Fontes, Maricopa, County of. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Exhibit Exhibit 1)(Offord, Talia) *Modified to correct event on 11/28/2018 (DXD). (Entered: 11/27/2018) |
| 11/30/2018 | 33 | *MOTION to Dismiss for Failure to State a Claim by Michele Reagan. (Attachments: # 1 Certificate of Conferral)(Elliott, Stephanie) *Modified to correct Motion type on 12/3/2018 (EJA). (Entered: 11/30/2018) |
| 11/30/2018 | 34 | STIPULATION *for Extension of Time for Plaintiff to Respond to Defendants' Motions to* |

| | | |
|---|---|---|
| | | *Dismiss* by David Isabel. (Attachments: # 1 Text of Proposed Order)(Scharff, Spencer) (Entered: 11/30/2018) |
| 12/03/2018 | 35 | ORDER: IT IS ORDERED granting the Stipulation for Extension of Time for Plaintiff Isabel to Respond to Defendants' Motions to Dismiss (Doc. 34 ) and extending the deadline for Plaintiff to respond to Defendants' motions to dismiss to January 7, 2019. Ordered by Judge Dominic W Lanza on 12/3/18. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 12/03/2018) |
| 01/07/2019 | 36 | RESPONSE to Motion re: 32 MOTION to Dismiss for Lack of Jurisdiction filed by David Isabel. (Scharff, Spencer) (Entered: 01/07/2019) |
| 01/07/2019 | 37 | RESPONSE to Motion re: 33 MOTION to Dismiss for Failure to State a Claim filed by David Isabel. (Scharff, Spencer) (Entered: 01/07/2019) |
| 01/14/2019 | 38 | REPLY to Response to Motion re: 33 MOTION to Dismiss for Failure to State a Claim filed by Michele Reagan. (Elliott, Stephanie) (Entered: 01/14/2019) |
| 01/14/2019 | 39 | REPLY to Response to Motion re: 32 MOTION to Dismiss for Lack of Jurisdiction *Maricopa County's Reply in Support of Its Rule 12(b)(1) Motion to Dismiss Plaintiff's Complaint* filed by Adrian Fontes, Maricopa, County of. (Offord, Talia) (Entered: 01/14/2019) |
| 02/05/2019 | 40 | REQUEST re: Telephonic Conference re Rule 26(f) Discovery Dispute by Plaintiff David Isabel. (Attachments: # 1 Exhibit Exhibits A - D)(Scharff, Spencer) (Entered: 02/05/2019) |
| 02/06/2019 | 41 | RESPONSE re: 40 Request by Defendant Michele Reagan. (Elliott, Stephanie) (Entered: 02/06/2019) |
| 02/07/2019 | 42 | ORDER: IT IS ORDERED denying Plaintiff's request (Doc. 40 ) for a telephonic conference with the Court regarding Defendants' refusal to participate in a Rule 26(f) conference [see attached Order for details]. Signed by Judge Dominic W Lanza on 2/7/19. (MAW) (Entered: 02/07/2019) |
| 02/08/2019 | 43 | ORDER denying (41) Motion to Transfer Related Case. See document for complete details. Signed by Judge Steven P Logan on 2/8/19. (Associated Cases: 2:16-cv-03618-SPL, 2:18-cv-03217-DWL) (MSA) (Entered: 02/08/2019) |
| 04/01/2019 | 44 | NOTICE of Service of Responses to Mandatory Initial Discovery (MIDP) filed by Plaintiff David Isabel. (Fidel, Nathan) (Entered: 04/01/2019) |
| 04/29/2019 | 45 | NOTICE of Appearance by Timothy Andrew LaSota on behalf of Michele Reagan. (LaSota, Timothy) (Entered: 04/29/2019) |
| 04/30/2019 | 46 | NOTICE TO FILER OF DEFICIENCY re: 45 Notice of Appearance/Association of Counsel filed by Michele Reagan. Document not in compliance with LRCiv 7.1(a)(3) - Party names must be capitalized using proper upper and lower case type. ***No further action is required***. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (GMP) (Entered: 04/30/2019) |
| 05/01/2019 | 47 | *MOTION to Withdraw as Attorney *for Stephanie Elliot, Jeremy Horn, Kara Karlson, and Joseph La Rue* by Michele Reagan. (Attachments: # 1 Exhibit Declaration of Michele Reagan, # 2 Text of Proposed Order (Proposed) Order)(LaRue, Joseph) *Modified to remove ex parte designation on 5/2/2019 (GMP). (Entered: 05/01/2019) |
| 05/01/2019 | 48 | ORDER granting 47 Motion to Withdraw as Attorneys. Attorney Kara Karlson; Joseph Eugene LaRue; Stephanie Susan Elliott and Jeremy Dominic Horn terminated. Timothy A. La Sota shall give prompt notice of the entry of this Order to all other parties or their attorneys. Signed by Judge Dominic W Lanza on 5/1/2019. (TCA) (Entered: 05/01/2019) |

| 05/21/2019 | 49 | MINUTE ORDER: Motion Hearing set for 5/29/2019 at 10:00 AM (1 hour) in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza as to 32 MOTION to Dismiss and 33 MOTION to Dismiss. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 05/21/2019) |
|---|---|---|
| 05/21/2019 | 50 | MOTION to Vacate 49 Set/Reset Motion and R&R Deadlines/Hearings by David Isabel. (Attachments: # 1 Text of Proposed Order)(Scharff, Spencer) (Entered: 05/21/2019) |
| 05/21/2019 | 51 | ORDER: IT IS ORDERED that the motion to vacate (Doc. 50 ) is granted. Oral Argument is reset from 5/29/2019 to 6/5/2019 at 10:30 AM in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza re: 32 MOTION to Dismiss and 33 MOTION to Dismiss. Ordered by Judge Dominic W Lanza on 5/21/19. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 05/21/2019) |
| 06/05/2019 | 52 | NOTICE re: Relevant Case Citation by David Isabel . (Scharff, Spencer) (Entered: 06/05/2019) |
| 06/05/2019 | 53 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Motion Hearing held on 6/5/2019. Argument held. IT IS ORDERED taking under advisement 32 Motion to Dismiss and taking under advisement 33 Motion to Dismiss.<br><br>APPEARANCES: Spencer Scharff and Nathan Fidel for Plaintiff. Timothy LaSota and M. Colleen Connor for Defendants. (Court Reporter Candy Potter) Hearing held 10:35 AM to 11:40 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 06/05/2019) |
| 06/07/2019 | 54 | ORDER: IT IS ORDERED that: (1) The County Defendants' motion to dismiss for lack of jurisdiction (Doc. 32 ) is denied; and (2) The Secretary's motion to dismiss for failure to state a claim (Doc. 33 ) is granted; and (3) By June 28, 2019, Isabel may file a motion for leave to amend his complaint to add a federal common law cause of action [see attached Order for details]. Signed by Judge Dominic W Lanza on 6/7/19. (MAW) (Entered: 06/07/2019) |
| 06/13/2019 | 55 | First MOTION to Amend/Correct 1 Complaint by David Isabel. (Attachments: # 1 Exhibit Exhibit A, # 2 Text of Proposed Order)(Scharff, Spencer) (Entered: 06/13/2019) |
| 06/13/2019 | 56 | *LODGED Proposed First Amended Complaint re: 55 First MOTION to Amend/Correct 1 Complaint . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by David Isabel. (Scharff, Spencer) Modified on 6/27/2019 (MAW). (Entered: 06/13/2019) |
| 06/26/2019 | 57 | RESPONSE to Motion re: 55 First MOTION to Amend/Correct 1 Complaint filed by Michele Reagan. (Attachments: # 1 Text of Proposed Order Proposed Order)(LaSota, Timothy) (Entered: 06/26/2019) |
| 06/27/2019 | 58 | REPLY to Response to Motion re: 55 First MOTION to Amend/Correct 1 Complaint filed by David Isabel. (Scharff, Spencer) (Entered: 06/27/2019) |
| 06/27/2019 | 59 | ORDER: IT IS ORDERED that: (1) Plaintiff's motion for leave to file an FAC (Doc. 55 ) is granted; and (2) Plaintiff shall file his FAC by July 8, 2019 [see attached Order for details]. Signed by Judge Dominic W Lanza on 6/27/19. (MAW) (Entered: 06/27/2019) |
| 06/27/2019 | 60 | AMENDED COMPLAINT against All Defendants filed by David Isabel.(Scharff, Spencer) (Entered: 06/27/2019) |
| 07/05/2019 | 61 | *Second MOTION to Dismiss for Failure to State a Claim by Michele Reagan. (LaSota, Timothy) *Modified to correct motion type on 7/8/2019 (REK). (Entered: 07/05/2019) |

**ER009**

| 07/07/2019 | 62 | *STIPULATION for Extension of Time to file Response/Reply re: 61 Motion to Dismiss for Failure to State a Claim by Michele Reagan. (LaSota, Timothy) *Modified to correct event and add document link on 7/8/2019 (REK). (Entered: 07/07/2019) |
|---|---|---|
| 07/08/2019 | 63 | Joinder re: 61 MOTION to Dismiss for Failure to State a Claim *DEFENDANTS MARICOPA COUNTY AND COUNTY RECORDER'S JOIN DEFENDANT REAGAN'S MOTION TO DISMISS FIRST AMENDED COMPLAINT* by Defendants Adrian Fontes, Maricopa, County of. (Attachments: # 1 Exhibit CERTIFICATE OF CONFERRAL) (Connor, M) (Entered: 07/08/2019) |
| 07/10/2019 | 64 | ORDER: IT IS ORDERED that the parties' stipulation (Doc. 62 ) is granted. Plaintiff shall have until up to and including Tuesday, July 23, 2019 to respond to Defendant Michele Reagan's Motion to Dismiss and Defendant Michele Reagan shall have until up to and including Friday, August 2, 2019 to file her Reply to Plaintiff's Response to Defendant Michele Reagan's Motion to Dismiss the First Amended Complaint. Ordered by Judge Dominic W Lanza on 7/10/19. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 07/10/2019) |
| 07/22/2019 | 65 | RESPONSE in Opposition re: 61 MOTION to Dismiss for Failure to State a Claim *and 63 Joinder* filed by David Isabel. (Scharff, Spencer) (Entered: 07/22/2019) |
| 08/01/2019 | 66 | *REPLY to Response to Motion re: 61 MOTION to Dismiss for Failure to State a Claim filed by Michele Reagan, Maricopa County, Adrian Fontes. (LaSota, Timothy) *Modified filers on 8/1/2019 (SLQ). (Entered: 08/01/2019) |
| 08/12/2019 | 67 | NOTICE of Service of Supplemental Mandatory Initial Discovery Responses (MIDP) filed by Plaintiff David Isabel. (Scharff, Spencer) (Entered: 08/12/2019) |
| 09/24/2019 | 68 | NOTICE of Service of Supplemental Mandatory Initial Discovery Responses (MIDP) filed by Plaintiff David Isabel. (Scharff, Spencer) (Entered: 09/24/2019) |
| 09/28/2019 | 69 | MOTION to Certify Class by David Isabel. (Attachments: # 1 Exhibit Exs. A & B, # 2 Text of Proposed Order)(Scharff, Spencer) (Entered: 09/28/2019) |
| 09/30/2019 | 70 | MINUTE ORDER: Motion Hearing set for 10/24/2019 at 10:00 AM in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza as to 61 MOTION to Dismiss for Failure to State a Claim. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 09/30/2019) |
| 09/30/2019 | 71 | NOTICE OF TENTATIVE RULING: The hearing on Defendants' motion to dismiss (Doc. 61 ) is set for October 24, 2019. In advance of that hearing, the Court wishes to provide the parties with its tentative ruling. Additionally, because the tentative ruling identifies grounds for granting dismissal that were arguably not raised in Defendants' motion, the parties are invited to file an optional supplemental brief, not to exceed 10 pages, by no later than **October 15, 2019.** Signed by Judge Dominic W Lanza on 9/30/19. (MAW) (Entered: 09/30/2019) |
| 10/15/2019 | 72 | *RESPONSE in Opposition re: 69 MOTION to Certify Class filed by Maricopa, County of, Adrian Fontes. (Attachments: # 1 Text of Proposed Order)(Connor, M) *Modified to add additional filer on 10/16/2019 (REK). (Entered: 10/15/2019) |
| 10/15/2019 | 73 | *SUPPLEMENT Defendants' Supplemental Brief on the Defendants' Motion to Dismiss re: 61 MOTION to Dismiss for Failure to State a Claim by Defendant Maricopa, County of, Adrian Fontes. (Attachments: # 1 Exhibit Exb 1-BOS Resolution Holiday)(Connor, M) *Modified to add additional filer on 10/16/2019 (REK). (Entered: 10/15/2019) |
| 10/15/2019 | 74 | *NOTICE of Errata re: 73 Supplement by Defendant Maricopa, County of, Adrian Fontes. (Connor, M) *Modified to add additional filer on 10/16/2019 (REK). (Entered: 10/15/2019) |

**ER010**

| 10/15/2019 | 75 | NOTICE re: Notice of nonbriefing by Michele Reagan . (LaSota, Timothy) (Entered: 10/15/2019) |
|---|---|---|
| 10/15/2019 | 76 | SUPPLEMENT Supplemental Brief in Opposition to Dismissal re: 71 Order by Plaintiff David Isabel. (Scharff, Spencer) (Entered: 10/15/2019) |
| 10/22/2019 | 77 | REPLY to Response to Motion re: 69 MOTION to Certify Class filed by David Isabel. (Scharff, Spencer) (Entered: 10/22/2019) |
| 10/24/2019 | 78 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Motion Hearing held on 10/24/2019. Argument held. IT IS ORDERED taking under advisement 61 Motion to Dismiss First Amended Complaint.<br><br>APPEARANCES: Spencer Scharff and Nathan Fidel for Plaintiff. Timothy LaSota, M. Colleen Connor and Talia Offord for Defendants. (Court Reporter Candy Potter) Hearing held 10:05 AM to 11:02 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 10/24/2019) |
| 11/01/2019 | 79 | ORDER: Defendants' motion to dismiss the FAC for failure to state a claim (Doc. 61 ) is granted; Isabel's motion for class certification (Doc. 69 ) is denied as moot; and The Clerk of Court shall terminate this action and enter judgment accordingly. (See Order for details.) Signed by Judge Dominic W Lanza on 11/1/2019. (SST) (Entered: 11/01/2019) |
| 11/01/2019 | 80 | CLERK'S JUDGMENT - IT IS ORDERED AND ADJUDGED that pursuant to the Court's order filed November 1, 2019, Defendant's Motion to Dismiss the First Amended Complaint (Doc. 61 ) is granted and this action is dismissed. (SST) (Entered: 11/01/2019) |
| 11/04/2019 | 81 | TRANSCRIPT REQUEST by David Isabel for proceedings held on 06/05/2019, 10/24/2019, Judge Dominic W Lanza hearing judge(s). (Fidel, Nathan) (Entered: 11/04/2019) |
| 11/26/2019 | 82 | NOTICE OF APPEAL to 9th Circuit Court of Appeals re: 79 Order on Motion to Dismiss for Failure to State a Claim, Order on Motion to Certify Class, 54 Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Dismiss for Failure to State a Claim, 80 Clerks Judgment, 42 Order by David Isabel. Filing fee received: $ 505.00, receipt number 0970-17675584. (Attachments: # 1 Exhibit Representative Statement)(Scharff, Spencer) (Entered: 11/26/2019) |
| 11/27/2019 | 83 | USCA Case Number re: 82 Notice of Appeal. Case number 19-17397, Ninth Circuit. (EJA) (Entered: 11/27/2019) |
| 12/04/2019 | 84 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of *MOTIONS HEARING* proceedings for date of 06/05/2019 before Judge DOMINIC W. LANZA re: 82 Notice of Appeal. [Court Reporter: Candy L. Potter, RMR, CRR, Telephone number (602) 322-7246]. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/26/2019. Redacted Transcript Deadline set for 1/6/2020. Release of Transcript Restriction set for 3/3/2020. (RAP) (Entered: 12/11/2019) |
| 12/04/2019 | 85 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of *MOTIONS HEARING* proceedings for date of 10/24/2019 before Judge DOMINIC W. LANZA re: 82 Notice of Appeal. [Court Reporter: Candy L. Potter, RMR, CRR, Telephone number (602) 322-7246]. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through |

**ER011**

PACER. Redaction Request due 12/26/2019. Redacted Transcript Deadline set for 1/6/2020. Release of Transcript Restriction set for 3/3/2020. (RAP) (Entered: 12/11/2019)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/05/2020 12:38:48 | | | |
| **PACER Login:** | SpencerScharff:4420963:0 | **Client Code:** | 11 |
| **Description:** | Docket Report | **Search Criteria:** | 2:18-cv-03217-DWL |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**ER012**

1    **WO**

2

3

4

5

6                  **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9    David Isabel,                           No. CV-18-03217-PHX-DWL

10              Plaintiff,                    **ORDER**

11   v.

12   Michele Reagan, et al.,

13              Defendants.

14

15          Pending before the Court is a motion to dismiss Plaintiff David Isabel's first

16   amended complaint ("FAC").  (Doc. 61.)  The motion was filed by Defendant Michele

17   Reagan and joined by Defendants Maricopa County and Maricopa County Recorder Adrian

18   Fontes.  For the following reasons, the motion will be granted and this action will be

19   terminated.

20                              **BACKGROUND**

21          On October 9, 2018, Isabel filed the initial complaint in this case.  (Doc. 1.)  It

22   alleged that Arizona's Secretary of State in 2016, Michele Reagan ("the Secretary"),

23   established Monday, October 10, 2016 as the voter registration deadline for the 2016

24   general election ("the 2016 Election").  (*Id.* ¶ 19.)  October 10 was also Columbus Day, a

25   state and federal holiday, and therefore certain methods of registration weren't available

26   on that day.  (*Id.* ¶¶ 15-17.)

27          Isabel registered to vote on October 11, 2016.  (*Id.* ¶ 24.)  Because this was one day

28   after the voter registration deadline that had been set by the Secretary, Isabel was only

                                                            **ER013**

permitted to cast a provisional ballot during the 2016 Election.  (*Id.* ¶ 35.)  Officials in the Maricopa County Recorder's Office ultimately determined that Isabel wasn't an eligible voter, due to his failure to register by the October 10 deadline, and thus didn't count his vote.  (*Id.* ¶¶ 36-38.)

In the complaint, which Isabel filed on behalf of a class of similarly-situated individuals, Isabel alleged that Defendants violated two federal statutes—(1) the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and (2) the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 21081 *et seq.*—as well as Article I, Section 2 of the United States Constitution ("the Qualifications Clause").  (*Id.* ¶¶ 53-71.)  All three claims were asserted via 42 U.S.C. § 1983.  (*Id.* at 11-15.)  As a remedy, Isabel sought "compensatory and punitive damages," among other things.  (*Id.* at 15.)

On June 7, 2019, the Court dismissed all three claims without prejudice.[1]  (Doc. 54.)  First, the Court dismissed the NVRA claim because the NVRA contains its own remedial scheme, which (unlike § 1983) authorizes only declaratory and injunctive relief, and Congress intended those limited remedies to be exclusive.  (*Id.* at 9-14.)  Second, the Court dismissed the HAVA claim because that statute only creates a federal right to cast a provisional ballot and to have the ballot be counted "if the appropriate election official 'determines' that the individual is eligible"—it doesn't go further and create a federal right to challenge the propriety of state-law eligibility determinations.  (*Id.* at 15-18.)  Third, the Court dismissed the Qualifications Clause claim because that provision prohibits states from establishing different qualifications for voting for state and federal offices (and Isabel's ballot was treated equally—that is, disregarded—for all of the contested races in the 2016 Election) and because Isabel hadn't, in any event, alleged facts showing that the registration deadline had disenfranchised him.  (*Id.* at 18-22.)

On June 27, 2019, Isabel filed the FAC.  (Doc. 60.)  The FAC does not contain any new factual allegations and does not assert any alternative theories concerning Count I of

---

[1]    The Court dismissed the initial complaint only against the Secretary because the County Defendants didn't move for dismissal on 12(b)(6) grounds.  (Doc. 54 at 22 n.10.)

ER014

the original complaint (the NVRA-based § 1983 claim), but it does seek to refine Count II (the HAVA-based § 1983 claim) and Count III (the constitutionally-based § 1983 claim).[2] Specifically, with respect to Count II, the FAC alleges that section 304 of the "HAVA expressly precludes [voter registration] determinations based on 'State requirements [that are] inconsistent with the [NVRA].'" (Doc. 60 ¶ 62.) The FAC thus asserts that, because the October 10 voter registration deadline was inconsistent with the NVRA, Defendants necessarily also violated the HAVA. (*Id.* ¶¶ 63, 64.) With respect to Count III, the FAC no longer relies solely on the Qualifications Clause and instead broadly invokes the Constitution as providing the foundation for the claim. (*Id.* ¶¶ 69-73.)[3]

On July 5, 2019, the Secretary moved to dismiss the FAC. (Doc. 61.) On July 8, 2019, the County Defendants joined this motion. (Doc. 63.)

On September 30, 2019, the Court issued a tentative ruling and authorized the parties to submit supplemental briefing. (Doc. 71.)

On October 24, 2019, after the parties submitted their supplemental briefs (Docs. 73, 75, 76), the Court held oral argument. (Doc. 78.)

## LEGAL STANDARD

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual

---

[2]   *See* Doc. 65 at 2 (Isabel's response to motion to dismiss: "The FAC contains three substantive amendments: (i) it addresses the Court's interpretation of HAVA by alleging an alternative violation; (ii) clarifies that Count III of the Complaint encompasses Mr. Isabel's claim that § 1983 codifies the common-law cause of action for deprivation of the fundamental right to vote, long established by the Supreme Court; and (iii) limits the claims for punitive damages to Defendant Reagan.").

[3]   *See also* Doc. 55-1 at 14 (redlined version of FAC, showing that Count III of the original complaint was premised on an alleged violation of "Article I, Section 2 of U.S. Constitution" and that the FAC amended this count by eliminating the reference to Article I, Section 2 and replacing it with a reference to "the Right to Vote Secured by the U.S. Constitution"); Doc. 65 at 7 (Isabel's response to motion to dismiss: "Although Article I, Section 2 of the Constitution still remains a basis for his Third Cause of Action, the FAC emphasizes that Article I, Section 2 is no longer the sole basis for his alleged constitutional deprivation.").

ER015

1   content that allows the court to draw the reasonable inference that the defendant is liable

2   for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded

3   allegations of material fact in the complaint are accepted as true and are construed in the

4   light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However,

5   the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S.

6   at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett*

7   *v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

**DISCUSSION**

I.   <u>HAVA</u>

      Isabel attempts to resuscitate his HAVA-based claim by arguing that (1) section 304

of that statute (which is codified at 52 U.S.C. § 21084) prohibits a state from making voter-

eligibility determinations that are inconsistent with the NVRA, and (2) Defendants

committed an NVRA violation here.

      This argument is unavailing. The starting point for the analysis is, of course, the

statutory text. Section 304 of the HAVA, which is entitled "Minimum requirements,"

provides as follows:

> The requirements established by this subchapter are minimum requirements and nothing in this subchapter shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements established under this subchapter so long as such State requirements are not inconsistent with the Federal requirements under this subchapter or any law described in section 21145 of this title [which includes the NVRA].

52 U.S.C. § 21084.

      This language does not, as Isabel contends, incorporate all of the NVRA's

substantive requirements, such that a violation of the NVRA is automatically a violation of

the HAVA. To the contrary, section 304 applies only when (1) a particular portion of the

HAVA ("this subchapter," *i.e.,* subchapter III of the HAVA, which encompasses 52 U.S.C.

§§ 21081-85 and 21101-02) establishes a particular type of requirement (an "election

technology and administration requirement"); (2) a state chooses to establish "such" a

requirement that is "more strict" than the one established under subchapter III of the

- 4 -

**ER016**

HAVA; and (3) the state requirement violates the NVRA or another one of the cross-referenced statutes mentioned in 52 U.S.C. § 21145.

Section 304 doesn't help Isabel's case because subchapter III of the HAVA doesn't purport to establish voter registration deadlines.  To the contrary, to the extent subchapter III of the HAVA addresses this topic at all, it leaves the choice to the states.  *See* 52 U.S.C § 21082(a) ("States . . . may meet the requirements of this subsection [governing provisional voting requirements] using voter registration procedures established under applicable State law.").  *See generally Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1170 (11th Cir. 2008) ("HAVA section 302(a) describes general procedures for casting and reviewing provisional ballots; it does not impose any federal standards on voter registration or voter eligibility, both of which remain state decisions.").  Thus, a voter registration deadline established by Arizona, or any other state, cannot be described as an "election technology and administration requirement[] that [is] more strict than the requirements established under this subchapter."  *See* 52 U.S.C. § 21084.

This conclusion is not only compelled by the plain language of the statute, which should end the analysis, but is also necessary to avoid absurd results.  As noted in the order dismissing the earlier iteration of Isabel's complaint, "[t]he NVRA requires a party to give notice of a violation before bringing a civil action if the federal election is more than 30 days away" and "only allows declaratory and injunctive relief."  (Doc. 54 at 14.)  But Isabel's interpretation of section 304 would allow him to circumvent the limited remedies Congress chose to create for violations of the NVRA and ignores the "assumption . . . that limitations upon the remedy contained in the statute are deliberate."  *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 124 (2005).  It would be illogical to assume that Congress chose to jettison the carefully-calibrated remedial scheme contained in the NVRA (which doesn't authorize money damages) via a fleeting cross-reference to the NVRA in a "minimum requirements" provision of a different statute.  *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it

- 5 -

ER017

1    does not, one might say, hide elephants in mouseholes.").

2         Finally, one additional reason why Count II of the FAC may fail is that it's unclear

3    whether Congress intended for § 1983 to serve as a vehicle for asserting claims for money

4    damages premised on violations of section 304 of the HAVA.  (This is an issue the

5    Secretary didn't raise in her motion to dismiss the initial complaint but now raises in her

6    motion to dismiss the FAC, *see* Doc. 61 at 5.)  Nevertheless, given the conclusions set forth

7    above, the Court need not resolve this issue here.

8    II.    "The Right To Vote"

9         The FAC frames Count III as asserting a violation of "the right to vote," rather than

10   merely a violation of the Qualifications Clause.  (Doc. 55-1 at 14; Doc. 60 ¶¶ 67-73.)

11   According to Isabel, this right arises from "federal common law" and has been "long

12   established in the Supreme Court's jurisprudence."  (Doc. 65 at 4.)  Isabel further argues

13   this right necessarily encompasses "the right of qualified voters within a state to cast their

14   ballots and have them counted at Congressional elections."  (*Id.* at 8, citation omitted.)

15        The FAC also alleges that Isabel was, in fact, eligible to vote under Arizona law.

16   (Doc. 60 ¶ 71 ["[A]ll of the provisional ballots described herein were cast by qualified

17   voters within the State of Arizona . . . ."].)  In support of this allegation, the FAC alleges

18   that the voter registration deadline chosen by the Secretary fell on Columbus Day, which

19   is a "state and federal holiday."  (*Id.* ¶¶ 15-16.)  And in his opposition to the motion to

20   dismiss the FAC, Isabel identifies an Arizona state statute that provides that "[w]hen

21   anything of a secular nature . . . is provided or agreed to be done upon a day . . . and the

22   day . . . falls on a holiday, it may be performed on the next ensuing business day with effect

23   as though performed on the appointed day."  *See* A.R.S. § 1-303.  Isabel thus contends that

24   "all registrations submitted on October 11, 2016 were, as a matter of law, filed on October

25   10, 2016" and that the facts alleged in the FAC therefore "[d]emonstrate that [Isabel] [w]as

26   a [q]ualified Arizona [v]oter on November 8, 2016."  (Doc. 65 at 4-5, citing A.R.S. § 1-

27   303 and Ariz. Att. Gen. Op. No 58-74.)

28        Defendants disagree with Isabel's interpretation of state law, albeit for different

ER018

1   reasons.   According to the County Defendants, Isabel's reliance on A.R.S. § 1-303 is

2   misplaced because a different provision of Arizona law (A.R.S. § 11-413) gives Arizona

3   counties the option to designate the day after Thanksgiving as a holiday in place of

4   Columbus Day and Maricopa County made such a designation in 2011. (Doc. 73.) Thus,

5   the County Defendants argue, "Maricopa County no longer recognizes Columbus Day as

6   a legal holiday" and Isabel "could have gone, in person, to any Maricopa County office

7   where someone could register to vote on October 10, 2016." (*Id.* at 2.) The Secretary,

8   meanwhile, argues that Isabel's reliance on A.R.S. § 1-303 is misplaced because it doesn't

9   apply to a deadline (such as the voter registration deadline at issue here) that must, by law,

10  precede an election by a set number of days. In support of this argument, which was raised

11  for the first time during oral argument, the Secretary cites *Fisher v. City of Apache*

12  *Junction*, 28 P.3d 946 (Ariz. Ct. App. 2001).

13         The Court concludes it is unnecessary to decide which party's interpretation of state

14  law is correct and will thus decline to resolve the issue. *United Mine Workers of Am. v.*

15  *Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both

16  as a matter of comity and to promote justice between the parties, by procuring for them a

17  surer-footed reading of applicable law."). As discussed below, even assuming for the sake

18  of argument that Isabel's interpretation of Arizona law is correct, and that he therefore

19  should have been deemed eligible under state law to vote in the 2016 Election, he still has

20  not stated a cognizable claim under § 1983.

21         At bottom, Isabel's theory is that the right to vote is a fundamental right protected

22  by the Constitution, so if a state official fails to count a qualified voter's ballot during a

23  federal election, it follows that the official may be sued for money damages under § 1983.

24  (Doc. 76 at 3 ["The constitutional right at issue in [Count III] is the right of qualified

25  electors to vote in federal elections. It is beyond dispute that this is a *fundamental* right

26  expressly protected by the Constitution."].) The FAC identifies *United States v. Classic*,

27  313 U.S. 299 (1941), as the case that provides the most direct support for this theory. (Doc.

28  60 ¶ 69.) Additionally, in his supplemental brief, Isabel argues that "[c]ourts have

- 7 -

**ER019**

consistently upheld the right to seek compensatory damages for the violation of the right to vote" and cites four cases—*Nixon v. Herndon*, 273 U.S. 536 (1927), *Taylor v. Howe*, 225 F.3d 993 (8th Cir. 2000), *Wayne v. Venable*, 260 F. 64 (8th Cir. 1919), and *United States v. Mosley*, 238 U.S. 383 (1915)—as further proof that he has "alleged a cognizable legal theory *and* a vehicle for pursuing a money-damages claim against Defendants under federal law." (Doc. 76 at 7-8.)

Isabel's argument has undeniable surface appeal. The Supreme Court has described the right to vote as "precious" and "fundamental"[4] and "preservative of all rights"[5]—sentiments with which this Court wholeheartedly agrees. Nevertheless, it doesn't follow that a state election official may be sued for money damages under § 1983 for making an incorrect determination concerning an individual voter's eligibility.

As an initial matter, *Classic* does not compel acceptance of Isabel's theory. In *Classic*, individuals who were qualified to vote under state law had their ballots "willfully altered and falsely counted" by corrupt local election officials. 313 U.S. at 307. Specifically, "[t]he overt acts alleged were that the [officials] altered eighty-three ballots cast for one candidate and fourteen cast for another, marking and counting them as votes for a third candidate, and that they falsely certified the number of votes cast for the respective candidates to the chairman of the Second Congressional District Committee." *Id.* at 308. Based on these facts, the Supreme Court concluded the election officials could be prosecuted for violating federal criminal law. *Id.* at 325-26.

To be sure, *Classic* contains a number of passages that, when read in isolation, can be construed as suggesting that a federal constitutional violation occurs whenever a state election official fails to count a ballot cast by a qualified voter. If this were the rule, then Count III of the FAC might survive dismissal. But the Court is not persuaded that this is, in fact, the rule. *Classic* was a criminal case involving the willful and intentional alteration of ballots cast by voters whose eligibility to vote under state law was undisputed. This is

---

[4]   *Harper v. Virginia State Bd. of Elec.*, 383 U.S. 663, 670 (1966).
[5]   *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (citation omitted).

ER020

1  a civil case in which Isabel has identified various legal reasons why he should have been

2  considered eligible to vote under state and/or federal law despite his failure to register until

3  one day after the ostensible registration deadline.  If it were possible to sue state election

4  officials for money damages under § 1983 under these circumstances, there presumably

5  would be some precedent for doing so.

6        In fact, there are several post-*Classic* cases that strongly suggest § 1983 does not

7  provide a remedy under these circumstances.  In *Powell v. Power*, 436 F.2d 84 (2d Cir.

8  1970), a group of voters "in a Congressional primary election" brought a § 1983 action

9  against "state election officials [for] permitting a number of individuals to cast ballots who

10  under state law were not qualified to vote."  *Id.* at 85.  Among other things, the voters

11  argued—just like Isabel argues here—that the officials' conduct violated Article I, Section

12  2 of the Constitution and that § 1983 authorizes "federal courts to remedy errors in the

13  election process."  *Id.* at 88.  The Second Circuit, after noting that these claims did "not

14  require extended consideration," held that "[A]rticle I, [S]ection 2 offer[s] no guarantee

15  against errors in the administration of an election" and that "while [A]rticle I, [S]ection 2

16  may outlaw purposeful tampering by state officials . . . we cannot believe that the framers

17  of our Constitution were so hypersensitive to ordinary human frailties as to lay down an

18  unrealistic requirement that elections be free of any error."  *Id.* (citing *Classic*, 313 U.S. at

19  299).  The *Powell* court further noted that, "[w]ere we to embrace plaintiffs' theory, this

20  court would henceforth be thrust into the details of virtually every election, tinkering with

21  the state's election machinery, reviewing petitions, registration cards, vote tallies, and

22  certificates of election for all manner of error and insufficiency under state and federal

23  law."  *Id.* at 86.  *Powell*, in other words, construed *Classic* as exposing state election

24  officials to liability for violating the Constitution only for "purposeful tampering" with

25  ballots—conduct that isn't alleged here—and held that state election officials otherwise

26  can't be sued under § 1983 for making erroneous voter-eligibility determinations.[6]

27        Similarly, in *Hutchinson v. Miller*, 797 F.2d 1279 (4th Cir. 1986), an unsuccessful

28  _____

[6]      Although *Powell* is a Second Circuit decision, and thus not binding here, the Ninth Circuit has cited *Powell* with approval as a case involving a "'garden variety' election

1  candidate for federal office brought a money-damages action under § 1983 against a host

2  of state and local election officials, alleging that the officials had conspired to disregard

3  certain votes that had been cast in his favor. *Id.* at 1280-81. In holding the claim was not

4  cognizable, the Fourth Circuit emphasized that "[e]lections are, regrettably, not always free

5  from error," noted that some common errors include "registrars [who] fail to follow

6  instructions" and "absentee ballots [that] are improperly administered," and acknowledged

7  that "serious problems of federalism and separation of powers" would arise if federal courts

8  were to authorize money-damages liability under such circumstances. *Id.* at 1286-87.[7]

9      The upshot of these decisions is that, although the right to vote is a fundamental

10  right under federal law, that right doesn't entitle a voter to sue a state election official for

11  money damages under § 1983 for incorrectly rejecting (or counting) a particular ballot or

12  for incorrectly rejecting (or accepting) a particular voter's registration application. This is

13  true even if the election official may have violated state law when making the challenged

14  determination. A contrary approach would threaten to enmesh the federal courts in

15  disputes arising from virtually every election and would pose significant federalism

16  concerns.

17      Indeed, during oral argument, the Court attempted to explore the ramifications of

18  Isabel's liability theory by bringing up the "hanging chads" from Florida that famously

19  entered the nation's consciousness during the 2000 presidential election. *See generally*

20  *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("Traditional paper ballots, as

21  became evident during the 2000 presidential election, are prone to overvotes, undervotes,

22  'hanging chads,' and other mechanical and human errors that may thwart voter intent.").

23  Specifically, the Court asked whether, under Isabel's theory, it would have been

24  permissible for a Florida voter whose ballot was disallowed during the 2000 election to

25  irregularit[y]" that did not rise to the level of a federal constitutional violation. *Bennett v.*
*Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998).

26

27  [7]    *Hutchinson* was cited with general approval by the Ninth Circuit in *Soules v.*
*Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176 (9th Cir. 1988). Specifically,
although the *Soules* court declined to adopt a blanket rule precluding post-election
challenges by unsuccessful candidates, it "endorse[d]" the Fourth Circuit's "restrained
28  approach to election challenges." *Id.* at 1182-83.

- 10 -

bring a § 1983 action for money damages against a Florida election official by arguing that (1) the election official misapplied Florida law on hanging chads when making the invalidity determination and (2) by doing so, the official infringed the voter's "right to vote" under the Constitution.  In response, Isabel stated that liability would potentially be available under those facts.  In the Court's view, this answer underscores the federalism problems that would arise from accepting Isabel's theory.

With that said, it must be acknowledged that Isabel isn't claiming Defendants simply made a mistake when determining he was ineligible to vote—the FAC alleges that Defendants acted with a culpable mindset.  (Doc. 60 ¶ 72.)  Nevertheless, there are three reasons why the presence of this allegation doesn't change the outcome here.

First, *Powell* and *Hutchinson* both suggest that § 1983 liability wouldn't be available under the facts of this case.  Although *Powell* involved innocent mistakes by election officials, the Second Circuit seemed to suggest that liability would arise only in the case of "purposeful tampering" with ballots (which was present in *Classic* but isn't present here), and *Hutchinson* involved allegations of intentional misconduct by the election officials yet the Fourth Circuit didn't allow the case to proceed.

Second, although Count III of the FAC asserts that Defendants acted with "evil motive or intent" or "reckless, callous, and deliberate indifference to [Isabel's] federally protected rights" (Doc. 60 ¶ 72), the Court is not required to accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 679-80.  The only facts alleged in the FAC that might support these allegations appear at paragraphs 28-34.  The Court has carefully examined those paragraphs and is skeptical they "plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.

For example, paragraphs 28-30 allege that, on November 3, 2016, a judge in a different lawsuit issued an order that "established that the October 10, 2016 deadline violated federal and state law" and that Defendants flouted this order when they subsequently decided to disregard Isabel's ballot and certify the election results.  But in the

ER023

order at issue,[8] the judge *denied* a request for an injunction to require the Secretary to count provisional ballots cast by voters (like Isabel) who had registered on October 11, 2016, concluding that such relief was unwarranted because "polling lists have been disseminated, early ballots have been cast, and polls open in a matter of days" and that requiring the Secretary to change course at such a late date would run the risk of "endangering the exercise of that right [to vote] by others." *Arizona Democratic Party v. Reagan*, 2016 WL 6523427, *4, *18 (D. Ariz. 2016). Notably, the order also rejected, on the merits, the plaintiffs' argument "that the Secretary's refusal to extend the October 10, 2016 voter registration holiday deadline impermissibly burdened constitutional rights," holding that the Secretary's decision to "adher[e] to the voter registration deadline served (and serves) the State's important interests in protecting the integrity and reliability of the electoral process itself," that "if the State had extended the voter registration deadline last minute in the days leading up to October 10th, or retroactively set an October 11th voter registration deadline now, [there is] a realistic possibility that the public's confidence in the state's ability to competently administer elections and protect against disorder would be undermined and dissuade them from going to the ballot box next week," and that "the Secretary has demonstrated that the decision not to extend the voter registration deadline in the weeks shortly before the deadline served (and serves) the State's important interests in the orderly, accurate, and reliable administration of elections." *Id.* at *8-12. The order thus concluded that "[t]he Secretary's decision not to extend the deadline in the final hours was a reasonable, non-discriminatory restriction that advanced an important state interest in administering a fair and orderly election. Therefore, the [plaintiffs'] constitutional claim

---

[8] The Court may consider the contents of the order when ruling on Defendants' motion to dismiss, even though the order wasn't attached as an exhibit to the FAC, because (1) the order is subject to judicial notice and (2) the order is referred to in the FAC. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[Courts] may take judicial notice of court filings and other matters of public record.") (citation omitted).

fails on the merits . . . ."  *Id.* at *12.

To be sure, the order in that case also concluded, as a retrospective matter, that the Secretary had violated the NVRA and state law by setting October 10, 2016 as the registration deadline.  *Id.* at *14-16.  Nevertheless, the overarching point is that the order concluded that the Secretary wasn't required to count provisional ballots cast by voters who had registered on October 11, that the Secretary had legitimate reasons for declining to extend the registration deadline or count such ballots, and that the Secretary's conduct was constitutional.  Given those conclusions, it is difficult to understand how Defendants' conduct in the weeks following the issuance of the order could be viewed as proof of "evil motive or intent."  *Cf. Wiley v. Sinkler*, 179 U.S. 58, 66-67 (1900) (suggesting it would be inappropriate to "subject[] election officers to an action for damages for refusing a vote which the statute under which they are appointed forbids them to receive it").

Meanwhile, paragraphs 31-34 allege that, in 2018 (*i.e.,* two years after the conduct at issue in this case), the Secretary helped promulgate a new version of Arizona's election procedures manual, which now recognizes that registration deadlines falling on state or federal holidays must be moved to the following day.  But such revisions do not plausibly show that Defendants acted with a culpable mindset during the 2016 election cycle.  *Cf. Noble v. McClatchy Newspapers*, 533 F.2d 1081, 1090 (9th Cir.1975) ("It was not error to exclude evidence that McClatchy deleted allegedly anticompetitive provisions in the distributorship contracts after plaintiffs' termination.  Plaintiffs argue that 'an inference of guilt or wrongdoing may be drawn' from such evidence; but it is well settled that evidence of subsequent remedial measures is not admissible to prove culpability of prior conduct.").

Third, it is important to note that the order in *Arizona Democratic Party v. Reagan* didn't reach the issue of whether the October 10 deadline should have been extended by one day pursuant to A.R.S. § 1-303.  Instead, the order concluded that, because the October 10 deadline was impermissible under the NVRA, it was necessarily impermissible under state law, too.  *Reagan*, 2016 WL 6523427 at *16 ("The Court . . . need not determine whether the Secretary was required to extend the deadline here pursuant to § 1-303, because

1  any application of Ariz. Rev. Stat. § 16-120 that effectively requires that voter registration

2  to be received earlier than 30 days before a federal election is superseded by NVRA.").

3  This is relevant because, as noted in the order dismissing the previous iteration of Isabel's

4  complaint, a plaintiff can't bring an action for money damages under § 1983 premised on

5  a violation of the NVRA.  (Doc. 54 at 9-14.)  It would be anomalous if Isabel could evade

6  this conclusion by simply repackaging his NVRA claim as a violation of the "right to vote"

7  established by the Constitution.

8          Finally, the four cases cited in Isabel's supplemental brief do not compel the

9  acceptance of his liability theory.  In *Nixon*—which was decided in 1927—a black resident

10  of Texas wasn't allowed to vote in a 1924 primary election due to a Texas statute, enacted

11  in 1923, which provided that "in no event shall a negro be eligible to participate in a

12  Democratic party primary election held in the State of Texas."  273 U.S. at 540 (citation

13  omitted).  In response, the plaintiff brought a § 1983 action for money damages against the

14  state election official who had refused to allow him to vote.  *Id.* at 539.  Notably, the

15  plaintiff didn't allege his constitutional injury was a deprivation of the "right to vote"

16  generally established by the Constitution—instead, he challenged the Texas statute under

17  the provisions of the Fourteenth and Fifteenth Amendments prohibiting race-based

18  discrimination.  *Id.* at 540-41.  The Supreme Court agreed with his challenge and allowed

19  the lawsuit to proceed, holding that "it is too clear for extended argument that color cannot

20  be made the basis of a statutory classification affecting the right [to vote] set up in this

21  case."  *Id.* at 541.  *Nixon*, in other words, doesn't hold that a state election official may be

22  sued for violating the "right to vote" whenever the official incorrectly concludes a

23  particular voter is ineligible to vote under state law—it is a race discrimination case.

24          *Taylor*, similarly, involved a § 1983 claim brought by "16 black citizens of

25  [Arkansas], all registered voters" against county election officials in Arkansas for

26  "discriminating against black citizens on the basis of their race, and intimidating them

27  during the election."  225 F.3d at 1002.  Among other things, the election officials were

28  accused of not allowing certain plaintiffs to vote, improperly challenging the ballots cast

- 14 -

by certain other plaintiffs, and engaging in other forms of racial harassment. *Id.* As in *Nixon*, the plaintiffs didn't assert their constitutional injury arose from a violation of the "right to vote"—instead, they relied upon statutes and constitutional provisions that specifically prohibit race-based discrimination. *Id.* at 996 ("The plaintiffs' substantive claims are based on 42 U.S.C. § 1971(a)(1), (a)(2)(A), and (a)(2)(B); the Fourteenth and Fifteenth Amendments to the United States Constitution, and 42 U.S.C. § 1973(a), (b).").

In *Wayne*—which was decided in 1919—a group of local government officials in Arkansas (including judges, candidates for office, and a deputy sheriff in charge of the polls) conspired to steal an election by delaying the opening of the polling facility, slowing the admission of certain voters (by requiring them to enter one by one), expediting the admission of certain voters who had been brought to the polling facility by the defendants' favored candidates, threatening certain individuals with violence, and refusing to admit certain voters when they reached the door of the polling facility. 260 F. at 67-68. The Eighth Circuit held that, under those facts, the defendants could be sued under § 1983 for money damages for violating the plaintiffs' right to vote. *Id.* at 69. Notably, there was no dispute over whether the plaintiffs were eligible to vote under Arkansas law. *Id.* at 67 ("The plaintiffs were qualified electors of Eagle township at the election therein on November 7, 1916, at which election a United States Senator and a member of Congress were lawfully to be voted for and elected.").

Last, in *Mosley*—which was decided in 1915—two Oklahoma election board members were indicted for the federal crime of conspiring to violate the constitutional rights of others. 238 U.S. at 385. Specifically, the officials were charged with entering into a secret agreement not to count the votes from certain precincts and to conceal this misconduct from the third board member. *Id.* at 385-86. Although the Supreme Court observed in passing that it is "unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box," *id.* at 386, the only issue before the Court was whether the criminal statute prohibiting civil rights conspiracies should be limited to "conspiracies contemplating violence." *Id.* at 378-88. The Court

- 15 -

concluded the statute should not be construed in this narrow fashion and thus reversed the district court's dismissal of the indictment.  *Id.*

The bottom line is that, although the Court is troubled by the notion that state election officials might disregard ballots that should have been considered valid under state law and/or the NVRA, Isabel not shown he is entitled to pursue a § 1983 money-damages claim against Defendants, at least under the facts of this case.  Congress declined to authorize such a remedy when enacting the NVRA (and again when enacting the HAVA), Isabel hasn't pointed to any decisions—in the nearly eight decades since *Classic* was decided—validating his theory of liability, and the FAC doesn't plausibly allege that Defendants acted with a culpable mindset.  Although the Court is "mindful that federal courts have a duty to ensure that national, state and local elections conform to constitutional standards," that duty must be pursued "with a clear-eyed and pragmatic sense of the special dangers of excessive judicial interference with the electoral process."  *Soules,* 849 F.2d at 1182-83.[9]

Accordingly, **IT IS ORDERED** that:

(1)    Defendants' motion to dismiss the FAC for failure to state a claim (Doc. 61) is **granted**;

(2)    Isabel's motion for class certification (Doc. 69) is **denied as moot**; and

(3)    The Clerk of Court shall terminate this action and enter judgment accordingly.

Dated this 1st day of November, 2019.

Dominic W. Lanza
United States District Judge

---

[9]    Isabel did not request leave to amend in his response to the motion to dismiss the FAC, in his supplemental brief concerning the FAC, or during oral argument and it doesn't appear to the Court that further leave to amend would be necessary or appropriate here.

ER028

1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    David Isabel,                              No. CV-18-03217-PHX-DWL

10                  Plaintiff,                   **ORDER**

11   v.

12   Michele Reagan, et al.,

13                  Defendants.

14
_____

15                       **NOTICE OF TENTATIVE RULING**

16          The hearing on Defendants' motion to dismiss (Doc. 61) is set for October 24, 2019.

17   In advance of that hearing, the Court wishes to provide the parties with its tentative ruling.

18          This is, to be clear, only a tentative ruling.  The point of providing it beforehand is

19   to allow the parties to focus their argument on the issues that seem salient to the Court and

20   to maximize their ability to address any perceived errors in the Court's logic.  Additionally,

21   because the tentative ruling identifies grounds for granting dismissal that were arguably

22   not raised in Defendants' motion, the parties are invited to file an optional supplemental

23   brief, not to exceed 10 pages, by no later than **October 15, 2019**.

24          Dated this 30th day of September, 2019.

25

26

27   _____
                                           Dominic W. Lanza
28                                      United States District Judge

**ER029**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15              **<u>TENTATIVE RULING</u>**
16
17
18
19
20
21
22
23
24
25
26
27
28

ER030

Pending before the Court is a motion to dismiss Plaintiff David Isabel's first amended complaint ("FAC").  (Doc. 65.)  The motion was filed by Secretary of State Michelle Reagan and joined by Maricopa County and Maricopa County Recorder Adrian Fontes (collectively, "Defendants").  For the following reasons, the motion will be granted.

**BACKGROUND**

On October 9, 2018, Isabel filed the initial complaint in this case.  (Doc. 1.)  The facts alleged in that complaint, which the Court briefly recounts here, are as follows.  Arizona's Secretary of State, Defendant Michele Reagan ("the Secretary"), established Monday, October 10, 2016 as the voter registration deadline for the 2016 general election ("the 2016 Election").  (*Id.* ¶ 19.)  October 10 was also Columbus Day, a state and federal holiday, and therefore certain methods of registration weren't available on that day.  (*Id.* ¶¶ 15-17.)

Isabel registered to vote on October 11, 2016.  (*Id.* ¶ 24.)  Because this was one day after the Secretary's voter registration deadline, Isabel was only permitted to cast a provisional ballot during the 2016 Election.  (*Id.* ¶ 35.)  Officials in the Maricopa County Recorder's Office ultimately determined that Isabel wasn't an eligible voter, due to his failure to register by the October 10 deadline, and thus didn't count his vote.  (*Id.* ¶¶ 36-38.)

In the complaint, which Isabel filed on behalf of a class of similarly-situated individuals, Isabel alleged that Defendants violated two federal statutes—(1) the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and (2) the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 21081 *et seq.*—as well as Article I, Section 2 of the United States Constitution ("the Qualifications Clause").  (*Id.* ¶¶ 53-71.)  All three claims were asserted via 42 U.S.C. § 1983.  (*Id.* at 11-15.)  As a remedy, Isabel sought "compensatory and punitive damages," among other things.  (*Id.* at 15.)

On June 7, 2019, the Court dismissed all three claims without prejudice.[1]  (Doc. 54.)

---

[1]     The Court only dismissed the initial complaint against the Secretary because the County Defendants didn't move for dismissal on 12(b)(6) grounds.  (Doc. 54 at 22 n.10.)

1    First, the Court dismissed the NVRA claim because the NVRA contains its own remedial
2    scheme, which (unlike § 1983) authorizes only declaratory and injunctive relief, and
3    Congress intended those limited remedies to be exclusive.  (*Id.* at 9-14.)  Second, the Court
4    dismissed the HAVA claim because that statute only creates a federal right to cast a
5    provision ballot and to have the ballot be counted "if the appropriate election official
6    'determines' that the individual is eligible"—it does not go further and create a federal
7    right to challenge the propriety of state-law eligibility determinations.  (*Id.* at 15-18.)
8    Third, the Court dismissed the Qualifications Clause claim because that provision prohibits
9    states from establishing different qualifications for voting for state and federal offices (and
10   Isabel's ballot was treated equally—that is, disregarded—for all of the contested races in
11   the 2016 Election) and because Isabel hadn't, in any event, alleged facts showing that the
12   registration deadline "disenfranchised" him.  (*Id.* at 18-22.)

13           On June 27, 2019, Isabel filed the FAC.  (Doc. 60.)  First, the FAC alleges that
14   section 304 of the "HAVA expressly precludes [voter registration] determinations based
15   on 'State requirements [that are] inconsistent with the [NVRA].'"  (*Id.* ¶ 62.)  The FAC
16   contends that the October 10, 2016 voter registration deadline was inconsistent with the
17   NVRA, and thus, Defendants violated the HAVA.  (*Id.* ¶¶ 63, 64.)  Second, the FAC no
18   longer relies on the Qualifications Clause as the sole basis for Count III and instead argues
19   Defendants violated Isabel's "Constitutionally protected right to vote" when they didn't
20   count his provisional ballot.  (*Id.* ¶¶ 69-73.)

21           On July 5, 2019, the Secretary moved to dismiss the FAC.  (Doc. 61.)  On July 8,
22   2019, the County Defendants joined this motion.  (Doc. 63.)

23           The Court provided the parties with a tentative ruling on September 30, 2019, which
24   afforded the parties with the opportunity to submit supplemental briefing.  After the parties
25   submitted their briefs, the Court held oral argument on October 24, 2019.

26                                    **DISCUSSION**
27   I.    Legal Standard
28           "[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter,

ER032

1  accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness*

2  *Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556

3  U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual

4  content that allows the court to draw the reasonable inference that the defendant is liable

5  for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "[A]ll well-pleaded

6  allegations of material fact in the complaint are accepted as true and are construed in the

7  light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted).  However,

8  the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S.

9  at 679-80.  The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett*

10  *v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

11  II.    Analysis

12           A.    **The HAVA**

13           Isabel attempts to resuscitate his HAVA-based claim (Count II) by arguing that

14  section 304 of the statute (which is codified at 52 U.S.C. § 21084) prohibits a state from

15  making voter-eligibility determinations that are inconsistent with the NVRA, which Isabel

16  contends occurred when Defendants refused to count his vote.

17           This argument is unavailing.  The starting point for the analysis is, of course, the

18  statutory text.  Section 304 of the HAVA, which is entitled "Minimum requirements,"

19  provides as follows:

20           The requirements established by this subchapter are minimum requirements
         and nothing in this subchapter shall be construed to prevent a State from
21       establishing election technology and administration requirements that are
         more strict than the requirements established under this subchapter so long
22       as such State requirements are not inconsistent with the Federal requirements
         under this subchapter or any law described in section 21145 of this title
23       [which includes the NVRA].

24  52 U.S.C. § 21084.

25           This language does not, as Isabel contends, incorporate all of the NVRA's

26  substantive requirements, such that a violation of the NVRA is automatically a violation of

27  the HAVA.  To the contrary, section 304 applies only when (1) the HAVA itself creates a

28  particular type of regulation—a "technology and administration requirement[]"; (2) a state

**ER033**

chooses to create a competing "such" requirement that is "more strict" than the one created by the HAVA; and (3) the state's preferred, stricter version violates the NVRA (or another one of the cross-referenced statutes). But a voter registration deadline isn't an "election technology and administration requirement." Additionally, the HAVA doesn't purport to create minimum standards governing state voter registration deadlines, such that a state could then use "such" standards as a baseline when attempting to create a "more strict" version. *See, e.g., Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1170 (11th Cir. 2008) ("HAVA section 302(a) describes general procedures for casting and reviewing provisional ballots; it does not impose any federal standards on voter registration or voter eligibility, both of which remain state decisions."); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004) ("HAVA is quintessentially about being able to cast a provisional ballot. No one should be 'turned away' from the polls, but the ultimate legality of the vote cast provisionally is generally a matter of state law."); *Ron Barber for Cong. v. Bennett*, 2014 WL 6694451, *8 (D. Ariz. 2014) ("HAVA does not contain language that requires that the provisional votes be counted; it is directed to providing provisional votes."). Section 304 is thus inapplicable here.

This conclusion is not only compelled by the plain language of the statute—which should end the analysis—but is also necessary to avoid absurd results. As noted in the order dismissing the earlier iteration of Isabel's complaint, "[t]he NVRA requires a party to give notice of a violation before bringing a civil action if the federal election is more than 30 days away" and "only allows declaratory and injunctive relief." (Doc. 54 at 16.) But Isabel's interpretation of section 304 would allow him to circumvent the limited remedies Congress chose to create for violations of the NVRA and ignores the "assumption . . . that limitations upon the remedy contained in the statute are deliberate." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 124 (2005). It would be illogical to assume that Congress chose to jettison the carefully-calibrated remedial scheme contained in the NVRA (which doesn't authorize money damages) via a fleeting cross-reference to the NVRA in a "minimum requirements" provision of a different statute. *Cf. Whitman v. Am.*

ER034

*Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Finally, one additional reason why Isabel's claim may fail is that it's unclear whether Congress intended for § 1983 to serve as a vehicle for asserting claims for money damages premised on violations of section 304 of the HAVA. (This is an issue that the Secretary didn't raise in her motion to dismiss the initial complaint but now raises in her motion to dismiss the FAC, *see* Doc. 61 at 5.) Nevertheless, given the conclusions set forth above—which provide alternative reasons for dismissing Count II of the FAC—the Court need not resolve this issue here.

### B.    **The Right To Vote**

The FAC frames Count III as a violation of "the right to vote," rather than merely a Qualifications Clause violation. (Doc. 60 ¶¶ 67-73.) The FAC alleges the "right to vote" includes "the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections." (*Id.* ¶ 69, citing *United States v. Classic*, 313 U.S. 299, 314-15 (1941).) The FAC further alleges that Isabel's right to vote was violated "[b]ecause all of the provisional ballots described herein were cast by qualified voters within the State of Arizona, [so] the U.S. Constitution required Defendants to count their votes." (*Id.* ¶ 71.)

In support of the allegation that Isabel was, in fact, a qualified voter under Arizona law, the FAC alleges that the voter registration deadline chosen by the Secretary fell on Columbus Day, which is a "state and federal holiday." (Doc. 60 ¶¶ 15-16.) And in his opposition to the motion to dismiss, Isabel identifies an Arizona state statute that provides that "[w]hen anything of a secular nature . . . is provided or agreed to be done upon a day . . . and the day . . . falls on a holiday, it may be performed on the next ensuing business day with effect as though performed on the appointed day." *See* A.R.S. § 1-303. Based on this statute, Isabel contends that "all registrations submitted on October 11, 2016 were, as a matter of law, filed on October 10, 2016" and that the facts alleged in the FAC therefore

ER035

"[d]emonstrate that [Isabel] [w]as a [q]ualified Arizona [v]oter on November 8, 2016."
(Doc. 65 at 4-5, citing A.R.S. § 1-303 and Ariz. Att. Gen. Op. No 58-74.)[2]

As an initial matter, the Court observes that the theory of disenfranchisement now being pursued by Isabel (*i.e.,* he was an eligible voter under Arizona law, because a state statute requires a one-day extension of all registration deadlines falling on holidays, yet Defendants failed to count his vote) is different than the theory that seemed to undergird the previous version of his complaint (*i.e.,* even though he missed the registration deadline by one day, the deadline was too early and thus effectively disenfranchised him). Although Isabel notes that the current theory "was clearly outlined in [his] previous filings" (Doc. 65 at 5 n.2), the Court didn't interpret the previous version of the complaint as pursuing an "I was actually eligible to vote under state law" claim. In any event, because Isabel was allowed to amend his complaint and the theory is now presented, any earlier misapprehension has been cured.

Defendants don't appear to fully comprehend or grapple with this refinement of Isabel's theory. In their motion to dismiss, Defendants argue that "[t]he issue of what [Isabel's] rights would be were he actually eligible to vote in the 2016 election are irrelevant because he was not eligible to vote. The registration deadline was October 10, 2016, and [Isabel] registered on October 11, 2016." (Doc. 61 at 6.) Notably, Defendants suggest that Isabel potentially may have been able to assert a § 1983 claim under *Classic* had he been eligible to vote under state law but argue his reliance on *Classic* is misplaced because he wasn't, in fact, eligible: "Even if this Court were to assume that *Classic* provides [Isabel] a basis for proceeding under Article I, Section 2 of the Constitution, it does not help [Isabel] in this instance because he was not a 'qualified voter' in the 2016 general election." (*Id.*) In their reply, Defendants repeat: "[Isabel] again tries some revisionist history by claiming that he was an eligible voter on November 8, 2016. He was

---

[2]      It should be noted that the FAC doesn't cite A.R.S. § 1-303 or specifically allege that Isabel's registration attempt should have been considered timely under Arizona law because the deadline fell on a holiday. Instead, this theory is developed in the opposition to the motion to dismiss. Nevertheless, the FAC alleges the relevant facts on which the theory is premised.

1    not.  Just as in *Rosario* and *Barilla*, [Isabel's] voter registration was untimely with regard

2    to the November 2016 general election."  (Doc. 66 at 4.)

3           Those arguments overlook Isabel's invocation of A.R.S. § 1-303.  Isabel contends

4    that his registration attempt on October 11, 2016 should have, as a matter of Arizona law,

5    been deemed to have occurred on October 10, 2016 (which was within the deadline set by

6    the Secretary) and Defendants do not proffer any reasoned basis for questioning this

7    outcome.[3]  Defendants also fail to meaningfully address Isabel's argument that, assuming

8    he should have been considered eligible to vote under state law, the failure to count his

9    vote amounted to a violation of the federal constitutional "right to vote" as recognized by

10   *Classic*.

11          Isabel argues that, because Defendants failed to make the correct arguments

12   concerning Count III in their motion to dismiss, the Court must deny the motion without

13   considering whether Count III is flawed for other reasons.  (Doc. 65 at 15-16.)  This

14   argument is unavailing.  As noted, Isabel's reliance on A.R.S. § 1-303 isn't apparent from

15   the face of the FAC.  Thus, Defendants' failure to fully comprehend his theory of liability

16   is understandable.  Moreover, the Ninth Circuit has recognized that "[a] trial court may act

17   on its own initiative to note the inadequacy of a complaint and dismiss it for failure to state

18   a claim" so long as the plaintiff is afforded "'an opportunity to at least submit a written

19   memorandum in opposition to such motion.'"  *Wong v. Bell*, 642 F.2d 359, 361-62 (9th

20   Cir. 1981) (citation omitted).  In the Court's view, it makes sense to get to the bottom of

21   whether Claim III states a valid claim right now, particularly when the alternative is

22   denying the motion to dismiss under a forfeiture theory, requiring the parties to slog

23   through months of expensive discovery, and, only after discovery is complete, then

24

25   [3]      Defendants' only fleeting attempt to address this issue is footnote 1 of their reply,
     which asks the Court to "take judicial notice of the fact that Maricopa County, where
26   [Isabel] resides according to his [FAC], does not observe Columbus Day as a holiday."
     (Doc. 66 at 2 n.1.)  But A.R.S. § 1-301(A)(13) specifically recognizes Columbus Day as a
27   holiday under Arizona state law and A.R.S. § 1-303 provides that whenever a deadline falls
     on a date that is considered a holiday under state law, acts taken on the following day must
28   be deemed timely.  It is therefore unclear why Maricopa County's non-recognition of
     Columbus Day has any bearing on the issues here.

ER037

rejecting Count III due to a legal infirmity that has seemed apparent to the Court from the outset. *Cf.* Fed. R. Civ. P. 1 ("These rules . . . should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").

On the merits, the fundamental problem with Count III is that it attempts to transform a state-law violation into a federal constitutional claim. The FAC can be construed as alleging that, when Defendants determined Isabel wasn't eligible to vote in the 2016 Election after he registered on October 11, 2016, they failed to give effect to A.R.S. § 1-303. (Doc. 65 at 5 ["[E]ven if the October 10, 2016 'deadline' were not unlawful, Plaintiff has adequately alleged that, as a matter of law, he timely registered to vote in November 2016 Elections and was eligible and qualified to cast a ballot on November 8, 2016."].) This may be true,[4] but it doesn't follow that Isabel's rights under the Constitution were violated. *See, e.g., Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) ("A violation of a state statute is not a *per se* violation of the federal Constitution. The federal government is not the enforcer of state law."); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1527 (11th Cir. 1987) ("[E]ven if the state statute has been violated, that does not prove a violation of a federal constitutional right.").

*Classic* is not to the contrary. Isabel argues that *Classic* recognized "the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections." (Doc. 65 at 8, quoting *Classic*, 313 U.S. at 315.) But *Classic* arose in a much different context—there, individuals who were deemed qualified to vote under state law, and who cast ballots, had their ballots "willfully altered and falsely counted" by corrupt local election officials. *Id.* at 307. Specifically, "[t]he overt acts alleged were that the [officials] altered eighty-three ballots cast for one candidate and fourteen cast for another, marking and counting them as votes for a third candidate, and that they falsely certified the number of votes cast for the respective candidates to the chairman of the Second

---

[4]     *See Dedolph v. McDermott*, 281 P.3d 484, 486 (Ariz. 2012) ("[I]f the [voting-related] deadline falls on [a holiday], a challenge filed on the next business day would be timely.") (citing A.R.S. § 1-303).

ER038

1    Congressional District Committee."  *Id.*  Based on these facts, the Supreme Court

2    concluded the election officials could be prosecuted for violating federal criminal law.  *Id.*

3           To be sure, *Classic* contains a number of passages that, when read in isolation, can

4    be construed as suggesting that a federal constitutional violation occurs whenever a state

5    election official fails to count a valid ballot.  If this were the rule, then Count III of the FAC

6    might survive dismissal.  But the Court is not persuaded that this is, in fact, the rule.  *Classic*

7    was a criminal case involving outright ballot fraud and alteration.  This is a civil case in

8    which Isabel has identified a legal reason why his ballot should have been considered valid

9    under state law despite his failure to register until one day after the ostensible registration

10   deadline.  If it were possible to sue state election officials for money damages under § 1983

11   under these circumstances, there would presumably be some precedent for doing so.

12   Isabel, however, has tellingly failed to identify a single case in the 78 years since *Classic*

13   was decided in which a court has endorsed such a theory in a § 1983 action.

14          The bottom line is that, although the Court is troubled by the notion that state

15   election officials might disregard ballots that should have been considered valid under state

16   law, Isabel has not identified any cognizable theory or vehicle for pursuing a money-

17   damages claim against such officials under federal law.  Congress declined to authorize

18   such a remedy when enacting the NVRA, and again when enacting the HAVA, and Isabel

19   hasn't pointed to any decisions—in the nearly eight decades since *Classic* was decided—

20   holding that such a remedy is part and parcel of the "right to vote" enshrined by federal

21   common law.

22          Finally, Isabel did not request leave to amend in his opposition to the motion to

23   dismiss and it doesn't appear to the Court that further leave to amend would be necessary

24   or appropriate.

25          Accordingly, **IT IS ORDERED** that:

26          (1)    Defendants' motion to dismiss for failure to state a claim (Doc. 61) is

27   **granted**; and

28

- 11 -

**ER039**

1          (2)    The Clerk of Court shall terminate this action and enter judgment

2  accordingly.

**ER040**

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

David Isabel,

           Plaintiff,

v.

Michele Reagan, et al.,

           Defendants.

No. CV-18-03217-PHX-DWL

**ORDER**

**INTRODUCTION**

In February 2016, Arizona's Secretary of State, Defendant Michele Reagan ("the Secretary"), published the State's calendar for the 2016 election cycle. This calendar identified Monday, October 10, 2016—Columbus Day—as the voter registration deadline for the 2016 general election ("the 2016 Election").

Plaintiff David Isabel ("Isabel"), who moved to Arizona from New York in early October 2016, registered to vote at the Arizona Department of Motor Vehicles ("DMV") on October 11, 2016. Because this registration effort occurred one day after the registration deadline the Secretary had previously set, Isabel was only allowed to cast a provisional ballot during the 2016 Election, which ultimately wasn't counted by officials within the Maricopa County Recorder's Office.

Isabel has now sued the Secretary, as well as Maricopa County Recorder Adrian Fontes and Maricopa County (collectively, "the County Defendants"), arguing that the Secretary and the County Defendants violated two federal election statutes as well as

1  Article I, Section 2 of the United States Constitution.  The first statute invoked by Isabel is
2  the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.*, which
3  requires each state's voter registration deadline to be "not later" than 30 days before the
4  election date.  Isabel contends that, because October 10, 2016 was a holiday that fell on a
5  Monday—meaning that post offices and the DMV were closed on that date, as well as the
6  preceding Sunday—Arizonans wishing to register via the mail or at the DMV were
7  effectively required to register at least 31 days before the 2016 Election, in violation of the
8  NVRA's 30-day limit.  The other statute invoked by Isabel is the Help America Vote Act
9  of 2002 ("HAVA"), 52 U.S.C. § 21081 *et seq.*, which requires state election officials to
10  count provisional ballots if the officials "determine[] that the individual [who cast the
11  provisional ballot] is eligible under State law to vote."  Isabel contends the HAVA was
12  violated when his provisional ballot wasn't counted.

13      Notably, Isabel seeks to utilize 42 U.S.C. § 1983 as a vehicle for asserting claims
14  based upon the NVRA and the HAVA (as well as for the alleged violation of Article I,
15  Section 2 of the Constitution).  As a remedy, Isabel seeks "compensatory and punitive
16  damages," among other things.

17      Now pending before the Court are the County Defendants' motion to dismiss for
18  lack of subject-matter jurisdiction (Doc. 32) and the Secretary's motion to dismiss for
19  failure to state a claim (Doc. 33).  The motions are fully briefed and the Court heard oral
20  argument on June 5, 2019.  For the following reasons, the Court will deny the County
21  Defendants' motion and grant the Secretary's motion.

22                          **BACKGROUND**
23  I.   <u>Factual History</u>
24      **A.   Voter Registration Deadline**
25      The facts alleged in the complaint, which the Court assumes to be true for purposes
26  of ruling on the pending motions, are as follows.  To be eligible to vote in a particular
27  election, Arizona law requires that a voter's registration form be "received by the county
28  recorder . . . prior to midnight of the twenty-ninth day" before that election.  (Doc. 1 ¶ 13.)

- 2 -

1   The twenty-ninth day before the 2016 Election was Monday, October 10.  (*Id.* ¶ 16.)  It

2   was also Columbus Day—a state and federal holiday.  (*Id.* ¶¶ 15, 16.)  Post offices were

3   closed on Sunday, October 9 and Monday, October 10.  (*Id.* ¶ 17.)  The DMV was closed

4   on Saturday, October 8, Sunday, October 9, and Monday, October 10.  (*Id.* ¶ 18.)

5       The Secretary set the voter registration deadline for the 2016 Election as Monday,

6   October 10.  (*Id.* ¶ 19.)  The Secretary and the County Defendants adopted a policy that

7   deemed invalid any ballot cast in the 2016 Election by a voter who registered on October

8   11, 2016.  (*Id.* ¶¶ 22, 23.)  More than 2,000 Arizonans registered to vote on October 11,

9   2016, including Isabel.  (*Id.* ¶ 24.)

10      **B.    Prior Lawsuit To Enjoin the Secretary From Implementing Deadline**

11      On October 19, 2016, the Arizona Democratic Party and the Democratic National

12  Committee filed a lawsuit against the Secretary, seeking, among other relief, a temporary

13  restraining order to enjoin her from "disqualifying any Arizona voter from voting a regular

14  ballot in the November 8 Election solely because he or she did not register by October 10,

15  2016, if he or she submitted a valid voter registration application before midnight on

16  October 11, 2016 and is otherwise eligible to vote."  Complaint at 10, *Arizona Democratic*

17  *Party v. Reagan*, 16-cv-03618 (D. Ariz. 2016.)[1]

18      On November 3, 2016, the Hon. Steven P. Logan issued an order denying the request

19  for emergency injunctive relief.  Although Judge Logan agreed with the plaintiffs that the

20  Secretary violated the NVRA by setting the voter registration deadline on Columbus Day,

21  Judge Logan concluded the plaintiffs' "delay in initiating this action, and the resulting

22  prejudice that has arisen due to that delay, precludes relief."  *Arizona Democratic Party v.*

23  *Reagan*, 2016 WL 6523427, *16 (D. Ariz. 2016).  As a result, Judge Logan didn't require

24  the votes of those who registered on October 11 to be counted.  *Id.* at 18.

25

26

---

27  [1]    Although Isabel didn't plead this fact, the Court may take judicial notice of
    "proceedings in other courts . . . within . . . the federal judicial system." *United States ex*

28  *rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.
    1992) (citation omitted).

1    **C.    Failure To Count Isabel's Vote**

2    On November 8, 2016, Isabel went to his assigned polling location to cast his ballot.

3    (Doc. 1 ¶ 35.)  Isabel was instructed to complete a provisional ballot because he wasn't on

4    the list of eligible voters.  (*Id.*)  Isabel's provisional ballot was verified by the County

5    Defendants but not counted because he had registered on October 11.  (*Id.* ¶¶ 36, 37.)

6    On or about November 28, 2016, the County Defendants certified the 2016 General

7    Election Official Canvass.  (*Id.* ¶ 39.)  On or about December 5, 2016, the Secretary

8    instructed the Assistant Secretary of State to serve as the Acting Secretary of State and

9    certify the 2016 General Election Official Canvass.  (*Id.* ¶ 40.)  The Secretary signed the

10   2016 General Election Official Canvass Certification as both the Secretary of State and the

11   Acting Governor.  (*Id.* ¶ 41.)

12   In 2017, Isabel first learned that his ballot had not been counted.  (*Id.* ¶ 43.)

13   II.   <u>Procedural History</u>

14   On October 9, 2018, Isabel filed his complaint in this action.  (Doc. 1.)

15   On November 27, 2018, the County Defendants filed a motion to dismiss for lack

16   of subject-matter jurisdiction under Rule 12(b)(1).  (Doc. 32.)

17   On November 30, 2018, the Secretary filed a motion to dismiss for failure to state a

18   claim under Rule 12(b)(6).  (Doc. 33.)

19   **DISCUSSION**

20   I.   <u>The County Defendants' Motion To Dismiss</u>

21   The County Defendants' motion identifies five reasons why the Court lacks subject-

22   matter jurisdiction over Isabel's claims.  First, the County Defendants assert that Isabel

23   lacks standing because his injury (not having his vote counted in the 2016 Election) isn't

24   "fairly traceable" to their conduct and isn't redressable by the Court.  (Doc. 32 at 4-7.)

25   Second, they argue the Arizona Legislature's passage of Senate Bill 1307—which ensures

26   no future voter registration deadlines will fall on a weekend or holiday—moots Isabel's

27   claims, as does the doctrine of laches.  (*Id.* at 7-12.)  Third, they contend Isabel's claims

28   against them are "improper because recorders are not empowered to establish statewide

- 4 -

voter registration deadlines." (*Id.* at 13.)  Fourth, they argue Isabel's NVRA-based claim is barred because he didn't follow the statute's notice procedures before bringing this lawsuit.  (*Id.* at 13-14.)  And fifth, they assert Isabel is barred from bringing a HAVA-based claim because he failed to exhaust administrative remedies.  (*Id.* at 14-15.).[2] However, during the oral argument on June 5, 2019, the County Defendants conceded that their second argument (mootness/laches) lacks merit and withdrew their fifth argument (exhaustion under the HAVA).  Accordingly, the Court will only address their first, third, and fourth arguments below.

### A.    **Standing**

Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies.  "[O]ne of the controlling elements in the definition of a case or controversy under Article III is standing.  The requisite elements of Article III standing are well established: A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) (citations and internal quotation marks omitted).  To be "fairly traceable," the injury cannot "result from the independent action of some third party not before the court."  *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 42 (1976).

### 1.    *"Fairly Traceable"*

The County Defendants ask the Court to dismiss this action because the injury suffered by Isabel—the failure to count his vote in the 2016 Election—isn't "fairly traceable" to them.  They contend that, although they "tallied the ballots in the 2016 General Election, [they] did not set the voter registration deadline," which was set by the Secretary. (Doc. 32 at 6.)  They further contend they were required to abide by this deadline by the threat of criminal penalties.  (*Id.*)  They conclude that Isabel's injury was therefore

---

[2]       The County Defendants make a sixth argument that "punitive damages are wholly inappropriate."  (*Id.* at 16.)  However, this argument is predicated on their argument that Isabel failed to exhaust his administrative remedies under the HAVA.  Because the County Defendants have now withdrawn their HAVA exhaustion argument, the Court doesn't address the availability of punitive damages.

- 5 -

either caused by the Secretary (who set the deadline) or by Isabel himself (who failed to register in time).  (*Id.*)

Isabel, in response, contends his injury is directly traceable to the County Defendants because "the County adopted and implemented a policy that deemed invalid any ballot cast in the November 2016 Election by a voter who registered on October 11, 2016."  (Doc. 36 at 6.)  As for "the-Secretary-made-us-do-it defense," Isabel argues the County Defendants are confusing comparative fault with traceability.  (*Id.* at 6-7.)

The County Defendants dedicate their entire reply to their traceability argument.  (Doc. 39.)  They cite *Kurtz v. Baker*, 829 F.2d 1133 (D.C. Cir. 1987), for the proposition that "a defendant's action cannot cause a plaintiff's alleged injury if the defendant has no authority or power to act."  (Doc. 39 at 3.)

The County Defendants are not entitled to dismissal based on a lack of traceability.  The Ninth Circuit has held that the "Article III causation threshold" is "less rigorous" than proximate causation.  *Canyon Cty. v. Syngenta Seeds, Inc.,* 519 F.3d 969, 974 n.7 (9th Cir. 2008); *see also Rothstein v. UBS AG,* 708 F.3d 82, 92 (2d Cir. 2013) ("[T]he test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a standard lower than proximate cause.").  Thus, "[t]o survive a motion to dismiss for lack of constitutional standing," plaintiffs need only "establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'  A causal chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'"  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (citations omitted).  Put another way, a plaintiff need not allege that a defendant was "the sole source of" its injury and "need not eliminate any other contributing causes to establish its standing."  *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011).

Here, Isabel alleges the County Defendants implemented the policy that resulted in his provisional ballot being disregarded.  This is sufficient to show that Isabel's asserted injury is "fairly traceable" to the County Defendants' conduct, because it places the County

ER046

Defendants in the "line of causation" that ultimately resulted in his injury. *Maya*, 658 F.3d at 1070. Although the County Defendants' conduct wasn't the only cause of his injury—it was the Secretary who established the October 10 voter registration deadline—it was a cause. *Barnum Timber*, 633 F.3d at 901 (a plaintiff "need not eliminate other contributing causes to establish its standing").

*Kurtz* is not to the contrary. There, "an advocate of 'secular humanism'" sued the chaplains of the United States Senate and House of Representatives after his request to make a non-religious speech to Congress about moral responsibility was denied. 829 F.2d at 1134-35. The D.C. Circuit concluded the plaintiff lacked standing to assert such a claim because the chaplains didn't have the authority or discretion to approve such speaking requests—"the opportunity to address either house is a privilege rarely extended to outsiders, and then only with the approval of the members of the respective houses." *Id.* at 1142. In other words, the *Kurtz* court concluded the plaintiff couldn't establish traceability because he'd sued the wrong people. Moreover, the *Kurtz* court noted the plaintiff would have been able to establish traceability if there had been "a directive from the House or the Senate that their chaplains not admit Kurtz to the benefits otherwise available to him," *id.* at 1144, or if "the chaplains were implementing an unconstitutional directive from their superiors," *id.* at 1145. That, of course, is exactly the situation here—Isabel faults the County Defendants for enforcing and implementing the Secretary's allegedly unconstitutional directives.

## 2. *Redressability*

The County Defendants next argue Isabel's injury isn't redressable because "there is no court decision that can require Defendants to retroactively count Plaintiff's ballot cast in the 2016 general election." (Doc. 32 at 7.)

This argument is premised on a misconception that Isabel is seeking injunctive relief. To be clear, Isabel only seeks monetary relief in this case. (Doc. 1 at 15.) The Supreme Court has repeatedly held "that actions for damages may be maintained for wrongful deprivations of the right to vote." *Carey v. Piphus*, 435 U.S. 247, 265 n.22 (1978)

(collecting cases).  Therefore, the County Defendants' redressability argument is without merit.

### B.    **Power Of County Recorders**

The County Defendants argue Count 1 is improper because "recorders are not empowered to establish statewide voter registration deadlines."  (Doc. 32 at 13.)  Rather, "the Secretary sets the voter registration deadline."  (*Id.*)

This argument merely repackages the County Defendants' standing argument regarding traceability, which the Court rejected above.

### C.    **Failure To Provide Notice Under The NVRA**

The County Defendants also argue Count 1 is improper because a prerequisite to filing suit under the NVRA is "pre-suit notice to the chief election official of the State (i.e. Secretary of State)."  (Doc. 32 at 13.)

This argument lacks merit.  The NVRA provides that an "aggrieved person need not provide notice" before bringing a civil action if "the violation occurred within 30 days before the date of an election for Federal office."  52 U.S.C. § 20510(b)(3).  Here, Isabel alleges he registered to vote on October 11, 2016 (Doc. 1 ¶ 24)—28 days before the 2016 Election.  Thus, the NVRA wouldn't have required notice under the facts of this case.

## II.    The Secretary's Motion To Dismiss

The Secretary argues Isabel has failed to state a claim because: (1) Isabel can't assert a violation of the NVRA using § 1983, and even if he could, the NVRA doesn't permit recovery of monetary damages; (2) the HAVA doesn't apply here because Isabel wasn't eligible to vote in the 2016 Election; and (3) Isabel wasn't disenfranchised by the Secretary's voter registration deadline.  (Doc. 33.)

### A.    **Legal Standard**

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual

ER048

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

B.    **The NVRA**

A brief discussion of the NVRA is helpful before addressing the parties' arguments. The NVRA requires each state to "ensure that any eligible applicant is registered to vote in an election" if the applicant has registered to vote "not later than the lesser of 30 days, or the period provided by State law, before the date of the election." 52 U.S.C. § 20507(a)(1). The statute also identifies four different ways in which a person can register to vote and identifies the date on which each method is deemed effective: (1) submission of a voter registration form to "the appropriate State motor vehicle authority," which is effective upon submission; (2) submission of a voter registration form through the mail, which is effective upon the date it is "postmarked"; (3) in-person registration "at the voter registration agency," which is effective when "accepted"; and (4) submission of a voter registration form to "the appropriate State election official," which is effective when "received." *Id*.

"The NVRA creates a private right of action for '[a] person who is aggrieved by a violation of [the NVRA].'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1035 (9th Cir. 2015) (citations omitted). An aggrieved person "may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 52 U.S.C. § 20510(b). Here, the crux of the dispute is whether Isabel can assert an NVRA-based claim via 42 U.S.C. § 1983 (instead of suing directly under 52 U.S.C. § 20510(b)) and if so, whether he is permitted to seek compensatory and punitive damages in the § 1983 action.

The Secretary argues that, because the NVRA "outlines a specific remedial scheme

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

providing only declaratory and injunctive relief to aggrieved parties," Isabel can't bring a § 1983 claim and can't seek compensatory damages.  (Doc. 33 at 7.)  In addition to relying upon the NVRA's text, the Secretary identifies various pieces of legislative history that suggest Congress didn't intend to allow monetary damages for violations of the NVRA.[3]  (Doc. 33 at 8.)

In response, Isabel makes three arguments.  First, he contends there is a presumption that a federal statute is enforceable via § 1983 where it (like the NVRA) creates "enforceable right[s]."  (Doc. 37 at 4-5.)  Second, he notes that the NVRA contains a "savings clause," which provides that "the rights and remedies established by this section are in addition to all other rights and remedies provided by law."  (*Id.* at 6-8.)  He contends the Supreme Court, in *Herman & McLean v. Huddleston*, 459 U.S. 375 (1983), "addressed nearly identical savings clauses and held that they evidenced Congress's intent to supplement, not preclude."  (*Id.*)  Third, he contends the legislative history cited by the Secretary doesn't support her position—it merely states "this section" of the NVRA doesn't authorize "the award of monetary damages" and thus doesn't preclude claims for monetary damages under other provisions, such as § 1983.  (*Id.* at 9.)

The Court agrees with the Secretary that a plaintiff wishing to assert an NVRA-based claim must sue directly under the NVRA, not via § 1983.  As an initial matter, it should be noted that four other courts have addressed this issue.  Two of those courts concluded a plaintiff can't assert an NVRA-based claim via § 1983[4] while the other two

---

[3]     The Secretary cites H.R. Rep. No. 103-9, at 20 (1993), which states, in part: "The Committee has heard concerns that this section authorizes the award of monetary damages. It does not."  She also cites S. Rep. No. 103-6, at 36-37 (1993), which states: "It should be noted that this section does not authorize the award of monetary damages.  Rather, the civil remedies that are authorized are corrective action in the form of declaratory and injunctive relief, plus reasonable attorney fees."  (Doc. 33 at 8-9.)

[4]     *Assoc. of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 367 n.11 (5th Cir. 1999) (rejecting plaintiff's contention that "it has standing to pursue its [NVRA] claims under 42 U.S.C. § 1983" in part because "'section 1983 . . . is not an available for deprivation of a statutory right when the statute, itself, provides an exclusive remedy for violations of its own terms'") (citations omitted); *Nat'l Coal. of Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 961 F. Supp. 129, 132 (E.D. Va. 1997), *reversed on other grounds*, 152 F.3d 283 (4th Cir. 1998) ("NCSD has failed to assert any rights under . . . the NVRA to support a cause of action under Section 1983.  The NVRA provides a detailed method of enforcement which is exclusive, and as a result private persons cannot

- 10 -

reached the opposite conclusion.[5]  These decisions, however, aren't terribly helpful here. Not only are all of them from outside the Ninth Circuit, but all were decided in the 1990s, before the Supreme Court and Ninth Circuit issued a series of decisions (discussed below) clarifying the circumstances under which a plaintiff should be permitted to assert a claim under § 1983 when the underlying statute providing the basis for the § 1983 claim contains its own remedial scheme.

The leading authority on this issue is *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113 (2005).  There, the Supreme Court began by acknowledging that when a federal statute creates an individual right, a rebuttable presumption arises that the right is enforceable under § 1983.  *Id.* at 120.  However, the Court went on to explain that "[t]he defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right."  *Id.* (citations omitted).  Evidence of such congressional intent "may be found directly in the statute creating the right, or inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'"  *Id.* (citations omitted).  The Court further emphasized that "[t]he provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983."  *Id.* at 121.  In other words, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Id.* (citation omitted).  Finally, the Court emphasized that "in *all* of the cases in which we have held that § 1983 *is* available for violation of a federal statute, we have emphasized that the statute at issue . . . *did not* provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated."  *Id.* (citations omitted).

support a Section 1983 claim based upon an alleged violation of the NVRA.").

[5]    *Condon v. Reno*, 913 F. Supp. 946, 960 (D.S.C. 1995) ("[T]he notice section is a prerequisite to filing a suit directly under the NVRA, but [the NVRA's savings clause] specifically provides that such rights and remedies established in the NVRA do not abrogate other rights, and here the private plaintiffs are also exercising their rights under 42 U.S.C. § 1983 . . . ."); *Assoc. of Cmty. Orgs. for Reform Now v. Miller*, 912 F. Supp. 976, 982 (W.D. Mich. 1995) ("NVRA creates an enforceable right under § 1983 . . . . [T]he statute contains no express provision limiting a plaintiff's remedy for violations of the act to the remedy created by the act.").

- 11 -

ER051

1    The NVRA expressly creates a private right of action for its violation: an aggrieved
2    person may bring a civil action for declaratory or injunctive relief after complying with the
3    applicable notice requirements.  *See* 52 U.S.C. § 20510(b).  Thus, the NVRA isn't like the
4    statutes for which the Supreme Court has held § 1983 remains available as a remedy.

5    That isn't to say the inclusion of a private remedy in the NVRA conclusively
6    establishes Congress's intent to prohibit its vindication under § 1983—it doesn't.  *Palos*
7    *Verdes*, 544 U.S. at 122 ("The Government as *amicus*, joined by the City, urges us to hold
8    that the availability of a private judicial remedy is not merely indicative of, but conclusively
9    establishes, a congressional intent to preclude § 1983 relief.  We decline to do so.").
10   Rather, "[t]he ordinary inference that the remedy provided in the statute is exclusive can
11   surely be overcome by textual indication, express or implicit, that the remedy is to
12   complement, rather than supplant, § 1983." *Id.*

13   Here, Isabel argues the inference of exclusivity is overcome by the NVRA's
14   "savings clause," which he contends is a textual indication that Congress intended § 1983
15   to be an additional mechanism to vindicate a violation of one's rights under the NVRA.
16   That clause provides: "The rights and remedies established by this section are in addition
17   to all other rights and remedies provided by law." 52 U.S.C. § 20510(d).

18   This argument is unavailing.  The savings clause in the NVRA is similar to the
19   savings clauses at issue in *Middlesex County Sewerage Authority v. National Sea*
20   *Clammers Association*, 453 U.S. 1 (1981), in which the Supreme Court determined that a
21   § 1983 action wasn't available for a violation of the Federal Water Pollution Control Act
22   ("FWPCA") or the Marine Protection, Research, and Sanctuaries Act of 1972 ("MPRSA").
23   The FWPCA provided: "Nothing in this section shall restrict any right which any person
24   (or class of persons) may have . . . *to seek any other relief* . . . ." *Id.* at 29 (citing 33 U.S.C.
25   § 1365(e)) (emphasis added).  Similarly, the MPRSA provided: "The injunctive relief
26   provided by this subsection shall not restrict any right which any person (or class of
27   persons) may have . . . *to seek any other relief* . . . ." *Id.* at 29 (citing 33 U.S.C. § 1415(g)(5))
28   (emphasis added).  The Supreme Court determined that neither statute preserved the

ER052

1    availability of a § 1983 action because "[t]he language of these clauses . . . does not . . .

2    support the view that Congress expressly preserved § 1983 remedies for violations of *these*

3    *statutes*."  *Id.* at 20 n.31.  Here, similarly, the NVRA's savings clause doesn't expressly

4    state that plaintiffs wishing to assert NVRA-based claims may do so under § 1983.

5         *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983), is easily distinguishable

6    and does not require a different result.  There, the Supreme Court held that a plaintiff could

7    bring a claim under Section 10(b) of the Securities Exchange Act of 1934—a provision

8    that didn't include its own express cause of action—even though the challenged conduct

9    would also provide the basis for an action under Section 11 of the Securities Act of 1933,

10   which did create an express private right of action.  *Id.* at 382-33.  Although the Court

11   stated that this outcome was supported in part by the presence of a savings clause, *id.* at

12   383-84, the Court also emphasized that "when Congress comprehensively revised the

13   securities laws in 1975, a consistent line of judicial decisions had permitted plaintiffs to

14   sue under Section 10(b) regardless of the availability of express remedies . . . .  In light of

15   this well-established judicial interpretation, Congress' decision to leave Section 10(b)

16   intact suggests that Congress ratified the cumulative nature of the Section 10(b) action."

17   *Id.* at 385-86 (citations omitted).

18        This case does not involve remotely similar circumstances.  At the time Congress

19   enacted the NVRA in 1993, it wasn't acting against the backdrop of decades of judicial

20   decisions authorizing plaintiffs to bring § 1983 actions to vindicate the right to register to

21   vote within 30 days of the election.  No such right existed until the NVRA was passed.

22   Accordingly, the inclusion of savings clause within the NVRA can't be viewed as a

23   congressional intent to "ratify" this preexisting caselaw.  Moreover, *Huddleston* addressed

24   the somewhat unique question of how to harmonize a pair of closely related securities

25   statutes that were enacted within a year of each other.  That is an entirely different kettle

26   of fish from the issue presented here—whether Congress intended to make § 1983 damages

27   actions available by including a savings clause in a statute that creates its own statutory

28   right of action with limited remedies.  If *Huddleston* had any bearing on that issue, the

- 13 -

1    Supreme Court surely would have mentioned it in *Palos Verdes*.

2            Finally, the inference of exclusivity arising from the NVRA's creation of an express

3    judicial remedy is further bolstered by other considerations.  In *Palos Verdes*, the Supreme

4    Court determined the statute at issue didn't allow for enforcement via § 1983 because,

5    among other reasons, the statute "limits relief in ways that § 1983 does not."  544 U.S. at

6    122.  The same is true here.  The NVRA requires a party to give notice of a violation before

7    bringing a civil action if the federal election is more than 30 days away—§ 1983 does not.

8    Also, the NVRA only allows declaratory and injunctive relief, whereas § 1983 allows a

9    plaintiff to recover monetary damages.  Thus, allowing a plaintiff to assert a § 1983 action

10   for money damages to vindicate violations of the NVRA "would distort the scheme of . . .

11   limited remedies created by [the NVRA]" and flip on its head the "assumption . . . that

12   limitations upon the remedy contained in the statute are deliberate and are not to be evaded

13   through § 1983."  *Palos Verdes*, 544 U.S. at 123, 127.  *See also Stilwell v. City of Williams*,

14   831 F.3d 1234, 1244 (9th Cir. 2016) ("The *Sea Clammers* line of cases teaches that when

15   Congress creates a right by enacting a statute but at the same time limits enforcement of

16   that right through a specific remedial scheme that is narrower than § 1983, a § 1983 remedy

17   is precluded.  This makes sense because the limits on enforcement of the right were part

18   and parcel to its creation.").[6]

19           Accordingly, Isabel's NVRA claim asserted through § 1983 must be dismissed.[7]

20   _____

21   [6]       Notably, in the two decisions approving the assertion of NVRA claims via § 1983,
     the plaintiffs were only seeking injunctive and declaratory relief.  *Condon*, 913 F. Supp. at
22   960 ("[T]heir suit . . . seeks only prospective injunctive relief rather than money
     damages."); *Miller*, 912 F. Supp. at 988 (after ruling in plaintiffs' favor, ordering the
23   following relief: "Defendants shall comply fully with the NVRA.  Within ten (10) days of
     this Order, defendants shall file and serve a proposed plan for implementing the NVRA.
24   The plan shall specify the date by which defendants shall be in full compliance with the
     NVRA, and shall include copies of defendants' most current voter registration forms.").
25   This provides an additional reason to conclude those decisions don't support Isabel's claim
     here.

26   [7]       In reaching this conclusion, the Court did not rely upon the legislative history
     materials proffered by the Secretary.  *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1631 (2018)
27   ("[L]egislative history is not the law.  It is the business of Congress to sum up its own
     debates in its legislation, and once it enacts a statute [w]e do not inquire what the legislature
28   meant; we ask only what the statute means.") (citations and internal quotation marks
     omitted).

1        C.      **The HAVA**

2        The "HAVA was passed in order to alleviate a significant problem voters

3   experience [, which] is to arrive at the polling place believing that they are eligible to vote,

4   and then to be turned away because the election workers cannot find their names on the list

5   of qualified voters." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th

6   Cir. 2004) (citation omitted).  The "HAVA dealt with this problem by creating a system

7   for provisional balloting, that is, a system under which a ballot would be submitted on

8   election day but counted if and only if the person was later determined to have been entitled

9   to vote." *Id.*

10       The complaint alleges the Secretary violated section 302(a)(4) of the HAVA.  (Doc.

11  1 ¶ 62.)  That provision states:

12           If the appropriate State or local election official to whom the [provisional]
             ballot or voter information is transmitted . . . determines that the individual
13           is eligible under State law to vote, the individual's provisional ballot shall be
             counted as a vote in that election in accordance with State law.
14

15  52 U.S.C. § 21082(a)(4).  Isabel alleges the Secretary violated that provision because he

16  "should have been eligible to vote under state law," yet the Secretary didn't count his

17  provisional ballot.  (Doc. 1 ¶ 63.)

18       The Secretary argues the HAVA is inapplicable, and thus Count 2 of Isabel's

19  complaint must be dismissed, because Isabel "was not eligible under state law to vote in

20  the 2016 General Election because he failed to timely register."  (Doc. 33 at 9.)  The

21  Secretary asserts that the "HAVA has not 'supplanted or 'strip[ped] from the States their

22  traditional responsibility to administer elections[,]' including their authority to set voter

23  registration deadlines."  (*Id.* at 10.)  She contends the deadline to register to vote was set

24  for October 10, regardless of whether it should have been set on October 11 under the

25  NVRA, and thus Isabel failed to timely register.  (*Id.*)

26       In response, Isabel asserts he "was eligible to vote under Arizona law" because when

27  a deadline to perform a function falls on a holiday, "it may be performed on the next

28  ensuing business day with effect as though performed on the appointed day."  (Doc. 38 at

- 15 -

10.)  Thus, "the Secretary was required to treat all valid registration forms, including [Isabel's], submitted on October 11th as if they were submitted on October 10th." (*Id.*).

Both parties miss the mark. "One and only one subsection of [the HAVA] addresses the issue of whether a provisional ballot will be counted." *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1080 (N.D. Fla. 2004). That subsection—section 302(a)(4)— doesn't require a provisional ballot to be counted if an individual *should have been* deemed eligible to vote by state election officials (as Isabel argues). Nor does section 302(a)(4) require a provisional ballot to be counted if an individual *actually is* eligible to vote under state law (as the Secretary's argument seemingly suggests). Rather, section 302(a)(4) requires a provisional ballot to be counted only if the appropriate election official "determines" the individual to be eligible.

Thus, under section 302(a)(4) of the HAVA, Isabel was entitled to have his provisional ballot counted only if a state or local election official determined he was eligible to vote. Here, Isabel concedes the Secretary determined he was ineligible to vote in the 2016 Election. (Doc. 1 ¶ 3 ["Defendants improperly deemed [Isabel] ineligible to vote and refused to count his ballot.].) Thus, Isabel fails to state claim under the HAVA.

This conclusion is compelled by the HAVA's plain language. After all, the "HAVA is quintessentially about being able to *cast* a provisional ballot." *Sandusky*, 387 F.3d at 576. In contrast, "[t]he only subsection of the HAVA that addresses the issue of whether a provisional ballot will be counted," section 302(a)(4), "conspicuously leaves that determination to the States." *Id.* at 577. Because Isabel's dispute is with the *propriety* of the Secretary's determination regarding his eligibility to vote under Arizona state law, the HAVA is not the proper vehicle for asserting his claim. *Sandusky*, 387 F.3d at 578 ("HAVA does not require that any particular ballot, whether provisional or 'regular,' must be counted as valid."); *Ron Barber for Cong. v. Bennett*, 2014 WL 6694451, *8 (D. Ariz. 2014) ("HAVA does not contain language that requires that the provisional votes be counted; it is directed to providing provisional votes."); *see also Hood*, 342 F. Supp. 2d at 1080 ("HAVA certainly does not require the counting of the vote of . . . one who registers

1   too late.").

2          During oral argument, Isabel argued that Congress couldn't have intended for the

3   HAVA to be interpreted in this manner because, otherwise, state and local officials could

4   disregard valid provisional ballots with impunity.  This argument is unpersuasive.  First,

5   it's entirely rational to interpret the HAVA as only creating the right to cast a provisional

6   ballot, while leaving it to the states to make the eligibility determination.  Isabel's

7   interpretation of the HAVA would create a federal cause of action to challenge a state or

8   local election official's application of state law whenever a provisional ballot has been cast.

9   If Congress had intended to effectuate such an enormous shift in the balance of power

10  related to elections, it presumably would have said so explicitly.  *United States v. Bass*,

11  404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be

12  deemed to have significantly changed the federal-state balance.").  The HAVA's statutory

13  language, moreover, raises the opposite inference—it states the "appropriate State or local

14  election official" is the one who "determines that the individual is eligible under State law

15  to vote."

16         Second, the bogeyman conjured by Isabel—that state and local officials can simply

17  disregard valid provisional ballots—doesn't exist.  An aggrieved voter may still challenge

18  the failure to count provisional ballots under state law.  *See, e.g., State ex rel. Skaggs v.

19  Brunner*, 900 N.E.2d 982, 988-89 (Ohio 2008) (The Help America Vote Act . . . authorizes

20  the states to determine 'whether a provisional ballot will be counted as a valid ballot' . . . .

21  This case involves the validity of three categories of provisional ballots cast at the

22  November 4 general election in Franklin County . . . .  Relators, two Franklin County

23  voters, request that all three categories of disputed provisional ballots be deemed invalid

24  and not be counted.  [The Secretary of State and others] request that the court hold that all

25  three categories be ruled valid and be counted.  Respondent Franklin County Board of

26  Elections defers to the secretary of state's position because of her tie-breaking decisions

27  on the disputed provisional ballots.  We address the three categories of provisional ballots

28  in order.").

ER057

1     Third, this outcome isn't inconsistent with the HAVA's administrative framework,

2  as Isabel suggested during oral argument.  The HAVA requires a state receiving certain

3  funding "to establish and maintain State-based administrative complaint procedures."  52

4  U.S.C. § 21112(a)(1).  The procedures must allow "any person who believes that there is a

5  violation of any provision of subchapter III"—and the provision at issue here, 52 U.S.C.

6  21082(a)(4), falls within subchapter III of the statute—to file an administrative complaint.

7  See 52 U.S.C. § 21112(a)(2)(B).  The presence of this parallel framework doesn't say

8  anything about whether Congress wanted to allow voters to challenge state-law eligibility

9  determinations in federal court.  If anything, it cuts against interpreting the HAVA as

10  creating an expansive federal cause of action.  *Cf. Am. Civil Rights Union v. Philadelphia*

11  *City Comm'rs*, 872 F.3d 175, 184-85 (3d Cir. 2017) (identifying the HAVA's

12  "administrative complaint" process as evidence of "Congress's intent to limit HAVA's

13  enforcement mechanism").

14     Finally, Isabel stated during oral argument that *Sandusky* demonstrates federal

15  courts can and should evaluate state-law voter eligibility determinations under the HAVA.

16  The Court respectfully disagrees.   In Section VI of the *Sandusky* opinion, the Sixth Circuit

17  reversed the portion of the district court's order that required state election officials to count

18  certain provisional ballots.  387 F.3d at 576 ("[T]he district court also held that provisional

19  ballots must be counted as valid ballots when cast in the correct county.  We disagree.").

20  In reaching this conclusion, the Sixth Circuit emphasized that the HAVA "explicitly defers

21  determination of whether ballots are to be counted to the States" and cited legislative

22  history materials suggesting that "[n]othing [in the HAVA] usurps the state or local election

23  official's *sole authority* to make the final determination with respect to . . .whether that

24  vote is duly counted."  *Id.* at 578 (emphasis added and citation omitted).

25     D.     **The Qualifications Clause**

26     Count 3 of the complaint alleges that Defendants violated Article I, Section 2, clause

27  1 of the United States Constitution by failing to count Isabel's ballot even though he was a

28  qualified voter.  (Doc. 1 ¶¶ 66-71.)

- 18 -

As an initial matter, the Court notes that the description of the Qualifications Clause[8] contained in Isabel's complaint—he characterizes it as "secur[ing] the right of qualified voters within a state to cast their ballots and have them counted in Congressional elections" (Doc. 1 at 14 ¶ 68)—is at odds with the actual text of that provision.  The Qualifications Clause provides: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

The best reading of the Qualifications Clause is that it simply ensures that a voter who is qualified to vote in an election for the most numerous branch of the state legislature (in Arizona, as in most states, the House of Representatives) must also be permitted to vote for candidates for the United States House of Representatives.  Many other courts have interpreted it in this fashion.  *See, e.g., Tashjian*, 479 U.S. at 229 ("The fundamental purpose of the Qualifications Clause[] . . . is satisfied if all those qualified to participate in the selection of members of the more numerous branch of the state legislature are also qualified to participate in the election of . . . Members of the House of Representatives."); *Cool Moose Party v. State of R.I.*, 6 F. Supp. 2d 116, 122-24 (D.R.I. 1998) (emphasizing that "[t]he purpose of the Qualifications Clause is to prevent voters who are eligible to vote in state elections from being disqualified from participating in federal elections" and rejecting voter's lawsuit under the Qualifications Clause because the challenged voting practice "does not establish different qualifications for voting for state and federal offices" and "applies equally to all offices, state and federal'); *see also The Ku Klux Cases*, 110 U.S. 651, 663 (1884) ("[The states] define who are to vote for the popular branch of their own legislature, and the [Qualifications Clause of the] constitution of the United States says the same persons shall vote for members of congress in that state.  It adopts the qualification thus furnished as the qualification of its own electors for members of

---

[8]    In *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986), the Supreme Court referred to Article I, Section 2, clause 1 of the Constitution as the "Qualifications Clause."  *Id.* at 225.

1    congress.").[9]  This, standing alone, dooms Count 3 of Isabel's complaint.  The Secretary

2    couldn't have violated the Qualifications Clause here because she determined Isabel to be

3    unqualified to participate in the elections for *both* the Arizona House of Representatives

4    *and* the U.S. House of Representatives.

5           The parties ignore this issue in their moving papers.  Rather than address the actual

6    text of the Qualifications Clause, the parties engage in an extensive debate over whether

7    the Secretary's actions "disenfranchised" Isabel.  The Secretary contends that Isabel "fails

8    to state a claim, because voter registration deadlines do not disenfranchise voters from an

9    opportunity to vote, they merely set forth a deadline by which voters must act in order to

10   cast a vote."  (Doc. 33 at 10.)  In support of this contention, the Secretary cites *Rosario v.*

11   *Rockefeller*, 410 U.S. 752 (1973), and *Barilla v. Ervin*, 886 F.2d 1514, 1525 (9th Cir.

12   1989), *overruled on other grounds by Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174

13   (9th Cir. 1996), in which the Supreme Court and Ninth Circuit, respectively, held that voter

14   registration deadlines did not unconstitutionally burden the right to vote.  (Doc. 33 at 11-

15   12.)  Isabel, in response, explains that he "does not contend that voter registration

16   deadlines, in and of themselves, disenfranchise voters.  Rather, [Isabel] simply contends

17   that *he* was disenfranchised . . . .  In other words, [Isabel's] ballot would have counted, but

18   for the Defendants' unlawful conduct."  (Doc. 37 at 10-11.)  Additionally, Isabel attacks

19   the cases cited by the Secretary—*Rosario* and *Barilla*—as inapposite.  He argues those

20   cases "do not stand for the proposition that *improperly* set voter registration deadlines

21   cannot disenfranchise or harm a voter."  (*Id.* at 14.)

22          Although it is unnecessary to resolve this dispute here—Isabel's Qualifications

23

24   _____

     [9]       Following oral argument, Isabel submitted a notice (Doc. 52) that identified *United*

25   *States v. Classic*, 313 U.S. 299 (1941), as a decision supporting his interpretation of the
     Qualifications Clause.  Although *Classic* does contain some dicta that may support Isabel's

26   position, the issue in that case was simply whether the Qualifications Clause applied in
     primary elections, such that certain state election officials who had "willfully altered and

27   falsely counted and certified the ballots of voters cast in the primary election" could be
     prosecuted for federal crimes.  *Id.* at 307.  The Supreme Court's subsequent ruling in

28   *Tashjian*, which recognizes that the "fundamental purpose" of the Qualifications Clause is
     to ensure that voters be treated equally when voting in dual federal/state elections, is more
     instructive.

                                                   - 20 -

Clause claim would fail regardless of who is correct—the Court agrees with the Secretary. Even if the Secretary violated state and/or federal law when setting the registration deadline, Isabel had ample opportunity to register to vote and therefore wasn't disenfranchised. *Rosario* and *Barilla* are controlling.

In *Rosario*, the Supreme Court upheld a New York law requiring a person to enroll with a political party at least 30 days before the general election in order to vote in that party's primary for the following election. 410 U.S. at 754. In effect, "[t]he cutoff date for enrollment [was] approximately eight months prior to a presidential primary (held in June) and 11 months prior to a nonpresidential primary (held in September)." *Id.* at 760. The plaintiffs in *Rosario* didn't enroll with a political party by the deadline and thus couldn't participate in the primary. *Id.* at 755. The Supreme Court held the challenged statute "did not absolutely disenfranchise the class to which the petitioners belong" but "merely imposed a time deadline on their enrollment, which they had to meet in order to participate in the next primary." *Id.* at 757. The Supreme Court further explained that, to the extent the plaintiffs' "plight can be characterized as disenfranchisement at all, it was not caused by [the challenged deadline], but by their own failure to take timely steps to effect their enrollment." *Id.* at 758. The Supreme Court concluded that New York had not placed an unconstitutionally onerous burden on the plaintiffs' exercise of the franchise— instead, New York "merely imposed a legitimate time limitation on their enrollment, which they chose to disregard." *Id.* at 760-62.

In *Barilla*, the Ninth Circuit upheld an Oregon statute requiring those wanting to vote in a general election to register at least twenty days before the election. 886 F.2d at 1517, 1524-25. The plaintiffs challenged the statute because they failed to register in time. *Id.* at 1517. The Ninth Circuit upheld the statute, relying in part on *Rosario* to support the conclusion that the plaintiffs "were all disenfranchised by their willful or negligent failure to register on time," not by the registration deadline. *Id.* at 1525. The court explained the plaintiffs "could have registered in time . . . but they failed to do so," and thus the registration deadline was "not a 'ban' on the plaintiffs' right to vote but rather a 'time

ER061

limitation' on when the plaintiffs had to act in order to be able to vote." *Id.*

The rationale underlying *Rosario* and *Barilla* is equally applicable here. The facts, as alleged by Isabel, show that the Secretary publicly set a voter registration deadline of October 10, 2016 and "adopted a policy that deemed invalid any ballot cast in the November 2016 Election by a voter who registered on October 11, 2016." (Doc. 1 ¶¶ 19, 22.) Isabel doesn't allege that the Secretary clandestinely set October 10 as the registration cut-off date. Nor does he allege he was unaware of the deadline or that it was impossible for him to register by October 10. Thus, Isabel's inability to vote was caused "by [his] own failure to take timely steps to effect [his] enrollment." *Rosario*, 410 U.S. at 758.

Isabel argues *Rosario* and *Barilla* "do not stand for the proposition that *improperly* set voter registration deadlines cannot disenfranchise or harm a voter." (Doc. 38 at 14.) True. In those cases, the plaintiffs didn't challenge the propriety of the voter registration deadlines under state or federal law. Yet even assuming the Secretary violated state and federal law when setting the October 10 deadline, that has no bearing on whether she violated the *Constitution* (particularly where the only constitutional provision invoked by Isabel merely requires voters to be treated equally for purposes of concurrent state and federal elections).

III.   Leave To Amend

At oral argument, Isabel stated that, if the Court were inclined to dismiss his three causes of action against the Secretary, he would request leave to file an amended complaint adding a new federal common law cause of action.

The Court will authorize Isabel to file a motion requesting leave to amend, which Defendants[10] may then evaluate and determine whether to oppose. *See* Fed. R. Civ. P. 15(a)(2). The Court notes, however, that to the extent Isabel's new federal common law cause of action is based on his disenfranchisement theory, the Court would likely be

---

[10]   Because the County Defendants only challenged the Court's subject matter jurisdiction and didn't join in the Secretary's motion to dismiss under Rule 12(b)(6), Counts 1-3 in the complaint remain pending against the County Defendants. The Court presumes, however, that a 12(b)(6) motion from the County Defendants will be coming soon. The parties may wish to meet and confer to avoid unnecessary motions practice.

ER062

1    inclined to deny leave to amend as futile for the reasons discussed above.  *Cervantes v.*
2    *Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) ("Although leave to
3    amend should be given freely, a district court may dismiss without leave where a plaintiff's
4    proposed amendments would fail to cure the pleading deficiencies and amendment would
5    be futile.") (citation omitted).
6            Accordingly, **IT IS ORDERED** that:
7            (1)     The County Defendants' motion to dismiss for lack of jurisdiction (Doc. 32)
8    is **denied**; and
9            (2)     The Secretary's motion to dismiss for failure to state a claim (Doc. 33) is
10   **granted**; and
11           (3)     By June 28, 2019, Isabel may file a motion for leave to amend his complaint
12   to add a federal common law cause of action.
13           Dated this 7th day of June, 2019.

_____
Dominic W. Lanza
United States District Judge

- 23 -

**ER063**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **David Isabel,** | ) | |
| | ) | No. **CV-18-3217-PHX-DWL** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | June 5, 2019 |
| **Michele Reagan, et al.,** | ) | 10:32 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE: THE HONORABLE DOMINIC W. LANZA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTIONS HEARING**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                        **A P P E A R A N C E S**

3

For the Plaintiff:
4      Scharff PLC
       By:  **Spencer Garrett Scharff**, Esq.
5      502 West Roosevelt Street
       Phoenix, Arizona 85012
6
       Miller Pitt Feldman & McAnally
7      By:  **Nathan Jean Fidel**, Esq.
       2800 North Central Avenue, Suite 840
8      Phoenix, Arizona 85012

9  For Defendant Reagan:
       Timothy A. LaSota PLC
10     By:  **Timothy Andrew LaSota**, Esq.
       2198 East Camelback Road, Suite 305
11     Phoenix, Arizona 85016

12 For Defendant Maricopa County:
       Maricopa County Attorney's Office
13     By:  **M. Colleen Connor**, Esq.
       222 North Central Avenue, Suite 1100
14     Phoenix, Arizona 85004

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings begin at 10:32 a.m.)

2          THE CLERK:  Civil case 18-3217, David Isabel versus

3   Michele Reagan and others.  Time set for hearing regarding

4   defendants' motions to dismiss.

5          Counsel, please announce your presence for the record.    10:32:22

6          MR. SCHARFF:  Good morning, Your Honor, Spencer

7   Scharff on behalf of David Isabel, with my co-counsel Nathan

8   Fidel.

9          THE COURT:  Good morning.

10         MR. FIDEL:  Good morning.    10:32:34

11         MR. LASOTA:  Good morning, Your Honor, Timothy LaSota

12  here on behalf of defendant Michele Reagan.

13         THE COURT:  Good morning.

14         MS. CONNOR:  Good morning, Your Honor, Colleen Connor

15  on behalf of Maricopa County Recorder Adrian Fontes and    10:32:41

16  Maricopa County.

17         THE COURT:  Good morning.

18         All right.  So we are here because I have a pair of

19  motions to dismiss that are now fully briefed.  First is the

20  County defendant's motion to dismiss based on lack of subject    10:32:52

21  matter jurisdiction.  And the other is the Secretary's motion

22  to dismiss under Rule 12(b)(6).

23         I've reviewed all of the pleadings, a lot of the

24  underlying case law, and I think I have a pretty good

25  understanding of the issues in play, but I wanted to hold    10:33:06

1    argument because these are some pretty interesting issues.

2            And so I think we should start with the County

3    defendant's motion because it goes to the Court's jurisdiction.

4            MS. CONNOR:  Your Honor, the County filed this motion

5    to dismiss based on lack of subject matter jurisdiction because    10:33:31

6    there's no Article III case in controversy here.

7            The U.S. Supreme Court established a three-part test

8    for standing, and the burden for establishing standing rests on

9    the plaintiff, which he has not met the burden.

10           One thing I want to emphasize is that in this case the    10:33:51

11   challenge is to, when the voter registration deadline, when it

12   falls on a holiday, does it get bumped to the next day?  And

13   that was addressed by Judge Logan back in 2016.

14           This lawsuit adds the Maricopa County Recorder and

15   makes the same argument, the Maricopa County Recorder should    10:34:19

16   have not had the voter registration deadline on the 29th day,

17   but instead on the 28th day.  But that assumed that

18   Columbus Day is considered a holiday in Maricopa County, and it

19   is not.

20           Maricopa County passed a resolution in December of    10:34:41

21   2011 in which the Board specified that the day after

22   Thanksgiving was to be deemed the legal holiday in place of the

23   second Monday in October.  And that became effective in 2012.

24           So, in fact, Maricopa County's three offices for the

25   Elections Department and Recorder were open for business on    10:35:11

1  that 29th day, and Mr. Isabel could have registered to vote on

2  that day.

3       Moreover, the County Recorder had no authority --

4       THE COURT:  Is this argument -- sorry, I focused on a

5  lot of other issues.  This argument about the fact that          10:35:28

6  Columbus Day isn't considered a holiday in Maricopa County, is

7  that in your briefs?

8       MS. CONNOR:  That specific issue is not in the brief,

9  that it wasn't a holiday.

10       THE COURT:  So your lead argument on this is something     10:35:43

11  you didn't brief?

12       MS. CONNOR:  Well, we briefed the standing and the

13  traceability.  And so there was no injury --

14       THE COURT:  So I'm looking at page 5 of your motion

15  where plaintiff alleges his injury is that his vote didn't       10:35:56

16  count and that it should have.  Maricopa County takes this

17  allegation as true for purposes of this motion to dismiss.

18       Seems to me now you're arguing that you do not take

19  that as true, and you're arguing that because Columbus Day

20  isn't recognized as a holiday it was perfectly appropriate for   10:36:11

21  it not to count.  And so I'm just trying to understand what

22  your position is.

23       MS. CONNOR:  Yes.  In the brief on the injury being

24  fairly traceable, the particular argument is whether the County

25  Recorder had the authority to -- to make the change to the       10:36:32

ER068

```
 1   deadline, given that State Statute 16-120 sets forth the

 2   statute as the 29th day before the election.

 3        Also -- okay.  And just add to that, the 29th day was

 4   the statutory deadline, and the County Recorder unilaterally

 5   had no authority to change it to the 28th day, especially since    10:37:13

 6   the Secretary of State, the chief election officer, had sent

 7   notice to all of the county recorders that the deadline for

 8   voter registration would continue to be the 29th day for the

 9   2016 election.

10        THE COURT:  You know, I guess just to address some of        10:37:33

11   the specific arguments that you raised in your motion papers,

12   among other things you argued that there is a absence of

13   redressability here, and that laches come into play.

14        MS. CONNOR:  Yes.

15        THE COURT:  I will say it seemed to me that you may           10:37:50

16   have misunderstood their Complaint as somehow seeking equitable

17   relief here.  They're seeking damages.  And the way I

18   understand the case law is that those doctrines are just

19   totally inapplicable here because this is a damages lawsuit

20   under 1983, not a claim for equitable relief.                     10:38:04

21        MS. CONNOR:  You're exactly right, Your Honor.  Those

22   were thrown in there based on the presumption that it was for

23   equitable or injunctive relief.  But, in fact, this is a

24   Section 1983 claim.  That's why --

25        THE COURT:  And I know you didn't write the opening          10:38:24
```

UNITED STATES DISTRICT COURT

1 brief, and I know that the reply brief focused more on the

2 traceability argument.

3   MS. CONNOR:  Correct, the standing issue.

4   THE COURT:  So with respect to traceability, it seems

5 to me that you've placed an awful lot of emphasis on this      10:38:35

6 D.C. Circuit case, which isn't binding on this Court.  It also

7 has a dissent from then Judge Ginsburg that disagrees with the

8 majority's analysis.

9   But it also seems to me that that case just doesn't

10 help your position for a broader reason.  There, the --       10:38:53

11 fundamentally the way I read that *Kurtz* case is that the

12 D.C. Circuit held that the plaintiff had sued the wrong people.

13 He had sued the chaplains, and they just didn't have anything

14 to do with the issue in that case, which is who gets allowed to

15 speak on the floor of the House of the Senate.                10:39:11

16   And if you really get into the weeds of the court's

17 analysis in that case -- excuse me just a moment -- the *Kurtz*

18 court, sort of near the end of the opinion, has some analysis

19 on how if the facts had been different the plaintiff would have

20 been able to show traceability.  And the quotes from the       10:39:31

21 decision are, traceability would have existed if -- quote, if

22 there had been a, quote, directive from the House or Senate

23 that the chaplains not admit Kurtz to the benefits otherwise

24 available to him, unquote, or if, quote, the chaplains were

25 implementing an unconstitutional directive from their          10:39:49

1  superiors, unquote.

2      It seems to me that that is just spot on what we have

3  here.  Your argument is that we were simply following orders,

4  the Secretary set this deadline, we're required by state law

5  under potential threat of criminal penalty to implement it.     10:40:04

6  And you say that, therefore, gets rid of traceability.

7      But *Kurtz* says that when you have a circumstance where

8  a state actor is simply implementing a directive from

9  superiors, that does place them within the line of causation

10  such that traceability exists.                                  10:40:22

11      So I'm trying to understand how *Kurtz* helps rather

12  than hurts your position.

13      MS. CONNOR:  Because it provides that the plaintiff in

14  that case did not have discretionary authority similar to this

15  circumstance.  The Recorder does not establish the voter        10:40:43

16  registration deadline.  And in fact, would have changed the

17  deadline for no reason, because the 29th day was not a holiday,

18  and there's no authority for the Recorder to change the

19  deadline set by the Legislature to the 28th day.

20      THE COURT:  I guess, just -- I see -- all the time you     10:41:07

21  see 1983 litigation where you have a variety of state actors,

22  and sometimes the folks who get sued include the people who are

23  closest to the ground who implemented the order, and they might

24  not have had a lot of discretion in those cases otherwise

25  because they're -- the rule was set by their superiors or set   10:41:24

1   by the government.

2          I guess my sense is, if the position you're taking

3   were correct, there would be a lot more case law beyond *Kurtz*

4   establishing that lower level state actors who were

5   implementing policies that were created by others can't get          10:41:43

6   sued in 1983 actions.

7          MS. CONNOR:  Well, under the National Voter

8   Registration Act the Secretary of State is the chief election

9   officer and develops the policies and procedures that have to

10  be executed by the local election officials.  And so it would       10:41:58

11  run contrary to the NVRA to allow for each county recorder to

12  establish their own voter registration deadline.

13         THE COURT:  All right.  Let's -- is there anything

14  else you'd like to say on standing?

15         MS. CONNOR:  Just to address the injury to be              10:42:31

16  redressed by a favorable position -- decision, excuse me.

17         The plaintiffs are naming the Recorder in this lawsuit

18  for failing to count the provisional ballot cast by Mr. Isabel.

19  But, in fact, the reason for the injury was Mr. Isabel's

20  failure to register by the voter registration deadline and,        10:43:04

21  therefore, he was just not qualified to register to vote.

22         THE COURT:  What does that go to though?  You haven't

23  moved to dismiss under 12(b)(6) ground, you've moved to dismiss

24  for lack of subject matter jurisdiction.  You've said that

25  there's no traceability and no redressability.  Yet he sued for   10:43:23

1  money damages.  Is seems to me the case law is pretty

2  straightforward that when you're suing for damages your injury

3  is redressable.  There might be other problems with your

4  theory, but it doesn't go to the redressability prong of the

5  standing test under Article III.                         10:43:38

6      MS. CONNOR:  That's a point well taken.  I do think

7  that goes to more of a 12(b)(6) argument.

8      THE COURT:  Okay.  Which you haven't made.

9      MS. CONNOR:  That's correct.

10      THE COURT:  All right.  With respect to HAVA, one of   10:43:56

11  the arguments in your brief has to do with failure to exhaust

12  under the HAVA.  That is one of the grounds for arguing that we

13  lack subject matter jurisdiction here.

14      The difficulty I have with that is that in response

15  the plaintiff pointed out that, you know, failure to exhaust   10:44:19

16  might create all sorts of problems in a case, but it's not

17  usually viewed as something going to the court's subject matter

18  jurisdiction, except in somewhat unusual circumstances.  You

19  didn't brief it in your reply, so I guess I'm just curious as

20  to your position on that.                              10:44:39

21      MS. CONNOR:  Well, yes, you're correct.  It wasn't

22  briefed in the reply for the other reason that it really

23  wouldn't apply to this situation, given that the issue was the

24  plaintiff's failure to register to vote on time.  And hence

25  HAVA had no applicability.  His -- the County Recorder, in   10:45:03

1   reviewing the provisional ballots, had no possibility of

2   accepting a provisional ballot that was submitted after the

3   voter registration deadline.  He simply wasn't eligible to

4   register -- or to vote in this election because of missing the

5   deadline.                                                    10:45:30

6          THE COURT:  I understand that that is one argument in

7   the case.  But in your brief you argue that plaintiff is not

8   entitled to relief because he lacks standing for failing to

9   exhaust his administrative remedies under HAVA.  And that seems

10  to me a much different argument than what you just said.       10:45:42

11         MS. CONNOR:  You're correct.  I think it could have

12  been worded better in the brief.

13         THE COURT:  Okay.  So are you withdrawing your

14  argument that the failure to exhaust creates a subject matter

15  jurisdiction --                                               10:45:59

16         MS. CONNOR:  Yes --

17         THE COURT:  -- defect.

18         MS. CONNOR:  -- I'll withdraw that.

19         THE COURT:  All right.  Is there anything else you'd

20  like to address?                                             10:46:05

21         MS. CONNOR:  No.  Thank you.

22         THE COURT:  Mr. Scharff.

23         MR. SCHARFF:  Thank you, Your Honor.

24         I'd like to first start by thanking the Court and my

25  co-counsel for accommodating my personal schedule, especially  10:46:16

1    on behalf of my wife, she's very, very thankful.

2          THE COURT:  Understood, of course.

3          MR. SCHARFF:  And I appreciate the questions from the

4    Court and would be happy to answer any questions you may have

5    from me.                                              10:46:32

6          THE COURT:  The first question I have, you know, I may

7    have tipped my hand because I already said my tentative views

8    on *Kurtz*.  But it seems to me that the strongest subject matter

9    jurisdiction argument they've raised in their brief has to do

10   with traceability.  The notion that the County defendants were  10:46:47

11   required by law under pain of criminal penalties to implement

12   the Secretary's directives and, therefore, how can it be said

13   that the injury Mr. Isabel suffered in this case is traceable

14   to their conduct?

15         MR. SCHARFF:  So I'd say that strongest in a relative  10:47:03

16   sense -- of course, we don't think that has any merit, in that

17   the Complaint clearly alleges what is necessary to establish

18   traceability; that Mr. Isabel timely registered, that he showed

19   up and did what he needed to do to vote, and that the County

20   did not count his vote.                               10:47:25

21         It's very simple, that the County is responsible for

22   counting the votes, as alleged in the Complaint.  Of course,

23   should they want to raise other facts after the motion to

24   dismiss stage, they could challenge traceability then.  We

25   would think, of course, that it would fail as well simply  10:47:45

1    because the County Recorder is responsible for that task, and

2    that they have authority to make decisions about which votes to

3    count and which votes not to count, all of which is alleged.

4            As it relates to the D.C. Circuit case *Kurtz*, we agree

5    with this Court's assessment that it's inapplicable, and                10:48:06

6    that -- you know, I think to some extent it raises kind of a

7    Nuremberg type defense, that we were forced to do it, we were

8    simply following orders.

9            But in that case, that's not even -- here, the

10   Complaint alleges that it was the County that had the                   10:48:23

11   responsibility and the authority to make that decision to apply

12   the law.  And that would be our contention.  And that they

13   failed to do so here.

14           THE COURT:  Okay.  I don't think I have any other

15   questions with respect to the County's subject matter              10:48:38

16   jurisdiction argument, so I think that I can take that into

17   consideration and we can move to Mr. LaSota on the Secretary's

18   arguments.

19           MR. SCHARFF:  Fantastic.  Thank you, Your Honor.

20           THE COURT:  Thank you.                                          10:48:51

21           MR. LASOTA:  Thank you, Your Honor.

22           And I know you've read the briefs, so I'm not going to

23   restate everything, obviously.  I would like to point out

24   that -- and we kind of touched on this, that the NVRA and HAVA,

25   these are things that are meant to facilitate voting, they're          10:49:16

1    not meant to jump start class action lawsuits.

2         And there's a certain irony in this attempt to contort

3    these statutes into a vehicle for damages in that it sort of

4    detracts from the main thrust of these statutes.  In other

5    words -- so particularly in the case of HAVA, you know, that          10:49:40

6    was all about, well, we got to get more resources because we've

7    got antiquated equipment.  And so it's a resources issue.

8         But here these people want to -- even though the

9    problem they've alleged has been fixed by the legislature, you

10   know, they want to diverse these resources into paying damages      10:49:56

11   for lawsuits.  And that just -- that really turns it on its

12   head, because that's not what it's about.

13        You know, the other thing I think that they conflate

14   very much so that -- you know, their argument that Mr. Isabel

15   should have been registered to vote with that he was registered    10:50:16

16   to vote.  And those are two very different things.  He was not

17   registered to vote.  That was the whole case in 2016, they

18   tried to get an order essentially making him a registered voter

19   that the judge turned that down.

20        THE COURT:  I mean, didn't Judge Logan find that the           10:50:34

21   NVRA was violated, he simply declined to order injunctive and

22   equitable relief because the lawsuit was brought too late?

23        MR. LASOTA:  Yes, Your Honor, but that wasn't the only

24   reason he didn't want to move the deadline.  You know, he

25   talked about a lot of the practical problems with moving a          10:50:50

**ER077**

1   deadline.  He quoted a Supreme Court case for the proposition

2   that, you know, a court -- quote, court orders affecting

3   elections can themselves result in voter confusion and

4   consequent incentive to remain away from the polls.  That's

5   *Purcell v. Gonzalez*, which Judge Logan quoted.                    10:51:07

6         So I think the thrust of it -- and he did analyze it

7   as you said, Your Honor.  But the thrust of it is -- of the

8   opinion is, he did not move the deadline.

9         So as a matter of law, Mr. Isabel was not a registered

10  voter.                                                             10:51:24

11        HAVA, as the *Sandusky* court pointed out, we quoted

12  that, you know, HAVA is really concerned with casting a

13  provisional ballot.  HAVA was borne out of the Florida recount.

14  And, you know, the practical part of HAVA is -- and this is

15  less and less true because we have more voting centers, there     10:51:41

16  are fewer instances where people go to their individual

17  precinct.  But it used to be that everybody just voted at their

18  precinct.  And there were thousands of these things in a state

19  like Arizona, and you had volunteers working the -- sort of

20  working the election.  And when they turned down a voter and      10:51:59

21  said, no, you can't cast a provisional ballot, you're not

22  registered, and that voter was -- that was it, there was no

23  recourse.

24        Well, when you cast a provisional ballot, at least

25  you're still in the game for sort of the more official           10:52:14

1  determination to be made by someone in a little bit higher

2  position, there's some avenues for relief there.

3       THE COURT:  So is it your position that -- what

4  happened -- what recourse would HAVA give a plaintiff if state

5  officials just decided to not -- provisional ballots got cast,  10:52:32

6  there are straightforward laws by state law under when

7  provisional ballots should be counted.  And let's just take a

8  case where the state and local official just decided to

9  disregard those things and not follow state law.  What, if any,

10 remedy would somebody have under HAVA in that circumstance?  10:52:51

11      MR. LASOTA:  Your Honor, I think particularly under

12 HAVA, I don't know that they'd have a remedy, because I think

13 HAVA is concerned with casting a provisional ballot.  And the

14 *Sandusky* case talks about how that's -- you know, whether the

15 ballot actually counts or not is a matter of state law.  10:53:11

16      Now, the scenario you raised could -- I mean, there

17 could be all kinds of other avenues under such a circumstance.

18 That's obviously not the circumstance here.  But HAVA I think

19 is limited to, you know, its purposes, and I don't think the

20 purpose is to -- for damages claims to be made.  10:53:34

21      THE COURT:  All right.  I want to turn back to the

22 NVRA.  Seems to me that the $64,000 question in this case is --

23 as to whether there's a 1983 remedy under it, is it's got the

24 savings clause that says the rights and remedies established by

25 this section are in addition to all other rights and remedies  10:53:55

UNITED STATES DISTRICT COURT

**ER079**

1    provided by law.

2           What does that mean?  Why did Congress put that in

3    there if not to allow other lawsuits and remedies in addition

4    to what's specified in the actual NVRA statute?

5           MR. LASOTA:  Your Honor, I think what that means is it    10:54:12

6    doesn't -- it doesn't foreclose a remedy that was available

7    under 1983, but it doesn't enlarge it either.  I think that's

8    pretty clear from the House and Senate report.  I know that the

9    plaintiff suggested -- I'm sorry.

10          THE COURT:  Let me -- I tend to have some skepticism    10:54:28

11   of legislative history, particularly when I think that the text

12   gives me all that I need to get to the right result in the

13   case.  So I haven't given a tremendous amount of emphasis on

14   the legislative history materials.

15          MR. LASOTA:  Okay.  Well, then I think the text very    10:54:45

16   much supports the notion that -- you know, the private right of

17   action that is meant to be granted here is limited.  And that

18   is spelled out in the -- in the statute.  So I think that -- I

19   think that to sort of harmonize the two.  The private right of

20   action granted by the NVRA is defined by the NVRA, but it    10:55:09

21   doesn't -- but it's not in derogation to other causes of

22   action.  If you had a cause of action previously, you can still

23   maintain it under 1983.  But I don't think the NVRA was meant

24   to expand that.

25          And I think that the -- if you look at the text -- I    10:55:26

1    mean, if -- presumably they could have left that private right

2    of action out if they hadn't intended it to have sort of some

3    meaning, and to sort of define the private rights that are

4    created by NVRA.  So I think that the fact that they put that

5    in there, it is a -- it is a scheme, and it does indicate              10:55:47

6    congressional intent that, you know, look, this is essentially

7    meant to provide a private cause of action as far as it goes.

8    But the cause of action is limited.  And, of course, it's

9    limited to declaratory and injunctive relief.

10           THE COURT:  I guess what I'm still struggling with is,         10:56:09

11    so a plaintiff can sue directly under the NVRA to get

12    injunctive and declaratory relief.  What else can a plaintiff

13    do?  Like what does the savings clause allow them to do beyond

14    bringing a lawsuit directly under the statute for those two

15    forms of relief?                                                      10:56:29

16           And if the question is zero, the general ways we think

17    about statutes and Congress's intent is, Congress doesn't enact

18    language that has zero meaning and achieves nothing.

19           MR. LASOTA:  Your Honor, I think that the savings

20    clause means that somebody can still maintain other rights that      10:56:45

21    existed before NVRA.  I mean, it's -- I can -- this is

22    speculation, but the conversation sometimes goes, well, you

23    know, look, you're introducing this now and people already have

24    the right to do this.  I don't want this being viewed as a

25    limit on current rights that people have.  And so they put the       10:57:05

1  savings clause in here.

2        No, it's not meant to be a limit on current rights,

3  but in terms of the new right it creates, it is meant to be

4  limited to its injunctive and declaratory relief.  I think

5  that's exactly why those two things are in there.                    10:57:22

6        THE COURT:  Okay.  I don't think I have any other

7  questions for you.

8        MR. LASOTA:  Okay.  Your Honor, I think that's all

9  then.  Thank you.

10       THE COURT:  Thank you.                                        10:57:33

11       MR. SCHARFF:  And, Your Honor, if we could jump to the

12  $64,000 question first, if it's okay with you.

13       THE COURT:  Please.

14       MR. SCHARFF:  I think that the Court's analysis could

15  be simplified by simply relying on the Supreme Court case law      10:57:54

16  that we cite to in our briefs.  If you look at the text of the

17  savings clause, that savings clause is identical -- or nearly

18  identical to the savings clause that was issued in -- that's in

19  the Securities Acts, 1933, 1934.

20       And the Supreme Court in *Herman v. Huddleston*               10:58:21

21  expressly quoted that language and called it unequivocal,

22  and -- unequivocal in that Congress evidenced an intent to,

23  quote, supplement -- I'll read the exact quote, which is at

24  pincite 383.

25       THE COURT:  What page of your brief is this on?               10:58:41

1    Sorry.

2          MR. SCHARFF:  Of my brief?

3          THE COURT:  Yeah.

4          MR. SCHARFF:  I apologize.

5          THE COURT:  I got it.  It's on page 7 and 8.          10:58:51

6          MR. SCHARFF:  I didn't have it in front of me.  I

7    apologize.

8          THE COURT:  The problem I have with *Herman & MacLean*

9    *v. Huddleston* is it's a case from 1983.

10         MR. SCHARFF:  Yes.                                      10:59:03

11         THE COURT:  And since then there's been a lot of ink

12   spilled by the Supreme Court on how courts should go about

13   thinking about this issue of whether or not 1983 actions should

14   continue to exist, even though, you know, statutes provide

15   their own private right of action.                           10:59:18

16         It seems to me that the most on point case is the

17   Supreme Court's 2005 decision in *City of Rancho Palos Verdes*,

18   which I think is in a little bit of tension with the 1983 case

19   you've cited.  And I think that I need to follow the more

20   recent cases.                                                 10:59:36

21         MR. SCHARFF:  So, Your Honor, I appreciate that.  And

22   I was just about to -- that was the other Supreme Court case I

23   think you should look at.  And I think you can look at both of

24   them as complementary.

25         So the key language I think in *Rancho Palos Verdes* is   10:59:46

**ER083**

1    on page 122 of that case.  And if I may read it, it's

2    the -- it's the -- there's a paragraph where it discusses the

3    Government's amicus brief and the City's contention that,

4    quote, the Government as amicus, joined by the City, urges us

5    to hold that the availability of a private judicial remedy is          11:00:05

6    not merely indicative of, but conclusively establishes, a

7    congressional intent to preclude.  And we decline to do so.

8         And importantly, the ordinary inference that the

9    remedy provided in the statute is exclusive can surely be

10   overcome by textual indication, express or implicit, that the         11:00:21

11   remedy is to complement, rather than to supplant, Section 1983.

12        I think that's the key language.  And that's why I

13   refer you back to the *Herman* language.  I agree that there's

14   been a lot of ink spilled on the issue of when a statute

15   precludes a 1983 clause.  But the reason why I think *Herman* is       11:00:39

16   still applicable, A, I've done exhaustive research and found no

17   case that calls the holding into question expressly by the

18   Supreme Court, but that it's important just how they read the

19   text of the savings clause.

20        And in that section which I was citing before, which              11:01:00

21   is, we read that text as showing an intent to supplement rather

22   than to supplant.  And here, given that we had -- what other

23   way could Congress -- by looking at the case law the Supreme

24   Court has established, how does Congress, if you're a

25   legislator, draft a savings clause that's meant to                    11:01:18

**ER084**

1  maintain -- not preclude a 1983 action.  You have this Supreme

2  Court case that's interpreted the exact same language and said,

3  this is evidence of an intent to supplement.

4      And I think that's pretty persuasive evidence that

5  Congress didn't want to supplant.                           11:01:42

6      But I think just looking at the text itself, that's

7  consistent.  Which is, as Your Honor read, the savings clause

8  provides the rights and remedies established by this section.

9  So "this section" meaning the section that provides for the

10  private right of action.                                    11:01:57

11     So the right here that it's referring to is obviously

12  the right of action.  And the remedy it's referring to are the

13  injunctive and declaratory relief.

14     THE COURT:  On the one hand the *Herman* case construed

15  savings clauses that are similar to the one here.  But you've  11:02:12

16  also got *Sea Clammers*, which also construed savings clauses

17  that are similar to the ones here.  And I think that the

18  *Sea Clammers* ones are -- they both said, nothing in this

19  section shall restrict the right of any person to seek any

20  other relief.                                               11:02:28

21     And the Court in that case said, that's doesn't allow

22  you to go to 1983, this is meant to be an exclusive remedy.

23  That also seems functionally identical to the one we have here.

24     MR. SCHARFF:  The *Sea Clammers* statutes, the Federal

25  Water Pollution Control Act and the Marine Protection Research  11:02:42

1    and Sanctuaries Act, had close but not as similar language as

2    in the Securities Act statutes.  I think the key difference is

3    that the Court focused on not meant to limit -- nothing in this

4    section shall restrict any right.  That's the language from the

5    Federal Water Pollution Act.  It doesn't refer to restricting          11:03:05

6    remedies, first, it just refers to the right.

7           And here, I think what's important about this --

8           THE COURT:  It says, shall restrict the right to seek

9    any other relief.  To me talking about relief encompasses

10   remedies.                                                              11:03:21

11          MR. SCHARFF:  The Supreme Court -- the analysis was in

12   footnote 31 of the *Sea Clammers* case, where it's rejecting

13   Justice Stevens' analysis of the savings clause focused on the

14   notion that the court was simply saying that you can't -- you

15   could have other ways to relief, but not to enforce this              11:03:41

16   statute.  Right, we're not restricting this statute, because it

17   didn't exist at the time.

18          Whereas in this savings clause, we have the language

19   "in addition to."  It's doesn't use the language about

20   limiting, it's in addition to, i.e., I can't -- it's hard for        11:03:56

21   me to think of any other way other than to expressly say we're

22   not precluding 1983 remedies, but to say that this is a --

23   evidence the intent to supplement, to say we have these

24   remedies, but these remedies aren't precluding, they're in

25   addition to other rights and remedies.                               11:04:16

1        And again, the rights reference are the private right

2   of action, and the remedies being the remedies provided by

3   1983.

4        In our brief we contend that the 1983 would not

5   be -- any action under 1983 wouldn't have to follow like the          11:04:42

6   notice provisions of the NVRA.  After preparing and thinking

7   about this more and rereading the case law, I don't know that I

8   necessarily still contend that that is accurate.  I think it's

9   possible to have both, in that if you were to seek injunctive

10  and declaratory relief under 1983 you would still have to            11:05:02

11  follow the notice requirements under the NVRA.

12       But that's consistent with our position that the other

13  remedies, i.e., for damages, would still be provided.

14       THE COURT:  Why would Congress go to the trouble of

15  creating this private right of action if they could have not         11:05:20

16  even bothered to do it and you could still just sue under 1983?

17       MR. SCHARFF:  They've done so in a number of cases

18  where the Supreme Court has found the availability of 1983.  So

19  sometimes Congress wants to make sure that the civil -- that

20  civil actions are clearly permitted to ensure that -- because        11:05:45

21  there's also another whole set of complicated case law about

22  the implied right of actions.

23       THE COURT:  Yeah.

24       MR. SCHARFF:  And so to make it clear, I think that's

25  a reason why they do it.                                             11:05:59

1    And I think, here again, the subject matter is very

2  important as it relates to both the NVRA and 1983.  This is

3  voting rights action, a voting rights case, protecting voting

4  rights.  And 1983 and its predecessor was a Civil Rights Act of

5  1871, which was passed after the Civil War to enforce the civil        11:06:17

6  rights amendments of the Constitution, principally the right to

7  vote.

8    So it's entirely consistent that Congress would want a

9  voting rights act statute to be enforced by the original remedy

10  providing statute for voting rights.                                    11:06:37

11    And even this Court's -- the statute that provides

12  this Court with original jurisdiction specifically highlights

13  voting rights -- claims for damages under voting rights.  And I

14  had it in front of me.  It's 28 U.S.C. 1343(a)(4).  And that

15  provides this Court with original jurisdiction for any civil            11:07:06

16  action, quote, to recover damages or secure equitable or other

17  relief under any act of Congress providing for the protection

18  of civil rights, including the right to vote.

19    I think Congress has time and again emphasized in

20  various ways that the right to vote is sacred, and it can be            11:07:25

21  enforced both by equitable injunctive relief which, as we note

22  in our briefs, is clearly preferred to have the vote count in

23  the first place than have post hoc to sue for damages.  But yet

24  it's another ability to deter the kind of conduct that's at

25  issue here.                                                             11:07:49

1    THE COURT:  I have a separate question that's really

2    neither here nor there with the issues that are currently

3    before the Court.

4    Nobody in U.S. history has sought damages under 1983

5    for a violation of the NVRA before.  You're trying to break new      11:08:02

6    ground here.  It seems to me that the parties have cited four

7    prior cases that addressed whether somebody could even sue

8    under the NVRA under 1983, two came out one way, two came out

9    the other.  But even the two that came out in your favor, they

10   were only seeking injunctive equitable relief.                       11:08:18

11   Aren't you going to have a huge qualified immunity

12   problem at some point in this case?  Because how are they on

13   fair notice that the conduct was clearly established and all

14   that when nobody's ever done this before?

15   MR. SCHARFF:  I take the Court's question with great                 11:08:33

16   interest, and I've also thought about that issue quite a bit.

17   And I think this case is unique in that you rarely have an

18   instance where a federal judge issues an order as it relates to

19   the exact facts, and then you have the unconstitutional -- or

20   the conduct that violates that federal statute occur.                11:08:55

21   And I think that's where the fair notice is.  And as

22   we allege in our Complaint at paragraph 32, it's clear that the

23   Secretary understood Judge Logan's order to mean that the NVRA

24   required the -- or however you want to call it, the deadline or

25   the last day to register, to be October 11th.  Because in the        11:09:20

1  proposed 2018 elections manual, the manual that was drafted by

2  the Secretary, signed by the Secretary, sent to the Attorney

3  General's Office, the Attorney General's Office signed off and

4  sent to the Governor.  And that draft elections procedures

5  manual in the section about holidays, there's a footnote, and          11:09:37

6  they cite to Judge Logan's opinion for the following

7  proposition, that the voter -- voter registration deadline must

8  be moved closer to election day if the closure of state or

9  federal offices would cause a method of registration to be

10 unavailable within a 30-day period preceding the next election.        11:09:56

11        So here, qualified immunity shouldn't be an issue

12 whatsoever, because we have a federal court order, we have

13 clear evidence that the Secretary understood that order, and

14 yet nevertheless ignored it.

15        THE COURT:  Okay.  I think I have all my questions               11:10:11

16 addressed on the NVRA.  I will tell you I still haven't fully

17 made up my mind on it.  I came -- where I sit right now, I

18 think I am ultimately probably leaning toward the Secretary's

19 position that I'm not convinced that this savings clause is

20 enough to overcome this presumption.  But I want to go back and        11:10:31

21 take a closer look at that 1983 case -- the Supreme Court's

22 decision in 1983 to --

23        MR. SCHARFF:  *Herman*.

24        THE COURT:  -- take a closer look at the specific

25 wording of that savings clause.                                        11:10:45

1    But where I'm at right now is, I think you've made

2  absolutely the best argument you could make on it.  But it

3  seems to me the 2005 to current date case law suggests that,

4  although as you correctly stated, the Supreme Court rejected

5  the argument that the existence of a private right of action          11:11:01

6  within the statute conclusively means that 1983 isn't

7  available, they still created a presumption that that means

8  that.  And some of the factors you need to consider on whether

9  that presumption has been overcome is just how strongly the

10  wordings of the savings clause evidences a congressional intent      11:11:19

11  to overcome that presumption.

12    And the savings clause here is sort of ambiguous, and

13  I'm not sure who it helps, because for the reasons you've

14  stated, it can be read to refer to 1983, but it doesn't say

15  point blank, we aren't getting rid of 1983 actions.  And I           11:11:35

16  think there's something anomalous about Congress going to the

17  trouble of creating a statute that doesn't allow damages, and

18  yet still creating this loophole through some ambiguous

19  language that allows damages actions to exist.

20    But I haven't made up my mind, I need to look more                 11:11:52

21  carefully at it.  And I think you've done, as I said, as good

22  of a job as you could have done on that issue.

23    MR. SCHARFF:  Thank you, Your Honor.  If I could just

24  follow up with two quick things.

25    I've also struggled with it, I think the text -- or               11:12:01

1    the case law that the Supreme Court has laid out, I would say

2    isn't a presumption but an inference that the private right of

3    action under 1983 isn't available.  But the question that I

4    kept coming back to as I sat and contemplated this probably too

5    much was, if you are a Congress person drafting language, given      11:12:23

6    *Rancho Palos Verdes, Sea Clammers, Fitzgerald*, what language in

7    a savings clause would you put in there to save a 1983 action?

8            And that's where I kept coming back to the *Herman*

9    *Huddleston* case, which is where the Court refers to it as

10   unequivocal language evidencing the intent to supplement.           11:12:46

11           And -- but I appreciate where the Court is at on that

12   issue.

13           THE COURT:  There's also this language in *Palos*

14   *Verdes*, quote, in all of the cases in which we have held that

15   1983 is available for a violation of the federal statute, we        11:13:00

16   have emphasized that the statute at issue did not provide a

17   private judicial remedy, or in most cases even a private

18   administrative remedy, for the rights violated.

19           MR. SCHARFF:  Yes.

20           THE COURT:  I need to look at that.  And I want to           11:13:15

21   take another look at the 1983 cases to see how those two can be

22   reconciled.

23           MR. SCHARFF:  Sure.

24           And last I'll point out is that the savings clause in

25   *Rancho Palos Verdes* was a clause that was included in a           11:13:24

ER092

1    legislative note, not in the legislative text itself.

2         But I appreciate Your Honor's attention to this issue.

3         THE COURT:  Let's move on to the HAVA.  I guess just

4    to sort of the set where I'm at on this one as well, it seems

5    like everybody agrees that 1983 is potentially available here,    11:13:43

6    but the question is whether you've stated a claim because --

7    you know, Mr. LaSota said that HAVA talks about the right to

8    cast a provisional ballot.  It doesn't go further and

9    federalize the right to challenge how state and local election

10   officials decide to count those things under state law.        11:14:01

11        And I tentatively agree with him on that, because when

12   I look at the text of the HAVA, it seems to me that it's

13   fundamentally a statute about giving a federal right to cast a

14   provisional ballot.  And it would be a much different thing if

15   it were read to go further and create a federal right to        11:14:17

16   challenge state law determinations of eligibility and whether

17   to count that vote.

18        MR. SCHARFF:  I refer the Court's attention to the

19   *Sandusky* case, the Sixth Circuit case, which squarely discussed

20   HAVA, its implications, and the ability to bring a 1983         11:14:31

21   action under HAVA.

22        THE COURT:  And let me -- *Sandusky* has the following

23   quotes, HAVA is quintessentially about being able to cast a

24   provisional ballot.  "Cast" being emphasized by the Court

25   there.  And it goes on to say, the only subsection of HAVA that  11:14:49

1    addresses the issue of whether a provisional ballot will be

2    counted conspicuously leaves that determination to the states.

3           It also has language, HAVA does not require that any

4    particular ballot, whether provisional or regular, must be

5    counted as valid.                                              11:15:04

6           MR. SCHARFF:  It says that it shall be counted if the

7    voter is eligible under state law.  And I think the distinction

8    between *Sandusky* --

9           THE COURT:  Let's be real clear on textual analysis,

10   because I think every word matters here.  And Section 52 U.S.C.  11:15:20

11   21082 subdivision (a)(4) provides that if the appropriate state

12   or local election official to whom the provisional ballot or

13   voter information is transmitted determines that the individual

14   is eligible under state law to vote, the individual's

15   provisional ballot shall be counted.                            11:15:43

16          I think that everybody's ignoring the word

17   "determines."  The way I read the statute, it says that if the

18   state law election official determines it's valid, they have to

19   count it.  Here they determined it wasn't valid.  And I'm

20   struggling to see whether -- how that statutory language would   11:16:00

21   encompass the right to challenge whether that determination was

22   correct.

23          And I know it's hard when I'm throwing statutory

24   language at you at the podium.

25          MR. SCHARFF:  That's fair, because this is central to    11:16:18

**ER094**

1    the case.

2         The determination -- if there was an inability to

3    challenge the determination, the *Sandusky* opinion would have

4    been a lot shorter.  The *Sandusky* case was about the added

5    precinct voting, and whether or not the state was required to          11:16:31

6    count those provisional ballots.  The analysis was about the

7    state's law and whether or not the state could do that or

8    couldn't do that.

9         And so I think the Sixth Circuit was clearly implying

10   that they were looking at the determination of whether that was        11:16:52

11   appropriate or not to apply that rule to these provisional

12   ballots.

13        THE COURT:  *Sandusky* says, in addition to finding that

14   HAVA requires -- this is on page 576, like the final heading of

15   the -- heading 6.  In addition to finding that HAVA requires           11:17:09

16   that voters be permitted to cast provisional ballots, it goes

17   on to say, the district court also held that the provisional

18   ballots must be counted.  We disagree.

19        MR. SCHARFF:  Well, they disagreed that it must be

20   counted because they upheld the right of the State of Ohio to          11:17:25

21   discount out-of-precinct ballots, because they felt the State

22   of Ohio had that ability.  I think if the State of Ohio was

23   throwing out ballots that were valid, I think you'd have a very

24   different result.

25        I think, you know -- I don't know why, but in my head            11:17:42

ER095

1   when you think of this case a little differently it's a little

2   easier to wrap your head around.  Let's say this was a case

3   about the polls close at 7:00 p.m., and Maricopa County and the

4   Secretary get together and say, we're going to close them at

5   6:30.  And the voters show up and they're not allowed to cast a       11:18:04

6   ballot at 6:35, and so their ballots aren't counted.  Or

7   they're allowed to cast provisional ballots but they throw them

8   out because they were cast 30 minutes late.

9       Those ballots were valid under state law.  And so any

10  determination that those ballots weren't valid was unlawful.        11:18:24

11  It was unconstitutional.  It violated state law, federal law.

12  And those rights were -- the right to vote was violated.

13      Here that's what happened.  We have an individual who,

14  under both state and federal law, was qualified and eligible to

15  vote in the November 2016 election.  The determination that was     11:18:47

16  made that he wasn't eligible was unlawful.  And I think if the

17  Court were to rule that someone couldn't challenge that

18  determination under HAVA, challenge the determination that a

19  ballot -- a provisional ballot that was lawfully cast, then it

20  would take the teeth out of the ability for HAVA to have any        11:19:12

21  real impact.  Because casting a provisional ballot would just

22  simply be that, you cast a provisional ballot and it's up to

23  the whims of elections officials.

24      Yet here the state law was clear.  There is like an

25  Attorney General opinion from 1958 that provided guidance.          11:19:31

**ER096**

1    There was a federal court order on point.  And as we allege in

2    our Complaint, the County knew that when they made -- when the

3    Secretary and the County made the decision not to count these

4    ballots, they knew the ballots should be counted, because they

5    had that court order.                                              11:19:53

6         So as alleged, we have elections officials throwing

7    out ballots that should have been counted.  And I think that

8    1983 was designed exactly for these kind of instances, where

9    you have a statute that -- it's a rights giving statute.

10        I think that's the other important part of *Sandusky*        11:20:13

11   that I would focus on.  That's why you're allowed to bring a

12   1983 claim, because the right is to cast a provisional ballot

13   and to have that ballot counted should it be valid under state

14   law.

15        THE COURT:  I hear what you're saying about the              11:20:25

16   consequences and what HAVA should mean, but I think that

17   there's a different way to look at HAVA, which is, HAVA arose

18   in the aftermath of the 2000 election which people realized

19   just not having the ability to cast provisional ballots was a

20   problem.  And so HAVA can be viewed as creating a mechanism to    11:20:43

21   ensure that people have the right to cast provisional ballots.

22        I think it's a much different animal to go further

23   than that and view HAVA as creating this mechanism by which

24   there's a federal right to challenge every state and local

25   determination as to the validity of each provisional ballot.     11:21:01

UNITED STATES DISTRICT COURT

**ER097**

1    MR. SCHARFF:  Well, I certainly agree that HAVA was

2  passed with the intent to provide a protection, because without

3  a provisional ballot there's nothing to fight about, because

4  you have no rights.

5    THE COURT:  Right.                                    11:21:18

6    MR. SCHARFF:  It's too late.

7    So that's certainly one aspect of it.  The other

8  aspect has to be that that provisional ballot be given

9  appropriate consideration.

10    THE COURT:  I guess -- what I'm disagreeing with is, I  11:21:28

11  think that Congress -- there's a world where Congress could

12  have done that, they could have said, listen, it's not enough

13  to create a right to cast a provisional ballot, we need to go

14  further and really get in the weeds of regulating state and

15  local elections.  And they could have drafted the statute in a  11:21:44

16  way to achieve that.

17    And what I'm struggling with is when I just look at

18  the plain language of subdivision (a)(4), it doesn't support

19  that.  You know, I think it could have been written differently

20  to say, and if the person disagrees with the determination they  11:21:59

21  may sue.  And instead it has this different language that says,

22  if the election official determines the individual's eligible,

23  the individual's provisional ballot shall be counted.

24    MR. SCHARFF:  So, Your Honor, why include that

25  language if not to allow for this type of action?  If it was  11:22:18

1   simply meant to, as Your Honor suggests, which I think is

2   accurate as well, to protect and provide this ability to have

3   this safeguard of provisional ballots, then they could have

4   simply just done that and say you have a right to cast a

5   provisional ballot and left it at that. But then they included    11:22:34

6   that extra language of, shall be counted. And I think that is

7   the key language here.

8        We're not -- this is not a claim that the plaintiff

9   wasn't allow to cast a provisional ballot, he was.

10       THE COURT: I don't think that the language does     11:22:50

11  nothing. You could see a circumstance where theoretically

12  state election officials decide that provisional ballots are

13  valid but they decide not to count them anyway because it will

14  be bad for their party, and in that circumstance HAVA would

15  give them a right to sue, because if there's been a     11:23:06

16  determination that they're valid they need to be counted.

17       So I don't think this language is meaningless or

18  achieves nothing, or that the only way to give it meaning is to

19  adopt the interpretation you're offering.

20       MR. SCHARFF: Respectfully, you could conclude that     11:23:20

21  the determination of Judge Logan was a determination that they

22  were valid. Footnote 15 of Judge Logan's opinion I think is

23  very telling. And that's the footnote which -- where he states

24  that distinguishing between the declaratory relief sought from

25  the amended relief sought, and he declined to say how the law     11:23:40

1    should be applied.  And the court's decision said, I'm not

2    going to determine that.  But clearly determined that those

3    individuals who registered on October 11th were eligible to

4    vote in that election.

5         So there was a determination made that they were          11:24:00

6    eligible.

7         THE COURT:  I mean, is Judge Logan a state or local

8    election official?

9         MR. SCHARFF:  No, certainly not.

10        THE COURT:  Right.                                         11:24:10

11        MR. SCHARFF:  I just worry that if this case were to

12   create the precedent that there's no way to challenge a state

13   or local official's unlawful unconstitutional determination

14   about eligibility, then it would strip HAVA of its other

15   important -- perhaps even more important point, which is that  11:24:30

16   provisional ballots are meant to be appropriately evaluated.

17        THE COURT:  I can't recall -- I don't know if the

18   parties cited the *Ron Barber for Congress versus Bennett* case

19   in their briefs, it's a HAVA case from 2004 out of Tucson.  It

20   contains, HAVA does not contain language that requires that the  11:24:52

21   provisional votes be counted, it is directed to providing

22   provisional votes.

23        So I guess that -- I suggest that I don't know if I

24   come out the way that I'm tentatively thinking right now I

25   would be setting a precedent that hasn't previously been set.  11:25:08

1      MR. SCHARFF:  I haven't had a chance to review that.

2  I'd be happy to review it.

3      It does appear that's what the Court's determination

4  is in that case.  I just -- I come back to looking back at

5  *Sandusky* and thinking about, why would they even evaluate the      11:25:24

6  Ohio's precinct policy -- voting policy if there wasn't an

7  ability to challenge the -- whether or not a ballot was

8  lawfully cast or not, whether or not the state law was valid.

9      And so whether or not you view it as the -- this case

10  raises the question -- there's a policy that was created by the      11:25:51

11  County and the Secretary to unlawfully not count valid ballots,

12  whether or not -- that is a violation of HAVA, because they're

13  creating a policy that undermines its purpose of that

14  determination.

15      Perhaps you could look at it as saying, this violating      11:26:12

16  HAVA because they're not making that determination.  They

17  decided not to make the determination because they created this

18  unlawful policy to avoid making that determination.

19      But regardless, I think the -- HAVA does provide the

20  ability to challenge those determinations.  The administrative      11:26:33

21  remedies they refer to, which is the precondition for funding

22  under HAVA, that clearly evidences, I think, a congressional

23  intent to have that ability to challenge those determinations,

24  at least one option to challenge it.

25      Here obviously we're taking advantage of another      11:26:51

**ER101**

1  federal law that provides an ability to challenge it.  But I

2  think it's hard to view those administrative remedies and say

3  that Congress didn't intend to have some sort of ability to

4  challenge the state and local election official's

5  determination.                                          11:27:08

6          THE COURT:  Okay.  I'm just making a note.

7          All right.  Let's move on to the third cause of

8  action, the qualification clause.

9          I got to say, I am very -- I think that both the NVRA

10 and the HAVA as we've discussed present interesting issues of  11:27:25

11 statutory interpretation.  I'm less convinced that the

12 qualifications clause provides a strong basis for your

13 challenge here.

14         And I think the -- the issue I have with it, it seems

15 like both parties in their briefs have viewed Count 3 in the  11:27:38

16 Complaint as a launching point to talk about whether or not

17 Mr. Isabel was disenfranchised and what happens when the

18 deadline was set too late under state law.  But it's unclear to

19 me why the qualifications clause has anything to do with any of

20 that.  As I read the qualifications clause -- you know, let me  11:27:58

21 just read the text of it.

22         The House of Representative shall being composed of

23 members chosen every year -- every second year by the people of

24 the several states, and the electors in each state shall have

25 the qualifications requisite for electors of the most numerous  11:28:12

1    branch of the state legislature.

2          I read that as saying, in a nutshell, the same rules

3    for eligibility have to apply to folks who are voting for the

4    State House of Representatives and the U.S. House of

5    Representatives.                                                      11:28:28

6          It seems to me that everybody -- Mr. Isabel was

7    created equally with respect to the votes he was casting in the

8    state and federal elections.  He wasn't allowed to vote in

9    either.  You challenged that, and I think that you have other

10   reasons for disagreeing with it.  But I'm not -- it's unclear    11:28:42

11   to me why the qualifications clause is applicable here.  It

12   just seems to me to require equal treatment for purposes of the

13   state and federal votes being cast.

14         MR. SCHARFF:  The cause of action isn't brought

15   because of a violation of that provision of the section.  It's   11:28:58

16   brought under the notion -- I don't have it in front of me.

17   There's a Supreme Court case that I believe is cited in the

18   Complaint which indicates that that provision of the

19   Constitution, Article I, Section 2, is another constitutional

20   protection of the right to vote, that it's providing the right   11:29:19

21   to vote for your member of Congress.

22         And that is what was violated here.  Mr. Isabel was

23   deprived of his ability to vote for his member of Congress, to

24   have his say in the representation of the United States House

25   of Representatives.  And that is the basis for this cause of     11:29:37

**ER103**

1    action.

2           THE COURT:  I'm looking in the -- at the Complaint on

3    pages 14 and 15, and I don't see any cases that are cited

4    there.

5           MR. SCHARFF:  And I apologize.  I wasn't                    11:29:50

6    prepared -- because as Your Honor knows, the motions kind of

7    just gloss over the third cause of action, really not

8    addressing it.

9           But there is a Supreme Court case which I have on my

10   computer which I'd be happy provide to the Court.              11:30:04

11          THE COURT:  Just a moment.  I'm just seeing if that

12   case is cited in your response.

13          MR. SCHARFF:  It wouldn't have been, no.  I apologize.

14   It wouldn't have been, because it wasn't raised as a -- it

15   didn't seem like there was a challenge to the third cause of   11:30:47

16   action.

17          THE COURT:  Okay.  The way I was -- had looked on this

18   is, we had looked at the text, and the text doesn't seem to

19   support this.  Wasn't -- I hadn't -- we hadn't found that case

20   in our independent research.  But I think before ruling I would  11:30:59

21   definitely want to know about that case.

22          So if following this hearing you want to submit a

23   short -- I don't want a lot of argument on it.  If you could

24   simply just file a notice that has the case, we'll take a look

25   at it and go from there.                                        11:31:12

1          MR. SCHARFF:  Sure, sure.

2          THE COURT:  Okay.

3          MR. SCHARFF:  Perfect.

4          And I guess the last point, unless Your Honor has

5    other questions, I'd like to emphasize is that the underlying          11:31:19

6    cause of action under all three is the violation of the right

7    to vote.  And I think the case law which is cited in our

8    opposition papers about the long line of cases providing for a

9    cause of action for the violation of the right to vote seems to

10   indicate a common law -- federal common law right of action to       11:31:50

11   sue for the deprivation of a right to vote.

12         And should the Court feel it necessary that we amend

13   our Complaint, should -- to add that cause of action,

14   underlying all of the causes of action here, the plaintiff

15   certainly would be willing to do so.  And we would have             11:32:16

16   suggested that had the motions raised an argument we thought

17   was challenging the third cause of action.

18         THE COURT:  Understood.

19         MR. SCHARFF:  But I think the Court would find that

20   common law right of action, which is actually recently            11:32:33

21   referenced in the Ninth Circuit case of *Gilstrap v. United*

22   *Airlines*.

23         I apologize, that's not the case.  It was the *National*

24   *Committee for the Reform Party of the U.S*.  And that's at 168

25   F.3d 360, pincite 363.  168 F.3d 360, pincite 363.                11:32:50

**ER105**

1        THE COURT:  So it's the Federal Common Law --

2        MR. SCHARFF:  It's --

3        THE COURT:  Is it a 1983 claim or does it arise --

4        MR. SCHARFF:  It would be a federal common law for the

5   violation of the right to vote, whether it be independent of          11:33:10

6   1983.  Because I think the case law that the Court is citing to

7   in the Supreme Court, that's the *Kerry* decision and the *Memphis*

8   *Committee School District* decision, which cites case law from

9   English common law times.  So clearly cases that preceded the

10  passage of Section 1983.                                              11:33:31

11       So there seems to be an agreement that there is a

12  common law right -- common law cause of action for the

13  deprivation of the right to vote, which we think would be

14  implicated here too.

15       THE COURT:  Okay.  Thank you.                                    11:33:46

16       MR. SCHARFF:  Thank you, Your Honor.

17       THE COURT:  All right.  Mr. LaSota?

18       MR. LASOTA:  Thank you, Your Honor.

19       And just very briefly, Your Honor touched on NVRA and

20  the two more recent cases on point, one district, one circuit,        11:34:02

21  saying no right to seek monetary damages through a 1983 action.

22       I did want to mention under HAVA, the -- there was a

23  scenario that was -- talks about, well, we're going to close

24  the polling station at 6:30.  You know, HAVA does only provide

25  the right for a provisional ballot.  And in terms of whether          11:34:24

1    the provisional ballots should be counted, it's not that

2    someone's without remedy, but it's a matter of state law.

3         And, for example, that's exactly what happens in a

4    closely contested race.  For example, in the -- Andy Biggs won

5    his congressional seat, I forget the exact number of votes.        11:34:41

6    But that was exactly what was litigated is, which one of these

7    provisional ballots should be counted, because that's about the

8    only thing you could argue about in a hotly contested election,

9    because all the other votes that have gone in the ballot are

10   done and they're counted.  It doesn't matter if they were          11:35:00

11   illegal or cast by a two-year-old, they can't be taken out

12   because we vote by secret ballot.

13        And that dovetails exactly with what the *Sandusky*

14   court was saying, that HAVA is quintessentially about being

15   able to cast a provisional ballot, but the ultimate legality of    11:35:17

16   the vote cast provisionally is generally a matter of state law.

17        But I didn't want to leave the impression that there

18   was some lack of remedy there, because there is, it's just a

19   matter of state law.

20        And that's all I have, unless you have any other               11:35:31

21   questions, Your Honor.

22        THE COURT:  One of the suggestions Mr. Scharff made

23   was that at a minimum they should be given leave to amend to

24   replead a federal common law.  The standard for giving leave to

25   amend is pretty generous.  Would you have any objection to          11:35:47

 1   that?

 2         MR. LASOTA:  Your Honor -- and I agree, it is -- it

 3   certainly is very liberal.  I think futility is an argument

 4   that I might want to raise.  And since this has just been

 5   raised here, I guess I would -- I would reserve the -- I would      11:36:03

 6   like to reserve the ability to make an objection on that basis.

 7   Because I think I understand his argument, but I'm not sure it

 8   really gets around some of the more fundamental problems with

 9   the third claim.

10         So I guess that's what I would say about that.  But I      11:36:24

11   mean, I don't want to -- I certainly agree, if there's an

12   amendment that could be made that breathes life into an

13   otherwise sort of cause of action that isn't cognizable, it

14   should be granted.  So I'm not -- but if it's futile anyway,

15   then it shouldn't.      11:36:47

16         So I guess I'd like to reserve that issue, if I could.

17         THE COURT:  Sure.

18         MR. LASOTA:  Thank you, Your Honor.

19         THE COURT:  All right.  Thank you.

20         Well, I'll be taking this matter under advisement.      11:36:54

21         Mr. Scharff, if you could provide that even today,

22   that would be wonderful, because these issues are fresh on my

23   mind, the supplemental brief regarding that other case.

24         MR. SCHARFF:  Will do, Your Honor.

25         THE COURT:  I thank everybody for the argument, it was      11:37:07

1   very helpful.  And I'll take this under consideration.

2         Thank you.

3      (Proceedings concluded at 11:37 a.m.)

4

5                           -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                          C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 4th day of December,

15   2019.

16

17

18

                              s/Candy L. Potter_____
19                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

––––––––––––––––––––

| | | | |
|---|---|---|---|
| **David Isabel,** | ) | | |
| | ) | No. | **CV-18-3217-PHX-DWL** |
| Plaintiff, | ) | | |
| | ) | | |
| vs. | ) | | Phoenix, Arizona |
| | ) | | October 24, 2019 |
| **Michele Reagan, et al.,** | ) | | 10:04 a.m. |
| | ) | | |
| Defendants. | ) | | |
| ––––––––––––––––––––––––––––– | ) | | |

BEFORE:  THE HONORABLE DOMINIC W. LANZA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTIONS HEARING

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                          **A P P E A R A N C E S**

3

For the Plaintiff:
4       Scharff PLC
        By:  **Spencer Garrett Scharff**, Esq.
5       502 West Roosevelt Street
        Phoenix, Arizona 85012
6
        Miller Pitt Feldman & McAnally
7       By:  **Nathan Jean Fidel**, Esq.
        2800 North Central Avenue, Suite 840
8       Phoenix, Arizona 85012

9   For Defendant Reagan:
        Timothy A. LaSota PLC
10      By:  **Timothy Andrew LaSota**, Esq.
        2198 East Camelback Road, Suite 305
11      Phoenix, Arizona 85016

12  For Defendant Maricopa County:
        Maricopa County Attorney's Office
13      By:  **M. Colleen Connor**, Esq.
             **Talia Janelle Offord**, Esq.
14      222 North Central Avenue, Suite 1100
        Phoenix, Arizona 85004
15                                                          10:04:40

16

17

18

19

20

21

22

23

24

25

1     (Proceedings begin at 10:04 a.m.)

2          THE CLERK:  Civil case 18-3217, David Isabel versus

3   Michele Reagan and others.  Time set for hearing regarding

4   Defendant Reagan's motion to dismiss First Amended Complaint.

5          Counsel, please announce your presence for the record.   10:04:55

6          MR. SCHARFF:  Good morning, Your Honor, Spencer

7   Scharff on behalf of Plaintiff David Isabel, along with my

8   co-counsel Nathan Fidel.

9          THE COURT:  Good morning.

10         MR. LASOTA:  Good morning, Your Honor, Timothy LaSota   10:05:05

11  on behalf of Defendant Michele Reagan.

12         MS. CONNOR:  Good morning, Your Honor, Colleen Connor

13  and Talia Offord on behalf of Maricopa County and the Maricopa

14  County Recorder.

15         THE COURT:  Good morning.   10:05:15

16         All right.  So we are here, pending before the Court

17  is a motion to dismiss the First Amended Complaint.  As the

18  parties know, there was a pre -- a motion to dismiss the

19  original version of the Complaint.  We had a lengthy hearing

20  and I issued a lengthy order after that.  But I gave the   10:05:33

21  plaintiffs leave to amend, which they have taken up.

22         A motion to dismiss the Amended Complaint came in.  I

23  reviewed that.  I issued a tentative order stating that I

24  tentatively think it should be granted, and I invited the

25  parties to submit supplemental briefing.  Everybody submitted   10:05:51

1 something, although some of them just declined to make further

2 argument, and I've reviewed all of those.  So that's where

3 we're at.

4          So I guess I'll start first with Mr. Scharff.

5          MR. SCHARFF:  Your Honor, I would ask that we go          10:06:03

6 second since it's not our motion.

7          THE COURT:  Okay.

8          MR. LASOTA:  Thank you, Your Honor.

9          And unfortunately I'm actually going to talk about

10 something that was not in my brief, but is kind of a late find,     10:06:21

11 but I believe is highly relevant to this matter.  And it goes

12 specifically to the statute the Court cited, and that's A.R.S.

13 1-303.  As the Court noted, it was not in the First Amended

14 Complaint, but made an appearance in the response to the motion

15 to dismiss.  It did feature in the case in 2016 in front of        10:06:42

16 Judge Logan.  There were different facts in that case --

17          THE COURT:  Can I -- right before I walked in here I

18 just read Judge Logan's order, and I think it's pages 26

19 through 32 have the state law analysis pertaining to that.  So

20 I'm familiar with it.                                               10:06:59

21          MR. LASOTA:  Yes, Your Honor.

22          Well, the one thing about that that I think that puts

23 this in a different realm is that in that case it dealt with --

24 he talked about 16-134 as providing an exception to 16-120.

25 But that exception essentially dealt with mail that was            10:07:15

**ER114**

1   received.  And the First Amended Complaint, I believe Mr. --

2   the plaintiff here registered in person.

3        So I think we're -- there's another subsection of

4   16-134(D), which I also don't think is applicable, which talks

5   about something being received after the fact and there being                 10:07:35

6   another reliable indicator of the date.  I don't think we're in

7   that realm either.

8        So I think we're essentially back on 16-120, and we're

9   back on the court -- the case that Judge Logan referenced, and

10  that is *Board of Supervisors of Maricopa County v. Superior*                 10:07:50

11  *Court*.  And it's 103 Arizona 502.  He does make reference to

12  it.

13       Probably a better explanation for the holding in that

14  case is found at *Fisher v. City of Apache Junction*.  And that's

15  200 Arizona 484.  Where it basically describes the law in                     10:08:10

16  Arizona.  And the law in Arizona with relationship to 1-303 and

17  a similar statute, 1-243, basically, if -- there's a certain

18  time to act to do something, like let's say you've got a

19  ten-day period to file a mandamus if you think a referendum

20  petition should have been gone forward and gone to the ballot,                10:08:38

21  and you've got ten days to take that to court.  Under those

22  circumstances 1-303 does apply, and if that falls on a Sunday

23  you would have until the next Monday.

24       And that was essentially the holding in *Fisher v. City*

25  *of Apache Junction,* it dealt with a mandamus petition that was              10:08:58

**ER115**

1  filed in relation to a referendum petition that was filed on

2  the Monday, which was the -- it was either the 11th day or the

3  6th day.  But whatever it was, it was the one day after, if you

4  just read it purely by the statute.  The Court said, that's

5  okay because it's 1-303.  But it noted that this Arizona            10:09:16

6  Supreme Court had found in 1968 that when we're dealing with a

7  statute that basically -- unlike that statute, a statute like

8  the one in this case, 16-120, that talks about the time period

9  preceding the election.

10        So in other words, it's not -- you've got ten days to      10:09:42

11  do something from this point.  It's something has to be done 29

12  days before the general election, as we have in this case.

13  It's a little -- it's kind of a fine distinction.  But in those

14  cases the -- you don't get the extra day.

15        And the holding is I think clear in *Fisher v. City of*     10:09:59

16  *Apache Junction*.  I wish I would have briefed it.  But it was

17  kind of -- because of the way this has wound its way through

18  the process, and the way it was dealt with seemingly by

19  Judge Logan, at least on the face, it didn't -- this didn't

20  seem to be -- at least didn't appear initially to be a valid     10:10:19

21  point.  I think it clearly is.

22        And also because of the point that Judge Logan did

23  deal with another statute, 16-134, essentially found that in

24  that circumstance 16-120 didn't control on that point because

25  of 16-134.  But we don't have the same facts here that would     10:10:40

1   implicate 16-134, so we're back to 16-120.

2          And as matter of state law, again, Mr. -- the

3   plaintiff here just was not registered to vote.

4          So I think that was the big point I wanted to make,

5   because that was kind of something new.  Most of the other       10:11:00

6   things I think have been largely covered.

7          Obviously we agree with Your Honor's tentative ruling.

8          We also agree with the rest of it, that even if it is

9   a state law violation, it does not automatically lend itself to

10  a constitutional right to sue.                                    10:11:17

11         THE COURT:  Let me -- it's hard for me to respond to

12  what *Fisher* holds because it wasn't cited.  I haven't read it.

13  So I accept your recitation of it.

14         MR. LASOTA:  Your Honor, may I approach?  I've got the

15  copies of the case.                                              10:11:33

16         THE COURT:  I appreciate it.  I can pull it up

17  afterward.

18         MR. LASOTA:  Right.

19         THE COURT:  I can't read it right now.

20         But A.R.S. 1-303 seems not a particularly difficult       10:11:40

21  statute to understand.  When anything of a secular nature is

22  provided or agreed to be done upon a day, and the day falls on

23  a holiday, it may be performed on the next ensuing business day

24  with the effect as though performed on the appointed day.

25         I think -- if I'm just looking at that statute in         10:12:00

1    isolation, something that happens on Columbus Day can be done

2    the following day; correct?

3              MR. LASOTA:  Your Honor, that's not the way Arizona

4    courts have interpreted that very statute.  If you read it,

5    that might be your conclusion.  But it is a state statute.  The    10:12:14

6    Arizona Supreme Court has spoken on this definitively and has

7    held that it -- and if I could, if I could just read a passage

8    from *Fisher* that addresses that exact issue.

9              It says, citing 1-231 and 1-303, our Supreme Court

10   pointed out that, quote, normally when the last day to do an      10:12:41

11   act falls on a Sunday it may be performed on the next ensuing

12   business day.  That's *Board of Supervisors*.

13             But the Court noted the statutes permitting this apply

14   to a statute that prescribe, quote, the time in which an act is

15   required to be done, or when it is provided that anything is to    10:12:58

16   be done upon a day named within a time period.

17             As the Court pointed out, however, 16-1104(B)

18   contained the words, not less than 30 days prior to the

19   election.

20             Therefore, the Court said, if we allow an additional     10:13:13

21   day to deliver the ballots because the last day falls upon a

22   Sunday, the delivery will no longer be 30 days prior.

23             And essentially that's how the court got to that.  And

24   there's a distinction between a time period that follows a

25   particular date that's the triggering event, and the time         10:13:31

1    period that precedes a particular date as the triggering event.

2          So you're right, if you just read 1-303, maybe why we

3    overlooked it, it does -- it's a familiar statute in law, and

4    it does seem to say that.  And Judge Logan, that even came up

5    in that case.                                              10:13:50

6          But the facts in this case are simply different, and

7    16-134 does not apply to this case.  So we're back to the

8    holding in *Board of Supervisors* and *Fisher v. City of Apache*

9    *Junction.*

10         THE COURT:  So the -- in the tentative, footnote 4    10:14:03

11   cited a case from 2012 from the Arizona Supreme Court, *Dedolph*

12   *v. McDermott,* which also dealt with a voting-related deadline

13   and the application of 303.  I need to re-review that to

14   familiarize myself with the facts, but was that another one of

15   those deadlines where the ten-day period was after a date not  10:14:24

16   preceding?

17         MR. LASOTA:  Yes, Your Honor.  I believe that was

18   a -- I want to say that was a candidate petition challenge, but

19   has the same -- the same date following.  But, yeah, that

20   is -- I'm almost 95 percent sure.  I think Colleen could answer  10:14:37

21   that.

22         But I think -- I think Miss McDermott was a candidate,

23   and the Arizona statute at 16-351, it gives you ten business

24   days to file a nomination petition challenge.

25         THE COURT:  Okay.  Let me ask -- I know we focused so  10:14:55

1   far mostly on the state law issue.  But let's just accept for

2   the sake of argument that these ballots should have been deemed

3   timely under state law.

4        And so the question is, you know, with that predicate

5   in mind, is a constitutional claim asserted when the allegation    10:15:08

6   is the state election officials just disregarded ballots and

7   failed to count them even though they were valid?

8        As you can see from the tentative, you know, it's a

9   tough issue.  And so I guess, what's your best argument on why

10  this is different than *Classic*?                                  10:15:28

11       MR. LASOTA:  Well, Your Honor, I think the Court

12  pointed out *Classic* was a criminal case.  It involved outright

13  fraud.  I mean, here we have a state election official that --

14  you know, we actually had a federal court that was invited to

15  move the deadline for the -- that election, the federal court     10:15:44

16  declined.

17       THE COURT:  I'm not sure -- I think their

18  counterargument to that would be that it has some forces.  I'm

19  not sure Judge Logan's order is that good for you here.  I

20  mean, it said that they screwed up setting this deadline.  And     10:16:02

21  although Judge Logan declined to require them, through the

22  injunctive power of the federal court, to do anything with

23  respect to ballots, they certainly still could have on their

24  own counted them.

25       And I think their argument that came up last time is,         10:16:16

UNITED STATES DISTRICT COURT

**ER120**

1  this order serves as the clearly established law for qualified

2  immunity purposes.  They were on notice at the time it

3  came -- whether to count these things, whether they were valid

4  or not, and they just decided not to do it.

5       MR. LASOTA:  Well, Your Honor, I do think that          10:16:34

6  16- -- I do think the *Board of Supervisors* case is relevant.

7  But to that I would -- I would simply say that, you know,

8  *Classic* turned -- and it was a case, I think it was 1941.  I

9  mean, it talks sort of in terms of broad rights and things of

10 that nature.                                                 10:16:52

11      I think you're right on the money when you say, yeah,

12 if you pick out this little snippet, that little thing here or

13 there, you know, you can find something that supports your

14 argument.  But I mean, it's never really been followed up on.

15 I think if it stood for the proposition they say it stood for, 10:17:04

16 you'd probably see better development of case law along those

17 lines.  And I don't think we have that here.

18      You know, it's -- and then sort of they get into the

19 Oliver Wendell Holmes quote, and you're sort of getting back

20 into the difference between a violation of the right to vote   10:17:22

21 versus the deadline on when to register to vote.  And I think

22 that kind of gets us back where we were.

23      And I know we've treaded that area, which is why I

24 don't want to take the Court's time.  But I think *Classic*, I

25 think Your Honor is right that, you know, it's a criminal case 10:17:38

1  and it deals -- it talks about things like fraud.  I mean, it

2  lends itself to much better in this -- to that kind of a claim.

3  But it's not really applicable here, and it's never been

4  really taken in that direction.

5           THE COURT:  A question I have on that.  One                    10:17:57

6  idea -- I've said that *Classic* is a case that involved outright

7  ballot manipulation and fraud and that sort of stuff.

8  Shouldn't one outcome here then be, we don't dismiss it at the

9  dismissal stage, but we allow the plaintiffs to conduct some

10 discovery to figure out what was actually going through the              10:18:21

11 heads of the election officials?

12          Because sort of implicit in this is I'm finding that

13 there's just -- because there was this dispute over state law,

14 this was just not fraudulent in the same way that *Classic* was.

15 Maybe that -- that may be true, but should we have to reach              10:18:39

16 that conclusion at the pleading stage?

17          MR. LASOTA:  Your Honor, I think the answer is yes.

18 And I think it's because the facts in *Classic* are so markedly

19 different than the facts in this case.  I mean, even sort of

20 viewed in their -- most favorably for the other side, we don't         10:18:56

21 have anything even approaching what *Classic* is talking about.

22 And we have a pretty good idea of what was kind of going

23 through the minds of state election officials.

24          We've got -- you know, you sort of have a new system

25 where a lot of people register on-line, you've got counties            10:19:11

1  that are now open.  When I worked for the County we were closed

2  on Columbus Day and open the day after Thanksgiving.  So you've

3  kind of got a new set of circumstances that's a little bit

4  challenging to deal with from an elected official standpoint.

5       And the Logan case did talk about the delays and                10:19:30

6  changing things at the last minute, which also lends itself to

7  I think the argument that we have a much more sympathetic

8  circumstance here in terms of what the state official did.

9       I mean, the *Classic* case, I think was 1940s,

10  Louisiana.  It's just -- it's not anywhere in that same frame.      10:19:48

11  And I don't think they can even plead anything.  I know they

12  talked about how this is willful conduct.  But, I mean, let's

13  take it in perspective.  I mean, we've got a state statute,

14  we've got 1-303, we've got the *Board of Supervisors*' holding,

15  and we've got kind of a last minute ask -- I know they would      10:20:07

16  argue with that characterization, but asking to move a deadline

17  when we've got a lot of case law that talks about, you know,

18  that -- at least in the standpoint of the courts, you know,

19  when the courts are moving things around at the last minute, it

20  hurts public confidence in the election.                          10:20:25

21       And I think that's another thing in the Secretary's

22  favor here is, you know, you're moving things around at the

23  last minute, and it does not look good in the public's mind.

24  That's a very valid concern.  And it's here.

25       And I think that the good faith shown by the Secretary       10:20:41

1   here, under those circumstances I just don't think *Classic*

2   lends itself to a claim.  And I don't think there's anything

3   they can plead to get them there.

4           THE COURT:  Okay.  Thank you.

5           MR. LASOTA:  Thank you, Your Honor.                    10:20:55

6           MS. CONNOR:  Good morning, Your Honor.

7           THE COURT:  Good morning.

8           MS. CONNOR:  I'll be brief, but first I wanted to

9   address the *Dedolph v. McDermott* case.

10          And as Mr. LaSota said, it was a nomination petition   10:21:18

11  challenge back in 2012.  The primary election was during the

12  first week of September.  That's significant because it alters

13  the nomination petition challenge period when it starts.

14          So it would have been in June, the nomination petition

15  challenges.  So presumably the holiday day was the 4th of July  10:21:40

16  that was referred to, but I haven't read the case in a while.

17          But in this case the holiday we're dealing with is

18  Columbus Day.  And as I put in the supplemental brief, Maricopa

19  County does not recognize Columbus Day as a holiday.

20          THE COURT:  So I don't understand why that matters at   10:22:03

21  all here.  Because it seems to me their argument is, we have a

22  state statute that says as a matter of state law anything that

23  happens on a holiday needs to be treated as it's done the next

24  date.  It's sort of unclear to me how county law could trump

25  state law.                                                      10:22:17

1    MS. CONNOR:  Well, actually, Your Honor, it's not just

2   county law, it's 11-413.  And that statute states,

3   notwithstanding A.R.S. 1-301, the statute that designates

4   Columbus Day as a holiday.  So thereby the newer statute has

5   eliminated -- has given the County the authority to not even          10:22:41

6   recognize it as a holiday under state law.

7        THE COURT:  Okay.

8        MS. CONNOR:  And to the point of election

9   administration, and Judge Logan's opinion just briefly talks

10  about the imminent election and the significance of the 29th         10:22:55

11  day.  There's not much in there, it's just paragraph 18, but

12  each day an election -- leading up to an election is so

13  significant.  For example, early voting starts the 27th day

14  before the election.  And multiple deadlines are there to

15  follow.                                                               10:23:17

16        So I just wanted to touch on that point as well.

17        THE COURT:  Okay.  Thank you.

18        MS. CONNOR:  Thank you.

19        MR. SCHARFF:  Good morning, Your Honor.

20        THE COURT:  Good morning.                                       10:23:42

21        It seems like most of the argument is focused on

22  Count 3, the constitutional claim, and so nobody's talked about

23  the HAVA claim yet in Count 1.  And you didn't address that in

24  the supplemental brief.  Do you want to say anything further on

25  that, or should we just focus on the constitutional claim?           10:23:56

1    MR. SCHARFF:  I prefer to spend the majority of our

2 time on the constitutional claim.  We're not necessarily

3 conceding those arguments.

4    THE COURT:  Understood.

5    MR. SCHARFF:  Given there was a supplement, we wanted          10:24:07

6 to focus the Court on what we thought were perhaps our

7 most -- our arguments most likely to persuade the Court to let

8 this case proceed.

9    THE COURT:  Okay.

10    MR. SCHARFF:  But just quickly on the HAVA claim, I          10:24:18

11 would just say that we would disagree that the voter

12 registration deadline wouldn't constitute an administrative

13 requirement under HAVA.  And given that we consider -- we think

14 under the statute's administrative requirement it would be

15 incorporated within HAVA.  But I don't think we need to have          10:24:34

16 much more of a discussion, unless Your Honor would like to.

17    THE COURT:  No.  Thank you.

18    All right.  Let's go to the constitutional claim.

19    MR. SCHARFF:  Yes, Your Honor.

20    I think given that it is what the County presented in          10:24:44

21 their supplemental brief, I'd like to first touch upon what

22 is -- seems to be a relatively new argument, because obviously

23 A.R.S. 11-413 wasn't discussed in any of the prior pleadings.

24    But I can provide Your Honor with I think five fairly

25 persuasive reasons why the Court should not accept the County's          10:25:07

1  view of that statute.

2        THE COURT:  Okay.

3        MR. SCHARFF:  The first is that the statute A.R.S.

4  11-413 is quite narrow.  And the narrowing is done by the

5  legislature in the text.  Because the scope is expressly        10:25:25

6  circumscribed by the legislature where it says, quote, for the

7  purposes of opening county offices for the transaction of

8  business.

9        This statute makes clear that what this is about is

10 really about the opening of offices and giving employees a day   10:25:39

11 off.  So rather than having Columbus Day off, they're going to

12 have Black Friday off.  And I think that's abundantly clear

13 from the language, especially when you compare it to the -- how

14 broad A.R.S. 1-303 is, where it says specifically, when

15 anything of a secular nature is due.                             10:25:59

16       So versus a statute where it says we're only opening

17 it for purposes of opening this office, narrow.  Where you have

18 1-303 saying anything of a secular nature.

19       The second point to Your Honor's point to the point

20 that was referenced in the footnote of the tentative ruling is   10:26:15

21 that Columbus Day is a state holiday.  Whether or not Maricopa

22 County chooses to give their employees the day off or not, it

23 doesn't change the fact that Columbus Day is still a state

24 holiday under state law.  And more importantly here, the

25 deadline at issue is a state voter registration deadline.        10:26:35

1    The third point, Your Honor, is it is inconsistent

2    with the County's own prior application.  And you don't need to

3    look to facts outside of the pleadings to know that, because as

4    we pled at paragraph 14 of the Complaint, Columbus Day -- the

5    voter registration deadline fell on Columbus Day in 2012.  And    10:27:01

6    if Your Honor looks to the exhibit that was attached to the

7    supplemental brief from the County, you'll see that they passed

8    this ordinance in 2011.

9    So here we know that they passed the ordinance in

10   2011, before the election in 2012.  And yet they still            10:27:17

11   considered voter registrations received the day after Columbus

12   Day timely.

13   The fourth I would say I think pretty significantly

14   is, it's inconsistent with the position that was previously

15   taken by the County in this litigation.  As Your Honor will       10:27:36

16   recall, the first motion to dismiss the County strenuously

17   argued, this case is moot, when they thought it was about

18   injunctive relief, because this will never happen again.

19   Because following the 2016 election, the state legislature

20   amended 16-120 and added a subsection that said, when a voter     10:27:55

21   registration deadline falls on a holiday, it's going to be the

22   next business day.

23   And so one thing -- I'd like to have like a surreply,

24   if I will, because I'm very curious to know what the County's

25   position is.  Because in 2022 the voter registration is again     10:28:11

1  going to fall on Columbus Day.  So are they telling us that the

2  County is not going to accept applications -- or registrations

3  that are filed the day after Columbus Day in 2022?  Because it

4  seemed like they were making the strong implication to this

5  Court before that it -- this instance would never happen again.  10:28:34

6        The last point, Your Honor, is if the Court accepts

7  this interpretation, the Court would be accepting an

8  interpretation of state law that is going to create another

9  constitutional problem, an equal protection problem.  Because

10  the Court will then be saying, okay, in some counties voters  10:28:55

11  have 29 days -- a certain number of days, and in some counties

12  you have one less day.

13        So if the Court does decide to accept it, I think we

14  would have a very clear equal protection violation under the

15  Supreme Court's case law in *Bush v. Gore* which made it clear  10:29:10

16  that, you know, once a state grants voters the right to vote,

17  or once they have the right to vote, you can't have different

18  standards, different opportunities in different parts of the

19  state.  And that's clearly what happened here.

20        THE COURT:  In the 2016 election, did Mohave County  10:29:26

21  allow things that -- registrations on October 11th to be

22  counted?

23        MR. SCHARFF:  That's not in the pleadings, Your Honor.

24  But it is our understanding that Mohave County did not accept

25  the legislature's opportunity to give their employees the day  10:29:42

1   off, so they recognized Columbus Day.  And so they did accept

2   voter registrations after the deadline.

3          THE COURT:  So that was an equal protection violation

4   when they did that?

5          MR. SCHARFF:  Your Honor, we would think ––                10:29:58

6          THE COURT:  Or everybody else committed an equal

7   protection violation by not doing that?

8          MR. SCHARFF:  Our view is that the registrations were

9   valid, they were timely.  There was no equal protection problem

10  necessarily, only because they violated the state and federal   10:30:12

11  law.

12         THE COURT:  Okay.

13         MR. SCHARFF:  But you certainly could see that there

14  could be an equal protection violation existing.  But we think

15  it's with greater force should it be –– it shouldn't be adopted 10:30:24

16  that the counties have an opportunity to give in certain

17  counties more days to register than others.

18         THE COURT:  Okay.

19         MR. SCHARFF:  And as Your Honor likely notes, that's

20  also one of the reasons –– he didn't cite to *Bush v. Gore*, but 10:30:38

21  Judge Logan in his opinion in dismissing this previous argument

22  dismissed it because it would ultimately create a nonuniform

23  registration deadline, which really doesn't make much sense

24  given what's at stake here.

25         THE COURT:  Okay.                                         10:30:56

**ER130**

1      MR. SCHARFF:  To address a few points raised by

2  Defendant Reagan, the one thing that I think hasn't been

3  flushed out necessarily is the similarities to the pleading of

4  the facts here and the facts in *Classic*.  One of the

5  allegations in *Classic* was falsely certifying the votes.          10:31:22

6      As Your Honor knows if you look at paragraphs 38

7  through 41 of the Complaint, we detail that both the County

8  defendants and Defendant Reagan falsely certified the selection

9  knowing that these ballots were not counted, and that they

10  should have been.                                                    10:31:46

11      And so --

12      THE COURT:  Hold on, I don't know if I have a copy of

13  the First Amended Complaint up here.  I want to pull it up.

14      MR. SCHARFF:  It's on page 8, Your Honor, document 60.

15      I have a paper copy, Your Honor, if you would like it.  10:32:23

16      THE COURT:  That would be great.  No, no, actually I

17  got it.  You can pass it up still.

18      All right.  So I just reviewed the paragraphs that

19  you're talking about.  The problem -- you definitely use the

20  words that they knowingly did it.  But under *Iqbal Twombly* I'm  10:33:14

21  not required to accept a fact free conclusion that somebody did

22  something knowing that it was in violation of state and federal

23  law.

24      So what are the facts that are alleged in the

25  Complaint that would support these conclusions?                     10:33:29

1     MR. SCHARFF:  Sure.  I think -- and Your Honor spoke

2  to this before, the linchpin here -- I mean, I think there's

3  other facts, but one of the most salient facts is they have a

4  order from a federal judge before the election telling them

5  that both under state and federal law these registrations were    10:33:48

6  timely.

7     And so that is, I think, an important fact that is

8  sufficiently pled and true to provide information to the Court

9  that they knew when they -- for example, when you look at 38

10  through 41, that when they were certifying these elections,    10:34:08

11  they knew that not all the ballots had been counted, not all

12  the votes had been counted, just as they did in *Classic*.  They

13  knew that not all the votes had been properly tabulated.

14     THE COURT:  You know, one -- one of the things that

15  I'm still working through with respect to Judge Logan's order,    10:34:27

16  you know, it's a little vague on exactly what he held in terms

17  of state law.  Because on page 29 he says, the Court need not

18  determine whether the Secretary was required to extend the

19  deadline pursuant to 1-303, because -- he then goes on to say,

20  because I've separately found that this violated the NVRA.  And    10:34:46

21  so, therefore, the NVRA violation shows that they should have

22  done it this way.

23     So I'm not sure this gets you quite as far as you

24  think it gets you on terms of like the knowledge that 303

25  required this construction.    10:35:00

**ER132**

1    MR. SCHARFF:  I would just say, Your Honor, at this

2  stage I think we're entitled to reasonable inferences.  And

3  while perhaps we didn't incorporate the order into the

4  Complaint, but I think there's a reasonable inference that you

5  could read Judge Logan's order and take away the                    10:35:16

6  understanding -- maybe not if you're looking at it from the

7  position of a law clerk trying to cite, did Judge Logan reach

8  this result, but from a party -- Defendant Reagan was a party

9  to that action, and the County defendants testified.  If they

10  would have read it, I think they could come away from reading      10:35:37

11  that reasonably and say, you know, both under state and federal

12  law these were valid registrations.  And I think we're entitled

13  to that inference, and we're entitled to discovery on that

14  question under *Iqbal*.

15       I think the Court has plenty of sufficient -- I mean,        10:35:56

16  to some extent a lot of the back and forth in these motions has

17  been as a result of the detail in this Complaint.  If we had

18  just alleged Defendant Isabel (sic) was a qualified voter,

19  period, I think that would have been enough to say, okay, we

20  get to the next step, they can challenge his qualifications,      10:36:16

21  maybe that he wasn't timely or not.

22       THE COURT:  I think that that raises the broader

23  picture.  It's definitely -- these issues are important what

24  state law means, what they do under state law.  But

25  fundamentally I think my tentative gets -- the conclusion in      10:36:30

**ER133**

1   there is that -- I'm just struggling to see a case that holds

2   you can sue a state election official under 1983 where they

3   don't count a ballot because they had a disagreement over

4   whether it was valid under state law.

5        And I know that *Classic* has language that sort of can        10:36:48

6   be construed to get at that.  In your response to the tentative

7   you cited some even earlier cases that have really broad

8   language about the right to vote.  Nobody's doubting the

9   primacy and deep importance of the right to vote.  But what I'm

10  trying to figure out is, what's the case that says you get to        10:37:05

11  sue state election officials for money damages under these

12  circumstances?

13       MR. SCHARFF:  Respectfully, Your Honor, I think we

14  don't -- I think there are cases, and I will address them.  But

15  I think really what it's down to is the statute, it's Section        10:37:17

16  1983, that's what says we can, or that the plaintiff in the

17  class can.

18       Section 1983 says two things, you got to prove two

19  things.  There's a constitutional right.  And as Your Honor

20  said, there's no question you have a constitutional right to        10:37:37

21  vote.  The second question is, did defendants deprive them of

22  that right to vote?

23       THE COURT:  The case law is there's -- the cases

24  suggest that any time you articulate that something touches

25  upon the right to vote, that doesn't automatically mean that if        10:37:53

1 you're right that you get into 1983 land, and if you show that

2 there were any infringement on it you automatically win and get

3 money damages.

4     MR. SCHARFF:  How could you have any more of an

5 infringement and disenfranchisement than actually casting a          10:38:04

6 ballot that was not counted?  For me that is like the textbook

7 example of the violation of the right to vote.

8     THE COURT:  I guess, if you're right, one would think

9 that in the last 80 years there would be a case where a state

10 election official screwed up and they got sued for money          10:38:24

11 damages, and the court said, yep, that infringed the right to

12 vote, you win.  And the absence of any those cases is just

13 what's giving me pause here.

14     MR. SCHARFF:  Two points, Your Honor.  The first is, I

15 would hope that this is a very infrequent happenstance.  And          10:38:36

16 that -- my hope is that maybe -- there hasn't been lots of

17 these cases because hopefully all the ballots are counted.  And

18 that's our hope that --

19     THE COURT:  I share your hope as a citizen that that's

20 how elections work.  But I also know as a realist that          10:38:53

21 elections are among the most heavily litigated contentious

22 things, and there's a bazillion elections that happen in state

23 and local places.  You know, each election cycle, now we're

24 talking about decades and decades, and so certainly this isn't

25 the first time something like this has come up.          10:39:11

1      MR. SCHARFF:  Well, frankly, Your Honor, I think -- I

2  mean, not to pat myself on the back, but I think there's

3  something to be said that a lot of plaintiffs' allegations for

4  damages is about money; right?  And that's what this case is

5  about, it's -- it comes to compensation.  And so it's possible          10:39:29

6  that not a lot of folks thought it was worth bringing this

7  action, this type of action.  That doesn't mean that this

8  action isn't viable, isn't lawful, isn't well established.  It

9  just means that there might not have been an incentive.

10  There's clearly, as Your Honor knows, lots of incentives,          10:39:48

11  perhaps political incentives, behind equitable pre-election or

12  post-election equitable relief.  There's a lot of money for

13  lawyers to litigate that.  And I think that might be more of an

14  explanation as to why there maybe haven't been thousands of

15  these types of cases before.          10:40:09

16      The second point is I think, Your Honor, if you

17  just -- if you're looking for a case, I think we cite a case in

18  *Wayne*, the Eighth Circuit case, where, as the Court can see,

19  that some of the allegations were there that they -- that

20  Arkansas law said you have to have the polls open from          10:40:29

21  8:00 a.m. to 6:30 p.m., and there they didn't open until like

22  9:30, they closed for lunch.  And they didn't have polls open

23  long enough to let everyone vote.  And that was part of the

24  allegations that these individuals were disenfranchised.  And

25  the court found that, yes, that's exactly what happened and          10:40:48

1  that they were entitled to damages.  And that was a 1983

2  action.

3        And as I think your court -- as the Court saw -- in

4  the initial stages of 1983, this is what was being litigated.

5  Maybe there's been a pause in these litigations, but after the    10:41:04

6  reconstruction era, 1983 was thought about as a means to

7  vindicate people's right to vote.

8        THE COURT:  Doesn't Judge Logan's order have a

9  different section where he specifically says, these voters were

10  not disenfranchised by setting this too late?  And so how does    10:41:21

11  that impact your allegations of willfulness?

12        MR. SCHARFF:  Well, I disagree with the Judge Logan's

13  view on that issue.

14        But as to willfulness, I think as alleged, they

15  read -- we feel that they went back and read this opinion, and   10:41:42

16  they knew these votes were counted -- these votes were valid,

17  and yet they still didn't count them.  And they knew that they

18  had counted these exact same type of ballots in 2012.  And

19  nothing prevented them from doing it.  At least they could, I

20  guess, after the pleading stage argue that -- some sort of       10:42:02

21  defense.  They're entitled to their defense.

22        But frankly, to hear the Secretary's defense here

23  being, we can't move a deadline because public confidence in

24  elections would be hurt, I think the greatest thing you could

25  do to injure the public's confidence in election is to know      10:42:21

**ER137**

1  that you have U.S. citizens --

2  And here alleged Mr. Isabel moved to Arizona to become

3  a City of Phoenix police officer, so someone here to serve his

4  community, to be a law enforcement agent, and registered quite

5  promptly upon arriving to Arizona, and didn't just register          10:42:39

6  promptly, registered appropriately, showed his proof of

7  citizenship in order to have a full ballot, and then showed up

8  on election day to vote.  Did everything that a U.S. citizen

9  needs to do to have their vote counted.  And they knew that

10  that was a valid ballot and they still didn't count it.            10:42:55

11  THE COURT:  So a question -- I'm just still trying to

12  work through the ramifications if I accepted your theory.

13  So I think we probably all remember the videos in 2000

14  in *Bush v. Gore* of all the people in Florida holding up the

15  ballots and looking at the chads, and all the state and local      10:43:12

16  officials were looking at those.  Under your theory, could each

17  one of those state election officials who's looking at the

18  chads, if they decided that a particular ballot shouldn't be

19  counted because the chad was half attached and in fact they

20  should have counted it under state law, could they be sued for     10:43:29

21  damages under your theory?  Because they infringed the right to

22  vote by not following the state law and therefore didn't count

23  a valid ballot?

24  MR. SCHARFF:  My apologies, but which state law would

25  they be following?                                                 10:43:44

**ER138**

1          THE COURT:  Florida --

2          MR. SCHARFF:  May I have some water?

3          THE COURT:  Florida law.  The argument is, in fact,

4    Florida law had standards for just how far the chad needed to

5    be detached, and this particular election made the wrong call          10:43:56

6    and it wasn't attached enough to disregard it.  And that state

7    election official's conduct, therefore, acting under color of

8    state law, infringed the common law right to vote.  Could they

9    sue for damages?

10          MR. SCHARFF:  If the defendant knew that that ballot          10:44:12

11   was valid, yet still disregarded it, 100 percent, 100 percent.

12   Because there you have an example of someone looking at a

13   ballot, knowing it's valid, and not counting it.

14          Now if they have a good faith explanation or reason

15   for doing that, they certainly would have a defense to doing          10:44:37

16   so.

17          THE COURT:  And so in that case it would pass the

18   pleading stage, and then we would have discovery into what all

19   of the chad counters knew and what they understood?

20          MR. SCHARFF:  In that case I think -- I don't know if          10:44:50

21   the chad counters are the ones who were actually certifying the

22   election and making the final decision not to count that

23   ballot.

24          Here there's two separate claims, as Your Honor knows,

25   there's the *Monell* claim.  There was a policy not to count          10:45:10

1  these ballots.

2       So if a county in Florida had a policy that said, do

3  not count these valid ballots, 100 percent that is a valid 1983

4  claim for violating their right to vote.  If a -- if the

5  elections official knew that it was a valid ballot, then yes.  10:45:34

6       But I think -- I think the tension -- and I appreciate

7  what you're concerned about from a policy perspective.  But

8  those -- that policy perspective is one that the legislature

9  has made.  And --

10      THE COURT:  To me like that's actually one -- that's  10:45:55

11 another thing I'm struggling with in the case.  Because when I

12 read it, the policy choices I see are the policy choices by

13 Congress in both the HAVA and the NVRA.  And I know you

14 disagree with my analysis.  But I view that as two different

15 times Congress has legislated in this area and decided not to  10:46:12

16 allow a federal cause of action for damages based on these

17 types of issues in this case.

18      And what you're asking me to do is, even though I

19 don't think those statutes do it, find in the federal common

20 law a decision to allow these types of cases to go forward.  10:46:30

21      MR. SCHARFF:  Your Honor, it's not the common law,

22 it's 1983.  And that's the legislature, and the congressional

23 choice I think was made.  1983, and the purposes behind 1983, I

24 think principally were to ensure the franchise was respected.

25      And as we noted in our briefs, at the time when it was  10:46:51

ER140

1    passed, there was a great deal of distrust among state

2    officials.  And that's why they passed it, to hold state

3    officials accountable.  And that's exactly what we're doing in

4    this case, consistent with congressional purpose.

5         And as 1983 cases, whether you're talking about the          10:47:08

6    right to vote or the right to free speech, that doesn't

7    necessarily make them easy cases.  As Your Honor knows there's

8    a lot of litigation about excessive force cases.  Those can be

9    difficult calls.  And it can be straining on the court to have

10   to make those different calls.  But it doesn't mean that those    10:47:26

11   who have a valid claim under 1983 for a violation of their

12   Fourth Amendment rights don't get to come to court and ask for

13   damages, because that's exactly what 1983 was designed to

14   facilitate.

15        I also think that the -- I guess my question I would         10:47:45

16   pose to myself would be, well, if this case -- if you don't

17   have a right to sue on this case, were the courts wrong in

18   *Wayne*, were they wrong in *Nixon?*  They clearly were

19   disenfranchisements where they sued for damages, and the

20   Supreme Court clearly recognizes that those were -- at least in   10:48:10

21   *Nixon* it's been recognized for 200 years that you have that

22   right.

23        Nothing has been shown by the plaintiffs that anything

24   has changed since then as relates to --

25        THE COURT:  I'm struggling with this case.  I think          10:48:23

1  it's a very interesting case and a very difficult case, because

2  for the reasons I've articulated in the tentative and in the

3  prior orders, your arguments are compelling in many ways, but

4  I'm struggling with the fact that there's just no prior cases

5  seeming to buy those arguments.  And so it may be that that's          10:48:41

6  just because nobody's -- it's never occurred to anybody to make

7  those arguments before, or the absence of precedent may be a

8  sign that there's something flawed to those arguments.  And

9  that's what I'm struggling with.

10       MR. SCHARFF:  I understand.  I would just say that I           10:48:56

11  don't know if there's an absence of precedent.  I think we do

12  have considerable precedent.  It may be old, but I think it's

13  just as valid.  I haven't seen any arguments from the other

14  side saying this case has been overturned or abrogated by

15  legislature or by the courts.  They haven't.  They sued for          10:49:13

16  damages.

17       And I think to some extent it's the question of, like,

18  well, putting a value on a vote, putting a value on your right

19  to speech is -- I agree, it's -- it doesn't always feel good to

20  do that.  But there's a purpose.  There's a legislative purpose     10:49:29

21  behind it, which is, if a state official thinks that there's a

22  risk that they could get sued for not -- for knowingly not

23  counting someone's ballot, that incentivized them to follow the

24  law.

25       And I think this is a quintessential case where that           10:49:50

1    is an important factor.  Because it is clear in my mind that

2    the County and the Secretary thought, you know, we can make

3    this decision, and maybe we'll suffer political consequences,

4    but ultimately we can get away with it.  And that's exactly

5    what 1983 is designed for, which is to say, you know,                    10:50:13

6    there's -- seek equitable relief.

7           And again, I think we put this in our pleadings and I

8    want to make sure to emphasize it, the preference by far for

9    both my client and counsel is to have the vote counted and not

10   seek damages, and to have equitable relief for sure.  In the            10:50:29

11   absence of that availability, because as the County pointed

12   out, it's -- the only option is to hold them accountable

13   through a suit for damages.

14          And that's why we have these cases.  And, yes, like

15   when -- it's troubling for sure, if you have a case where               10:50:51

16   someone loses their life, and there's a lot of time and effort

17   spent on 1983 cases involving loss of life, and they're tragic

18   and terrible, and ultimately it comes down to a lawsuit about

19   damages and putting a value on someone's life, which is hard

20   and difficult.  At the same time that is what the legislature          10:51:14

21   contemplated when passing these statutes in order to

22   incentivize our state officials to follow the constitutional

23   principles.

24          And as Your Honor knows and I think agrees, and I'm

25   confident my opposing counsel agrees, we're talking about a            10:51:31

1    fundamental right here.

2            And interestingly I think it's worth pointing out, the

3    initial reason why we referenced *Classic* to begin with –– I

4    think the more I've read *Classic* the more I think it actually

5    helps us and helps the Court –– guides the Court's struggle          10:51:47

6    looking at state law claims and how the state law colors the

7    right to vote, because ultimately qualifications are a matter

8    of state law.  But the reason we cited to it in the first place

9    was just for the notion of, in order to sue under 1983 you have

10   to establish a right, a right that's granted by the                  10:52:07

11   Constitution.

12           So we felt that *Classic* provided repeatedly –– as you

13   may see, they repeat the one line over and over again, that

14   Article I, Section 2 provides the right to vote and the right

15   to have your ballot counted.  But that was what gave us our          10:52:20

16   first prong of our 1983 analysis, this is a right secured by

17   the Constitution expressly.

18           And, of course, we believe that our pleading

19   established that the defendants' conduct bridged that right

20   here.                                                                10:52:39

21           THE COURT:  Okay.

22           MR. SCHARFF:  And what I also would end with by saying

23   is, I speak on behalf my co-counsel and client, we sincerely

24   appreciate the Court's time and attention.  We understand ––

25   sometime it may have been frustrating for us, but nonetheless        10:52:52

**ER144**

1   we understand that the Court has taken very careful

2   consideration of this case and the law.  And I think there's no

3   other case that for me that is worthy of it, because this is a

4   critical right, one worthy of the Court's attention.

5          So thank you.                                      10:53:10

6          THE COURT:  Thank you.

7          Mr. LaSota?

8          MR. LASOTA:  Thank you, Your Honor.

9          Your Honor, I would also echo that in terms of the

10  attention the Court has spent on this case.  I spend a lot of   10:53:26

11  time in State Court, and we don't always get that kind of

12  level.  So I would echo those comments.

13         I did want to mention, 16-120, the legislature has,

14  quote, fixed this.  16-120, subsection B references legal

15  holiday.  Columbus Day is a legal holiday.  This is an issue    10:53:47

16  that is never going to see the courthouse again.  If it does,

17  I'd like to be on the plaintiff's side, frankly, because I

18  think they would have a very compelling case.  But as it is,

19  that has been fixed.

20         Sort of this -- Mr. Scharff kind of pooh-poohed sort    10:54:04

21  of the elections officials, all they have to do is just count

22  the votes.  Well, they have to follow the law, and they have to

23  do it in the context of an election that is happening in real

24  time.  It's not a sort of a law school exercise.  And I think

25  that not enough credit is given to the -- that it is a          10:54:28

1  difficult task.  And I know he's trying to get -- trying to fit

2  a round peg into a square hole, and it just doesn't fit.  And

3  that's why we get this sort of pooh-poohing, if they just count

4  the votes.

5      Well, they have to follow the law.  If they don't      10:54:46

6  follow the law, somebody else will sue them.  Your Honor

7  referenced how litigious elections are.  So it is a difficult

8  task.  The facts here, even with every benefit of the doubt

9  given to the plaintiff, don't come anywhere near *Classic*.

10      There are other remedies we haven't even talked about,  10:55:04

11  there are election contest statutes, things like that.  Now

12  those are narrow remedies.  But this notion that we have to

13  allow for monetary damages to -- that we absolutely have to

14  have this I think is just simply not borne out at all.  I mean,

15  counsel himself conceded what a sort of unique situation this  10:55:23

16  was.

17      And I know we're not really talking about the --

18  strictly the law that's on the books, but he did mention that

19  as a policy reason that, well, this is the only way to enforce

20  this.  And I think the dearth of case law kind of tells you  10:55:38

21  that, no, this is not something that we need and not something

22  that's desirable.

23      The hanging chad thing is a great example.  I mean,

24  now federal courts are going to be -- these cases get very

25  nasty, they're very litigious, state courts handle them.  And  10:55:55

1    sort of opening the door for federal courts to get involved any

2    time there's any kind of dispute I think is not a great idea

3    and not supported by the law.

4        So with that --

5        THE COURT:  I don't know if you reviewed the *Wayne*          10:56:08

6    case that they cited in their supplemental brief.  What's your

7    response to that and why that's distinguishable?

8        MR. LASOTA:  Well, Your Honor, I think in this

9    instance -- for example, Judge Logan under different facts

10   found that there was no disenfranchisement.  And I think that   10:56:23

11   is the case.  I think the variety of options are available to

12   people that register.

13       I believe *Wayne* involved someone who showed up to vote

14   and the polling place wasn't open.  But I may be confusing it.

15       But I just don't think that the facts in that case are     10:56:40

16   at all on point.  I think under, frankly, better facts for the

17   plaintiff in that case, in the case decided by Judge Logan, he

18   still didn't find voter disenfranchisement.  We don't even

19   know -- and I don't think it's determinative, but from the

20   Complaint we don't even know if there was an attempt made to    10:57:00

21   register to vote on Columbus Day.

22       So I just don't think -- you know, sort of going all

23   the way back to very old case law that never really produced a

24   sort of a prodigy, I just don't think that's availing.

25       THE COURT:  Okay.  Thank you.                               10:57:19

**ER147**

1    MR. LASOTA:  Thank you.

2    MS. CONNOR:  I have nothing further.

3    THE COURT:  I actually did have a question for you.

4  And I want you to address the point that Mr. Scharff made, that

5  11-413 ought not to be read as something that carte blanche          10:57:33

6  allows Maricopa County to declare Columbus Day not a holiday,

7  instead it's a very narrow statute that it just says you can

8  treat it not as a holiday only for purposes of opening offices.

9    MS. CONNOR:  Well, I wasn't really following his

10  argument, I have to admit.  But I don't understand the             10:57:58

11  distinction, because the reason that 11-413 was so important is

12  because it was open for business.  Someone could have walked

13  into any County office and registered Mr. Isabel to vote.  And

14  they were processing --

15    THE COURT:  I guess the way I see the argument is          10:58:26

16  this:  303 says, anything that's a holiday means, if you do it

17  on that date, it has to be counted the next date.  A different

18  section of 303 says Columbus Day is a holiday.

19    So the only way you can get out of that kind of

20  analytical framework is by saying, in Maricopa County             10:58:40

21  Columbus Day just is not a holiday.  And that's what I read you

22  as citing 11-413 as providing.  But when you look at the text

23  of 413 it says, notwithstanding Section 1-301, for the purposes

24  of opening county offices for the transaction of business,

25  comma, and then it says, you cannot count Columbus Day as a       10:59:01

1  holiday.

2          So to me that statute doesn't mean that Columbus Day

3  isn't a holiday for all purposes in Maricopa County, it just

4  says it's not a holiday for one very specific purpose and

5  that's opening County offices.                                  10:59:14

6          MS. CONNOR:  Well, I think -- I guess I just disagree

7  with that analysis, only because opening the office or closing

8  the office is essentially because Columbus Day is not being

9  recognized as a holiday.

10          THE COURT:  Okay.  I think you understand your          10:59:38

11  argument.

12          MS. CONNOR:  Okay.  Thank you.

13          MR. SCHARFF:  Your Honor.

14          THE COURT:  Yes.

15          MR. SCHARFF:  If you would indulge me, I'm still very    10:59:43

16  curious to know what the County's position is as it relates to

17  future Columbus Days.  I think, given the argument they're

18  making here, I think it's worth at least asking the County what

19  they plan to do in a future -- in 2022 when we know that the

20  day will be -- fall on Columbus Day.                           10:59:59

21          MS. CONNOR:  Well, Your Honor, I think the statute has

22  been amended to address that issue, as Mr. LaSota pointed out.

23          THE COURT:  So what's the answer?

24          MS. CONNOR:  I beg your pardon?

25          THE COURT:  Specifically I think the question is        11:00:12

**ER149**

1    what's going to happen if a registration comes in on October

2    11th on the next election and how is it going to be treated?

3           MS. CONNOR:  Well, now that the statute has been

4    amended it would be the next business day.  Because --

5           THE COURT:  So it would be counted?                      11:00:30

6           MS. CONNOR:  The way the statute is written now,

7    correct.  So this will not come up in the future.

8           As a policy matter too, it depends on who the

9    Secretary of State is and who the County Recorders are to make

10   those decisions.  I can't say as a matter of law.            11:00:43

11          THE COURT:  I understand.

12          Mr. Scharff, does that address your question?

13          MR. SCHARFF:  It does.

14          It's just worth pointing out that the amendment to

15   that statute was -- the quote of the language is, if the       11:00:52

16   deadline falls on, quote, a legal holiday.

17          So I guess the County considers Columbus Day now still

18   a legal holiday.

19          THE COURT:  I understand.

20          MR. SCHARFF:  Thank you, Your Honor.                     11:01:04

21          THE COURT:  Anything else from the parties?

22          MR. LASOTA:  No, Your Honor.

23          THE COURT:  All right.  Given that, I've got a lot to

24   think about.  I will take this under advisement.  I hope to

25   issue a final order soon, but truly I'm still thinking about   11:01:13

1    the issues and so I don't know how soon it will be.

2              Thank you.

3              MR. SCHARFF:  Thank you, Your Honor.

4         (Proceedings concluded at 11:01 a.m.)

5

6                             -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    C E R T I F I C A T E

5

6            I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9            I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14           DATED at Phoenix, Arizona, this 4th day of December,

15   2019.

16

17

18
                         s/Candy L. Potter_____
19                       Candy L. Potter, RMR, CRR

20

21

22

23

24

25